Marvin L. **FISHMAN** and Illinois Basketball, Inc., Plaintiffs-Appellees,

v.

**ESTATE OF Arthur M. WIRTZ, et al.,** Defendants-Appellants.

and

**ILLINOIS BASKETBALL, INC.,** Plaintiff-Appellant,

v.

**ESTATE OF Arthur M. WIRTZ, et al.,** Defendants-Appellees.

Nos. 85–1453, 85–1545.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1986.

Decided Nov. 21, 1986.*

As Amended March 3, 1987.

---

*A Petition for Rehearing with Suggestion for Rehearing *In Banc* was filed by appellants but was dismissed after the parties advised this court that they had reached a settlement.

Easterbrook, Circuit Judge, dissented
in part and filed opinion.

Donald R. Harris, Jenner & Block, Chicago, Ill., for defendants-appellants.

Bruce S. Sperling, Paul E. Slater, Sperling, Slater & Spitz, Chicago, Ill., for plaintiffs-appellees.

Before CUDAHY and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUDAHY, Circuit Judge.

This appeal concerns the 1972 purchase by defendant Chicago Professional Sports Corporation ("CPSC") of the Chicago Bulls professional basketball team. Plaintiffs Illinois Basketball, Inc. ("IBI") and Marvin Fishman, who had also sought to purchase the Bulls, brought suit alleging that the Bulls had been acquired through violations of the Sherman Act and Illinois common law. The district court found that IBI and CPSC had been competing to control a natural monopoly market in the presentation of live professional basketball in Chicago. In the court's view, the plaintiffs had "won" when they executed a contract with the Bulls' former owners. The sale was, however, contingent upon the approval of the National Basketball Association ("NBA"), and the court found that the defendants had set out to destroy the plaintiffs' victory through anticompetitive acts. It ruled that they had violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982), by refusing the plaintiffs a lease at the Chicago Stadium and by participating, with certain NBA members, in a group boycott of IBI, and it awarded plaintiff IBI treble damages for these violations. The court also ruled that the defendants had interfered with IBI's contract rights and prospective advantage in violation of Illinois law and entered an alternative judgment for actual and punitive damages.

We agree with the district court that the refusal to lease the Chicago Stadium violated sections 1 and 2 and constituted tortious interference with prospective advantage, and we affirm its judgment as to liability on these bases. We do not agree that the

judgment can be sustained on the NBA boycott claim or on the claim based on tortious interference with contract. We also believe that the district court erred in its award of damages and that the case must be remanded on that account.

## I. LIABILITY ISSUES

### A. Facts

The facts as found by the district court are set out at length in the district court opinion. *Fishman v. Wirtz*, 1981–2 Trade Cas. (CCH) ¶ 64,378 (N.D.Ill. Oct. 28, 1981) ("Liability Opinion"). We set forth only those that are necessary to understand the issues on appeal.

*1. Negotiations to Purchase the Bulls.* In 1971 the Chicago Professional Basketball Corporation ("Chicago Basketball") decided to sell the Chicago Bulls. Plaintiff Fishman formed an investors' group (which included defendants Albert Adelman, Lester Crown, Philip Klutznick and James Cook and non-defendants Edward Ginsberg and George Steinbrenner III) to investigate purchasing the Bulls. By January 1972 this group had reached an agreement in principle with Chicago Basketball to acquire the Bulls for $3.3 million. Several members of the Fishman group thought it unwise to buy the team without a lease commitment from a local arena, and Chicago Basketball president Elmer Rich arranged a meeting between the group and Arthur Wirtz, who with his son William, controlled defendant Chicago Stadium Corporation ("CSC"). The Bulls had been playing at the Chicago Stadium under a series of short-term leases.[1] The group asked Wirtz for a three-year lease at a lower rate than that which Chicago Basketball was paying. Wirtz refused and, in

---

1. In 1966, the NBA awarded an expansion franchise for Chicago to Chicago Basketball. After considering both the Chicago Stadium and the International Amphitheatre, at that time Chicago's two indoor sports arenas, Chicago Basketball selected the Amphitheatre as the Bulls' home arena for the 1966–67 season. In January 1967, McCormick Place, Chicago's convention and exposition facility, burned down. The Amphitheatre was selected as the replacement site for McCormick's scheduled events. To facilitate this switch, Arthur Wirtz, at Mayor Daley's request, took the Bulls as a tenant at the Chicago Stadium. In June 1967, Chicago Basketball and CSC executed a three-year lease agreement. When McCormick Place was not rebuilt by either the 1970–71 or 1971–72 seasons, additional one-year leases were executed.

light of this rejection, the group made Rich a lower offer for the Bulls, which was rejected.

Fishman then formed a new investors' group, later incorporated as IBI,[2] which resumed negotiations with Rich. By April 1972, he had competition: first, Peter Graham, a Vancouver investor and owner of an arena in San Diego, and, second, a group largely composed of the other members of the first Fishman group (with the addition of Arthur Wirtz). This group was later incorporated as defendant CPSC.[3] Between March and May 1972, Graham and IBI both offered to purchase the Bulls for $3.25 million; CPSC offered $3.3 million. Chicago Basketball rejected Graham's offer on May 4, 1972, and Graham dropped out of the competition. Negotiations continued with both IBI and CPSC. On June 2, 1972, IBI submitted to the Bulls' attorney a signed offer to buy the Bulls for $3.3 million; that same day the Bulls' Executive Committee recommended that IBI's offer be accepted because IBI was willing to pay all cash at closing. Rich wrote to Adelman, advising CPSC of this recommendation. On June 5, 1972, Adelman telephoned Rich and attempted to renew negotiations on CPSC's behalf. Adelman reminded Rich that Fishman's group had no place to play and still needed NBA approval. Rich responded to Adelman by letter dated June 7, stating that he did not see how an offer by CPSC could get preference over IBI's. He also advised Adelman, however, that if CPSC wanted to make a new offer it would have to submit a signed contract incorporating all terms required by Chicago Basketball.

On June 9, CPSC sent Chicago Basketball an executed stock purchase agreement and a cashier's check for $3.3 million. This time, CPSC also agreed to pay the entire purchase price in cash at the closing. On June 12, Ginsberg telephoned Rich and in-

creased the CPSC offer by $50,000 in order to top IBI's offer. Finally, on June 13, CPSC again modified the stock purchase agreement in hopes of winning Rich's approval.

Nevertheless, on June 14, 1972, Chicago Basketball formally accepted and executed IBI's contract. The contract provided that any sale was subject to approval by the NBA and obligated Chicago Basketball to use its best efforts to secure NBA approval. The district court found:

> IBI's contract and offer was [sic] perceived by the Bulls to be preferable to CPSC's offer for several reasons, among them was the fact that various ambiguities and problems in the CPSC offer would require additional negotiations, with what was viewed as, the somewhat difficult CPSC group, and it was unlikely, as a consequence, that the agreement would be ready for presentation at the June 15–16 NBA meeting.

Liability Opinion, 1981–2 Trade Cas. at 74,-748.

*2. The June NBA Meeting.* The NBA Constitution provides that all business and policy decisions of the NBA are to be made by its Board of Governors, which is comprised of one representative from each NBA franchise. Any transfer or sale of ten percent or more of any franchise must be approved by three-quarters of the Board of Governors. Thus, the contract between IBI and Chicago Basketball needed the affirmative vote of thirteen out of seventeen governors for the sale to become final. The NBA Board of Governors met in White Sulphur Springs, West Virginia on June 15–16, 1972. By that time, the NBA Commissioner and NBA Finance Committee had investigated and approved IBI's financial and moral fitness to be the owner of an NBA franchise, and the proposed sale was

---

2. IBI was incorporated on June 13, 1972. Its shareholders were to have included Marvin Fishman, Robert Block, A.E. Stanley III, Lloyd Levin, Thomas Nadler, Robert Paliofito, Harold Paliofito and Jonathan Kovler. *See infra* note 35.

3. CPSC was incorporated on May 18, 1972. Its original shareholders were defendants Lester Crown, Philip Klutznick, Arthur Wirtz, James Cook and Albert Adelman and non-defendants Edward Ginsberg, George Steinbrenner III, Arnold Meyer, Lamar Hunt and Jonathan Kovler.

on the agenda for presentation to the full Board at the June meeting.

Prior to the execution of the IBI–Chicago Basketball contract, several CPSC shareholders had sent telegrams to the NBA Commissioner and the Board of Governors advising them that CPSC's cash offer for the Bulls was larger than IBI's and that "[w]e have reached an agreement with Arthur Wirtz owner of the Chicago Stadium for a ten year lease which insures the availability of the best arena with the largest seating capacity in Chicago at which the Chicago Bowls [sic] can play." CPSC also sent its president, James Cook, and its attorney to White Sulphur Springs, although CPSC had no scheduled business before the NBA. On the evening of June 14, Cook discussed CPSC's position with several NBA members; he later admitted that "his purpose was to secure nonapproval of the transfer to IBI as this would be the only possible way his group could possibly acquire the Bulls." *Id.* at 74,749.

On June 15, Rich presented the proposed sale of the Bulls to the Board of Governors. Only ten of the seventeen governors voted to approve the transfer.[4] Two reasons for not approving the transfer to IBI were mentioned: (1) IBI did not have a lease and, specifically, did not have a lease at the Chicago Stadium, and (2) CPSC had made it known that it wanted to purchase the Bulls. After the vote, it was suggested that, since IBI's primary problem was the lack of a lease, the negative vote be rescinded to allow IBI to secure a lease commitment. The proposed transfer could then be presented at the next NBA meeting, to be held in New York City on July 11, 1972.

*3. IBI's Efforts to Acquire a Stadium Lease.* After being informed that a stadium lease was the prerequisite to NBA approval, Rich and Fishman decided to each approach Wirtz separately to discuss acquiring a lease at the Chicago Stadium.

From June 19 to June 29, 1972, Fishman attempted to arrange a meeting with Wirtz, but Wirtz would not see him or return his telephone calls. Wirtz did, however, meet with Rich on June 21. At this meeting, Wirtz told Rich that he would not discuss a lease with Fishman because IBI did not own the Bulls. He told Rich that he would consider giving Chicago Basketball (Rich's organization) a ten-year lease, which would be assignable only if Chicago Basketball "guaranteed" the assignee's performance, including rent payments, for the entire ten-year term. Wirtz explained that he needed a ten-year guarantee because of his concern about IBI's financial responsibility. The district court found, however, that "Wirtz never met with Fishman to learn about IBI's financial stability. Moreover, the rent for the Chicago Stadium was often taken 'off the top' of the office receipts and, accordingly, the 'guarantee' concept appears to have been unrelated to any business needs of the Chicago Stadium." *Id.* at 74,751.

At the same June 21 meeting, Wirtz asked Rich to sell the Bulls to his group or, in the alternative, to present both offers to the NBA and let the Board of Governors choose between them. Rich stated that he would discuss all matters raised by Wirtz with Chicago Basketball and asked Wirtz to put his ten-year lease proposal in writing, which Wirtz said he would do. Speaking on his own behalf, Rich stated that Chicago Basketball would only consider a lease that it could freely sublease to any buyer without the Stadium's consent and without remaining financially liable. He also stated that he would not consider a sale to CPSC because Chicago Basketball had already executed a contract with IBI.

After this meeting, Rich contacted Wirtz several times, asking for the promised lease proposal. On June 27, Wirtz wrote Rich, again stating his position that the

---

**4.** The governors representing the New York Knicks, Los Angeles Lakers, Washington Bullets, Kansas City Kings and Detroit Pistons voted against the transfer. The Portland Trailblazers were not represented at the meeting. There is some question as to how William Putnam of the Atlanta Hawks voted. Putnam recalled that he voted not to approve but notes from the meeting indicate the opposite.

Bulls should be sold to CPSC. He did not enclose or discuss a lease with, or assignable to, IBI. In this letter, the district court found that "Wirtz made it clear that he was going to use the power of the Chicago Stadium and whatever influence he could assert among NBA governors to obtain the Bulls." *Id.* at 74,751–52. Wirtz sent copies of this June 27 letter to the NBA Commissioner, the President of the NBA and the owner of the Los Angeles Lakers. With this communication, the district court found, "Wirtz made it clear to the members of the NBA that IBI did not, and would not, have a lease at the Chicago Stadium, that the Crown-Wirtz group would have such a lease, and that the Crown-Wirtz group wanted to purchase the Bulls." *Id.* at 74,752.

Rich and Wirtz met again on June 29. Wirtz attempted to raise the issue of effecting a sale to CPSC and not IBI, but Rich interjected that he was there only to discuss a lease for IBI and that his attorney had advised him not to discuss any other disposition of the Bulls. On July 10, Wirtz wrote Rich stating that he would not lease the Chicago Stadium to IBI and that he intended to attempt to obtain the Bulls for CPSC.

Since mid-May 1972, when IBI learned that Wirtz was allied with the competition, IBI had been investigating alternative sites for the Bulls' home arena. On July 5, after Wirtz had refused to make any sort of lease at the Chicago Stadium available to IBI and six days before the July NBA meeting, IBI executed a lease at the International Amphitheatre.

*4. The July NBA Meeting.* The NBA Board of Governors met in New York City on July 11, 1972 and, once again, the Chicago Basketball-IBI sale was on the agenda.

Prior to the meeting, CPSC continued its efforts to effect a rejection of IBI's application and obtain the franchise for itself. Telegrams were sent to the NBA Commissioner and several NBA members, stating that CPSC still wanted to purchase the Bulls and had a commitment for a ten-year lease at the Chicago Stadium. William Wirtz wrote Abe Pollin, NBA President and owner of the Washington Bullets, setting forth the seating capacity of the International Amphitheatre; Ginsberg sent a copy of the letter and telegram to Ned Irish, owner of the New York Knicks; other individual defendants also communicated with individual members of the NBA.[5] The effect of these communications was to make "it clear to NBA members that, although the Chicago Stadium was not available to the Bulls (and the NBA) if the Bulls were sold to IBI, the Chicago Stadium would be available to the Bulls (and the NBA) if the IBI sale was aborted, and the Bulls sold to the Crown-Wirtz group." *Id.* at 74,753.

At the July 11 meeting, Rich again requested the NBA Board of Governors to approve the transfer of the Bulls to IBI. Rich told the Board that Wirtz would not make a lease at the Stadium available to IBI and that, as a result, IBI had arranged a lease at the International Amphitheatre. There was some discussion prior to the vote. Certain NBA governors, including Alan Rothenberg (Los Angeles Lakers) and Joel Axelson (Kansas City Kings), openly expressed their desire to have the team sold to CPSC and not IBI. After the discussion and upon a vote, the proposed transfer was defeated. Ten members voted to approve the transfer and seven voted not to. Those opposed to the transfer were

---

**5.** Ginsberg spoke with Pollin several times about his group's interest in acquiring the Bulls. Arthur Wirtz provided NBA Commissioner Kennedy and Pollin with copies of his correspondence with Rich. William Wirtz did the same for Jack Kent Cooke (owner of the Los Angeles Lakers) and invited Cooke to call him and discuss the matter. William Wirtz also called William Putnam (Atlanta Hawks) and told him that CPSC could obtain a lease at the Chicago Stadi-

um, whereas IBI could not. Arthur Wirtz called Ray Patterson (Houston Rockets) to deliver the same message.

Some of the NBA governors took the initiative. Irish (New York Knicks) and Pollin telephoned Rich and asked what could be done to cause a sale to CPSC. Alan Rothenberg (Los Angeles Lakers) spoke to fellow NBA members to persuade them not to approve the transfer to IBI.

Irish (New York Knicks); Jack Kent Cooke (Los Angeles Lakers); Pollin (Washington Bullets); Putnam (Atlanta Hawks); Axelson (Kansas City Kings); Ray Patterson (Houston Rockets); Richard Bloch (Phoenix Suns) (hereinafter collectively the "NBA no-votes").

According to the district court:

There were two primary reasons for the votes cast against IBI by each of at least six, and perhaps seven, members who so voted: (1) The Chicago Stadium, which was withheld from IBI, but available to the Crown-Wirtz group, was vastly superior to any other arena in Chicago and was in their opinion the only adequate facility in Chicago for NBA basketball; and/or, (2) The Crown-Wirtz group was considered the more preferable group to acquire the Bulls and in order to make their acquisition of the Bulls possible the sale to IBI had to be prevented.

Specifically, each "no" vote, with the exception of Phoenix, admitted that they so voted because IBI had a lease at the International Amphitheatre, which they deemed entirely inadequate and unacceptable. The Phoenix governor, Robert [sic] Bloch, testified that he "had no present recollection" of why Phoenix voted against the transfer to IBI.

Further, the following NBA members admitted that a substantial contributing factor in their decision to vote against the transfer to IBI was the request and invitation of the Crown-Wirtz group, and others on its behalf, to aid the efforts of the Crown-Wirtz group to acquire the Bulls: Los Angeles by Alan Rothenberg

and at the direction of Jack Kent Cooke; Kansas City by Joel Axelson; Atlanta by Bill Putnam; Houston by James Foley at the direction of Ray Patterson. In addition, Rich received phone calls from Abe Pollin and Ned Irish asking what it would take to favor the Crown-Wirtz group. Consequently, an inference can be drawn from all the circumstances that a substantial contributing factor in the decision of NBA members Abe Pollin (Washington) and Ned Irish (New York), who voted against the transfer, was for the same reason.

*Id.* at 74,753–54 (footnotes omitted).

On July 19, 1972, IBI's contract was terminated, pursuant to a provision which permitted the purchaser to do so if NBA approval could not be obtained. Shortly thereafter, Chicago Basketball renewed negotiations with CPSC. A contract was executed on July 28, 1972, and the NBA approved the transfer of the Bulls to CPSC on August 10, 1972.

*5. The Litigation.* IBI and Fishman filed two complaints in the Northern District of Illinois, *Fishman v. Wirtz*, No. 74–C–2814, and *Fishman v. Adelman*, No. 78–C–3621. These two suits were consolidated on January 25, 1979. A consolidated complaint was filed, naming as defendants Arthur Wirtz, William Wirtz, Lester Crown, Philip Klutznick, James Cook, Albert Adelman, CPSC, CSC, Emprise Corporation, Chicago Blackhawk Hockey Team, Inc., and Atlanta Hockey, Inc.[6]

The consolidated complaint alleged various violations of sections 1 and 2 of the Sherman Act and of Illinois law. Plaintiffs

**6.** Defendant Emprise Corporation operates the food and beverage concessions at various arenas throughout the country, including the Chicago Stadium. Defendant Chicago Blackhawk Hockey Team, Inc. owns and operates the Chicago Blackhawks, a National Hockey League ("NHL") franchise; Arthur Wirtz owns a controlling interest in this corporation. As of 1972, defendant Atlanta Hockey, Inc. owned the Atlanta Flames, also an NHL franchise.

Prior to 1979, other defendants in this suit included the NBA; Madison Square Garden Center, Inc.; California Sports, Inc.; Missouri Valley Professional Sports; Texas Sports Invest-

ment, Inc.; Atlanta Hawks Basketball, Inc.; Phoenix Professional Basketball; and Capital Bullets, Inc. The last seven were the owners of the seven teams that voted against the transfer of the Bulls to IBI. The claims against these eight "NBA defendants" were the same as those against the defendants here. In December 1978, these defendants settled with the plaintiffs for $750,000 and the claims against them were dismissed.

Finally, Washington Hockey, Ltd. was named as a defendant but was dismissed on its motion for summary judgment in May 1977.

specifically charged, first, that Arthur Wirtz, William Wirtz and CSC had violated section 2 of the Sherman Act by "refusing to deal" with plaintiffs regarding a lease for plaintiffs at the Chicago Stadium, thereby precluding plaintiffs from entering the market for the presentation of live basketball in Chicago. Consolidated Complaint, Count II(c). Second, plaintiffs alleged that CPSC and Crown, Klutznick, Cook and Adelman had conspired with Arthur Wirtz, William Wirtz and CSC to withhold from plaintiffs a lease at the Chicago Stadium and to make such a lease available only to CPSC, in order to exclude plaintiffs from the market for the presentation of live professional basketball in Chicago. This, it was alleged, constituted a contract or conspiracy in restraint of trade, in violation of section 1, *id.*, Count I, and monopolization, attempted monopolization and a conspiracy to monopolize, in violation of section 2, *id.*, Count II(b). Third, plaintiffs alleged that CPSC and Crown, Klutznick, Cook and Adelman, Arthur Wirtz, William Wirtz and CSC had conspired with the NBA, certain NBA members, Emprise Corporation, Atlanta Hockey, Inc., and Chicago Blackhawk Hockey Team, Inc. to prevent IBI from acquiring the Bulls by means of a group boycott, in violation of both sections 1 and 2. *Id.*, Counts I, II(a), VIII. Finally, plaintiffs alleged that all defendants had violated Illinois law by interfering with plaintiffs' contract rights and prospective economic relationship with Chicago Basketball. *Id.*, Count VII.

A bench trial was held in March and April of 1979. On April 9, 1979, the district court bifurcated the case into separate liability and damages trials. On October 28, 1981, it rendered its decision on the liability issues, finding that the plaintiffs had proven all of the above allegations.[7]

In reaching this conclusion, the district court found that the relevant market was competition for the presentation of live professional basketball in Chicago. It also found that this was a natural monopoly market and rejected the defendants' contention that a bidding competition to acquire a natural monopoly was not within the purview of the antitrust laws. On the merits, the court found that, in 1972, the Chicago Stadium was an "essential facility" for the presentation of live professional basketball and that the Wirtzes had used their "strategic dominance" of the market in suitable arenas to exclude IBI from the Chicago professional basketball market. It ruled that the Wirtzes had engaged in an unlawful refusal to deal with IBI, with the purpose and effect of excluding IBI from the market and for the further purpose of monopolizing that market on behalf of CPSC, in violation of section 2 of the Sherman Act. It further found that Arthur and William Wirtz, CPSC, CSC, Crown, Klutznick, Cook and Adelman had conspired to prevent IBI from obtaining a stadium lease, which constituted a conspiracy to monopolize, an attempt to monopolize, monopolization and an unreasonable restraint of trade in violation of sections 1 and 2.

The court also found that the defendant CPSC shareholders had personal friendships and business associations with owners of at least five of the NBA franchises, that they had contacted their friends in the NBA for support, and that these friends had as a result voted against the transfer to IBI. It ruled that these communications, together with the resulting "no" votes, established an unlawful group boycott of IBI, subjecting all defendants to

---

7. The complaint also alleged that defendants had monopolized, attempted to monopolize, and conspired to monopolize the market for indoor sports arenas in Chicago and had conspired to restrain trade with respect to indoor sports arenas in Chicago. Consolidated Complaint, Counts III, IV. The district court ruled that plaintiffs lacked standing to bring this claim because there was insufficient evidence that they planned to acquire or build an indoor sports arena in Chicago. Liability Opinion, 1981–2 Trade Cas. at 74,790. Further, the complaint alleged that defendants had monopolized, attempted to monopolize, and conspired to monopolize the market for major league professional winter sports in Chicago and had conspired to restrain trade in that market. Consolidated Complaint, Counts V, VI. The district court did not discuss these counts in its opinion, nor do the parties mention them on appeal.

liability for violations of sections 1 and 2. Finally, by lobbying and refusing to deal with intent to block the sale, all defendants had also tortiously interfered with IBI's contract rights and prospective economic relationship with Chicago Basketball in violation of Illinois law.

The defendants have appealed [8] the district court's ruling. They question its delineation of the relevant market and its conclusion that the antitrust laws are applicable to this competition to acquire a natural monopoly, as well as each of its rulings on the antitrust and state law counts.

### B. The Relevant Market

■ Claims of monopolization under section 2 of the Sherman Act, as well as section 1 claims analyzed under the Rule of Reason, require the trier of fact to delineate the "relevant market." A relevant market is comprised of those "commodities reasonably interchangeable by consumers for the same purposes...." *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). In making this determination, the trier must decide whether the product is unique or has close substitutes, as to which there are substantial cross-elasticities of demand. *Cass Student Advertising, Inc. v. National Educational Advertising Service, Inc.*, 516 F.2d 1092, 1094–95 (7th Cir.), cert. denied, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975). The district court found that the relevant product market in this case was the presentation of live professional basketball, reasoning that "the demand function for professional basketball is not effected [sic] in any significant way by the existence of other amateur or professional sports or other forms of entertainment." Liability Opinion, 1981–2 Trade Cas. at 74,756. It found the relevant geographic market to be the Chicago metropolitan area because "[p]rofessional basketball exhibitions are presented in a local market, which, in the present case, is essentially the Chicago metropolitan area. Almost all of the fans who buy tickets and attend NBA games come from a 35 mile radius of the home arena." *Id.*

■ Such a finding as to the area of effective competition is subject to the "clearly erroneous" standard of review. *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1213 (9th Cir.1983), cert. denied, 471 U.S. 1007, 105 S.Ct. 1874, 85 L.Ed.2d 166 (1985). The defendants do not, however, challenge the facts as found by the district court. Rather, they assert that it "entirely misconstrued the competition in issue in this case," Appellants' Brief at 65, and urge that we therefore review *de novo* the district court's ruling, Appellants' Reply Brief at 8.

Defendants assert that the relevant market is actually the nationwide market for the purchase of professional sports franchises. They reason that "[i]n the context of this case, the seller was the Rich group; the potential buyers were IBI, CPSC and Peter Graham (at the outset); and the product was the Bulls franchise." Appellants' Brief at 65. They contend that the market as found by the district court must be wrong because "CPSC and IBI never met or intended to meet in competition in that market." *Id.* at 64. We do not see why this matters. The defendants are alleged to have unlawfully precluded the plaintiffs from entering the market for the presentation of live basketball in Chicago, thus ensuring the monopoly for themselves. We know of no rule that states that the parties must be in head-to-head competition *in* the relevant market (as opposed to head-to-head competition *for* the relevant market) before the antitrust laws will apply.

■ In this case, the competitors were bidding to acquire a franchise, but they were also bidding to acquire access to a market. It is not clearly erroneous to define the relevant market in these circumstances as the market to which access is sought. In fact, this is how the market has been defined in such cases as *Otter Tail Power Co. v. United States*, 410 U.S. 366,

---

**8.** Defendant Atlanta Hockey, Inc. has not ap- pealed to this court.

369, 93 S.Ct. 1022, 1025, 35 L.Ed.2d 359 (1973) (competition between prospective suppliers of retail electric power; relevant market is electric power in area to be served); *City of Mishawaka v. American Electrical Power Co., Inc.*, 465 F.Supp. 1320, 1325–26 (N.D.Ind.1979), *aff'd in relevant part*, 616 F.2d 976 (7th Cir.1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981) (same), as well as any number of cases concerning distributorships and sales franchises, *e.g., Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985) (relevant market is market for "haulaway services in Chicago area"); *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 712–14 (7th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980) (relevant market is drive-through retail photo processing in Indianapolis metropolitan area); *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 709–10 (7th Cir.1977), *cert. denied*, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1979) (relevant market is consumer market for electromagnetic microbalances); *see also* Annot., 56 A.L.R.Fed. 406 (collecting cases). In all of these cases, the relevant market was that to which access had allegedly been foreclosed by the challenged conduct, not the market for similar business opportunities.[9] We find nothing erroneous in the trial court's delineation of the relevant market.

## C. Natural Monopoly and Consumer Interest

The district court found that the market for the presentation of live professional basketball in Chicago was a natural monopoly market because "[t]he Chicago metropolitan area, like virtually all of the cities in which the NBA has franchises, cannot as a practical matter support two professional basketball franchises." Liability Opinion, 1981–2 Trade Cas. at 74,757. Further, the NBA, the more powerful of the two professional basketball leagues in existence in 1972, granted its franchisees exclusive territorial rights in their home cities. The district court thus found that if one wanted to put on professional basketball games in Chicago in 1972, one had to buy the Bulls. *Id.*

The defendants and the dissent do not dispute this finding. They both, however, do argue that this competition between IBI and CPSC to acquire a natural monopoly was not protected by the antitrust laws because substitution of one competitor for another would not injure competition: Whether CPSC or IBI ultimately managed to acquire the Bulls was a matter of indifference to the Chicago fans, who would face a monopolist in any event. Thus, the only parties injured by the defendants' shenanigans were IBI and its organizers, who had lost an opportunity to own a monopoly. "[T]he antitrust laws ... were enacted 'for the protection of competition, not competitors.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original). This argument requires an analysis of two related issues: the requirement of an antitrust injury, as articulated in the *Bowl-O-Mat* case, and the concern of the antitrust laws with the interests of the consumer.

*1. Antitrust Injury.* The concept of "antitrust injury," as introduced in *Bowl-O-Mat*, is akin to a standing requirement. The plaintiff's injury must be related to the sorts of concerns that underlie the Sherman Act. In *Bowl-O-Mat* the plaintiffs brought an action under § 7 of the Clayton Act, alleging that defendant Brunswick's acquisition of several rival bowling alleys (which otherwise would have gone out of business) tended to lessen competition because Brunswick was already the "giant"

---

9. The national sports franchise market could be a relevant market under the facts of this case, but this would change the theory of the suit as pleaded by the plaintiffs. If the relevant market were the market for franchises, the charge would be monopsony, that is, that CPSC had made itself the only *buyer* of basketball franchises in Chicago. But, given the case that the plaintiffs brought, the trial court correctly defined the relevant market.

in the bowling alley field. The Court disagreed: What the plaintiffs were really complaining about was *increased* competition. It ruled that

> plaintiffs ... must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

429 U.S. at 489, 97 S.Ct. at 697 (emphasis in original). A claim of injury arising from the preservation of competition in a market was considered inimical to the purposes of the antitrust laws. *Id.* at 488, 97 S.Ct. at 697; *see also Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. ——, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (plaintiffs did not suffer antitrust injury when defendants conspired to artificially inflate prices because, as sellers in the same market, they tended to benefit from the violation); *Local Beauty Supply, Inc. v. Lamaur, Inc.*, 787 F.2d 1197, 1202–03 (7th Cir.1986) (claimed damages represented sub-jobber's inability to continue to profit from illegal price maintenance scheme).

▮▮▮ The case before us is different from these cases. The refusal to lease the Chicago Stadium effectively cut off all competition for the acquisition of the Bulls franchise and injured plaintiffs as a result. Plaintiffs alleged that they were deprived of a fair shot at winning a legal monopoly. There is no reason why this injury is not an antitrust injury unless the Sherman Act does not protect competition to acquire a natural monopoly—which is precisely what the defendants assert.

Defendants seek to extend *Bowl-O-Mat* into a general rule that "aggressive and even tortious competition to acquire a natural monopoly is not a violation of the Sherman Act." Appellants' Brief at 56. They claim that "[i]t is well settled that the substitution of one competitor for another does not injure competition." *Id.* at 57. The case law, however, does not support such a broad contention. Indeed, the Supreme Court's decision in *Otter Tail*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359, involved competition to acquire a natural monopoly and held that the use of monopoly power to preclude such competition violated the Sherman Act.

In *Otter Tail*, a major electric power company ("Otter Tail") sought to acquire retail franchises to distribute and sell electricity in certain municipalities. Each municipality could "accommodate only one distribution system, making each town a natural monopoly for the distribution and sale of electric power at retail." 410 U.S. at 369, 93 S.Ct. at 1025.[10] In each town, Otter Tail found itself competing for the retail franchise with a power distribution enterprise owned by a municipality. There would never be any head-to-head competition for consumer patronage: There was only one retail seller before the competition and there would be only one afterwards. The consumers would always face a monopolist. In order to acquire the natural monopoly franchises, Otter Tail refused to sell the municipal companies electric power at wholesale; it also refused to "wheel" power generated by others over its transmission system. Without access to electric power, the competitors were eliminated and Otter Tail won the franchises. The Court held that Otter Tail had "used its monopoly power in the towns in its service area to foreclose competition or gain a competitive

---

**10.** As defendants point out, the Court also stated that "[t]he aggregate of towns in Otter Tail's service area is the geographic market in which Otter Tail competes for the right to serve the towns at retail." 410 U.S. at 369, 93 S.Ct. at 1026 (footnote omitted). But it goes on to explain "[t]hat competition is generally for the right to serve the entire retail market within the composite limits of a town, and that competition is generally between Otter Tail and a prospective or existing municipal system." *Id.* at 369–70, 93 S.Ct. at 1026. Thus, the Court recognized that the area of effective competition between Otter Tail and each of the municipal systems was a single town, which was a natural monopoly.

advantage, or to destroy a competitor, all in violation of the antitrust laws." *Id.* at 377, 93 S.Ct. at 1029 (citation omitted). The fact that the plaintiffs' only damages were exclusion from the competition to be a (legal) monopolist did not alter the result.

One of the arguments made by the dissenters in *Otter Tail* is the same as that made by the defendants and by the dissent in the case before us. Thus, the *Otter Tail* dissenters argued that:

> The theory of [*Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951)] was that competition in the communications business was being foreclosed by the newspaper's exercise of monopoly power. Here, by contrast, *a monopoly is sure to result either way.*

410 U.S. at 388–89, 93 S.Ct. at 1035 (emphasis supplied). However, the majority in *Otter Tail* ignored this argument advanced by the dissenters and in effect held that, even though the consumers of the affected municipalities would face a monopoly—either a municipal utility or the power company—the power company still could not deny its competitor access to its transmission system, either to purchase power from the company or to wheel it from a third-party source.

The dissent attempts to distinguish *Otter Tail* by arguing that *Otter Tail,* through its monopoly power over transmission, could preclude consumers in the affected municipalities from receiving the benefits of competition at the level of electric generation. We agree with the dissent that a potential for economies in generation may have existed in *Otter Tail,* apparently because the affected municipalities might have been able to wheel cheaper power from government hydroelectric dams. The

Supreme Court, however, did not rely on the municipalities' potential access to cheaper generation as a basis for its decision. In fact, the majority in *Otter Tail* did not feel compelled even to respond to the dissenters' point that "a [retail] monopoly is sure to result either way." Thus, whatever the economic distinctions, we think it is difficult to avoid the impact of *Otter Tail* as a controlling authority.[11]

In *Mishawaka,* 616 F.2d 976, this court also protected competition for a natural monopoly market. There the defendants were the sole source of wholesale electric power to certain municipalities, each of which held a natural monopoly in its local retail market. The defendants (which were vertically integrated) instituted a "price squeeze," charging an unjustifiably high price for wholesale power to the municipalities so that their ability to compete at retail was impaired. The price squeeze was allegedly calculated to drive the local retailers out of business and allow the defendants to replace them as retail supplier and natural monopolist. We held that the defendants had violated section 2 because their acts tended to "foreclose competitors from access to markets or customers...." *Id.* at 986, quoting *Sargent-Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701, 711–12 (7th Cir.1977), *cert. denied,* 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). This principle was repeated in *Hecht v. Pro-Football, Inc.,* 570 F.2d 982 (D.C.Cir. 1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *Omega Satellite Products Co. v. City of Indianapolis,* 694 F.2d 119, 127 (7th Cir.1982) ("[T]he antitrust laws protect competition not only in, but for, the market—that is, competition to be the firm to enjoy a natural monopo-

---

**11.** The dissent states that the "generation of power is highly competitive...." *Infra* p. 571. The struggle for access to generation owned by third parties other than the local serving utility has been going on for many years with varying degrees of success. A provision for mandatory "wheeling" was rejected in the Federal Power Act amendments of 1935 (S.Rep. 621, 74th Cong., 1st Sess. 19, *cited in City of Paris v. Kentucky Utilities Co.,* 41 FPC 45 (1969)) but was

incorporated in a somewhat limited form in the Public Utility Regulatory Policies Act of 1978, Pub.L. No. 95–617, § 203 (codified at 16 U.S.C. 824j (1982)). The regulated structure of the electric utility industry makes it questionable how much generation in adjacent utility serving areas really "competes," although there has certainly been an effort in recent years to further competition.

ly...."); *Union Leader Corp. v. Newspapers of New England, Inc.*, 284 F.2d 582 (1st Cir.1960), *cert. denied*, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961). *See also Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1055 (9th Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983) (fact that government is sole purchaser of sophisticated military aircraft does not render Sherman Act inapplicable); *Westborough Mall, Inc. v. City of Cape Girardeau*, 693 F.2d 733, 745 n. 7 (8th Cir.1982), *cert. denied sub nom.* 461 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983) (evidence supports inference that defendants achieved natural monopoly through exclusionary and predatory means); *Greenville Publishing Co., Inc. v. Daily Reflector, Inc.*, 496 F.2d 391, 397 (4th Cir.1974) ("[T]he antitrust laws need not tolerate exclusionary conduct whenever it appears that only one competitor can survive the preliminary bout."); *Structure Probe, Inc. v. Franklin Institute*, 450 F.Supp. 1272, 1286 (E.D.Pa.1978), *aff'd mem.* 595 F.2d 1214 (3d Cir.1979); *Ovitron Corp. v. General Motors Corp.*, 295 F.Supp. 373, 378 (S.D.N.Y.1969). The antitrust laws protect against unlawful, exclusionary conduct to acquire a natural monopoly; the Supreme Court has not intimated that *Bowl-O-Mat* has changed this rule.

We do not quarrel with the dissent's efforts to show that *Mishawaka, Union Leader* and *Hecht* were different from the case before us in some economic respects. But the dissent is engaging in *post hoc* analysis. There is nothing in any of these opinions to suggest that the economic phenomena identified by the dissent were important considerations to the courts which found antitrust violations in these cases. For example, in *Mishawaka* there is no reason to believe that American Electric Power's price squeeze was *designed* (as the dissent asserts *infra* p. 572) to deprive

consumers of the benefits of competition in generation and no reason to think that this was a significant factor in this court's analysis. Rather, American Electric Power's ostensible purpose was to replace the town as sole supplier in the retail market. Similarly, in *Union Leader* there is little to suggest that the First Circuit had in mind in deciding the case the distinctions offered by the dissent. The court applied the antitrust laws in *Union Leader* to protect competition for a natural monopoly; the court did not believe the market could sustain competition over an extended period of time. 284 F.2d at 584.

*2. The Consumer Interest.* The defendants further argue that, even if some natural monopoly cases are within the purview of the Sherman Act, this one is not because the plaintiffs have failed to articulate just how the ultimate consumers— Chicago fans—will be hurt by this violation. They assert that "the antitrust laws do not apply where there is no consumer interest to protect." Appellants' Reply Brief at 11. The dissent makes the same argument about consumer effect: "Antitrust law condemns *results* harmful to consumers.... Bad means that injure only business rivals—that is to say business torts—are outside the scope of antitrust law." *Infra* p. 564 (emphasis in original).[12] This proposition, we think, presents a difficult question requiring the most careful analysis and the weighing of conflicting policies and lines of authority in the application of the antitrust laws.

We agree that the enhancement of consumer welfare is an important policy— probably the paramount policy—informing the antitrust laws. *See MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1113 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Some Supreme Court cases indicate that effect on ultimate

---

**12.** As the dissent indicates, *infra* p. 577, Joseph Schumpeter said that the capitalist process creates a "gale of creative destruction." J. Schumpeter, *Capitalism, Socialism and Democracy* 84 (2d ed. 1947). Schumpeter also said, among other things, "... the capitalist process unavoid-

ably attacks the standing ground of the small producer and trader," *id.* at 140, and "[t]he capitalist process not only destroys its own institutional framework, but it also creates the conditions for another," *id.* at 162.

consumers is, in an appropriate context, a significant consideration in analyzing a business practice to see whether there has been an antitrust violation. *See, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 2859, 86 L.Ed.2d 467 (1985) ("The question whether [the defendant's] conduct may properly be characterized as exclusionary cannot be answered by simply considering its effect on [the plaintiff]. In addition, it is relevant to consider its impact on consumers . . . ."). These cases do not seem to us, however, to say that the law places on the plaintiff, as a prerequisite to maintain an antitrust suit, the burden of articulating how the welfare of the ultimate consumer has been diminished by an injury to competition at *another level.* We have found no case (and none has been cited to us) in which the Supreme Court has put the burden on a plaintiff to isolate and demonstrate the consumer impact of a particular purported antitrust violation not directed at the consumer level.[13] While antitrust law may be moving in the direction of being construed as a "pure" consumer protection measure, cases such as *Otter Tail* strongly suggest that in the natural monopoly area, at least, the Supreme Court has not embraced this approach.[14] The Court has instead stressed that the antitrust laws seek to protect competition, *see Bowl-O-Mat*, 429 U.S. at 488, 97 S.Ct. at 697 (antitrust laws enacted for the protection of competition, not competitors); *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 558 (7th Cir.1980) (The issue was not whether *ultimate* consumers were clearly affected by the challenged conduct but whether there was injury to competition at *any* level. "[T]he sole question is whether [unfair means of competition] lessened competition."), as well as to protect those activities that will promote competition, *see National Society of Professional Engineers v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978) (relevant question is whether restraint promotes or suppresses competition). The antitrust laws are concerned with the competitive *process*, and their application does not depend in each particular case upon the ultimate demonstrable consumer effect. A healthy and unimpaired competitive process is presumed to be in the consumer interest.

Here the defendants, through the economic leverage provided by their stadium monopoly, succeeded in driving out all competition for ownership of the Bulls. They used a monopoly in one market to foreclose competition in another—a classic violation of the antitrust laws. The *actual* competition confronting the defendants consisted of Peter Graham, who dropped out early (before CPSC was involved), and later IBI. The potential competition, *see United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 658–59, 84 S.Ct. 1044, 1048, 12 L.Ed.2d 12 (1964), was much broader and consisted of all those who might have bid for the Bulls had they not faced the insuperable obstacle of the defendants' stadium monopoly. That the survivor of the aborted competition would quite fortuitously find itself alone in the consumer basketball market in Chicago—at least for a while—does not make the destruction of competi-

---

**13.** The defendants rely heavily on the Court's approving quotation from R. Bork, *The Antitrust Paradox* (1978)—that Congress designed the Sherman Act as a "consumer welfare prescription"—in *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979). *Reiter* is not, however, on point: It held that a consumer who pays a higher price for goods because of an antitrust violation has been injured in her "property" and may sue under § 4 of the Clayton Act.

**14.** As a matter of fact, the concept that ultimate consumer loss is an essential element of an antitrust claim may have puzzling implications for the application of antitrust principles to industries where prices are pervasively regulated. Retail electric rates, for example, are regulated in most jurisdictions to be "just and reasonable." The law presumes that rate regulation has denied monopoly profits to the electric utility and has precluded any injurious impact on consumers. Yet antitrust principles have been broadly applied to all aspects of the electric utility industry. *See Otter Tail*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359; *Mishawaka*, 616 F.2d 976; and *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976).

tion to enter that market any less an antitrust violation.

A rule that made the legality of arguably predatory conduct at the level of entry into the consumer market depend on whether *post hoc* analysis could clearly identify adverse impacts on ultimate consumers would be capricious, as well as unjust. Following this approach would mean that if *two* teams were presumed to survive, *see Hecht*, 570 F.2d 982, the Sherman Act had been violated. But if only one could be practically supported, very similar business conduct would be unexceptionable and, according to the dissent, would here not even be a "business tort." Such a distinction would seem not only unjust but would not be capable of being practically administered because it would depend on after-the-fact economic conjecture and not on the obvious fact of injury to competition at the level of entry to the market. Here, there seems to be no way of telling whether IBI or CPSC would be a "better" owner from the perspective of basketball fans. But we think the Sherman Act requires that the choice between them result from unconstrained competition on the merits.

On the other hand, and viewing the matter from a different perspective, we agree that identifying consumer effect, to the extent this is feasible, may allow us in some cases invoking the Rule of Reason to better evaluate the impact of a purported violation on the competitive process. For instance, the Court has countenanced some restrictions on competition that would actually enhance the overall competitive process, *see, e.g., NCAA v. Board of Regents*, 468 U.S. 85, 102, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984) (NCAA's horizontal restraints "widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as *procompetitive*") (emphasis supplied). The defendants here have not suggested any procompetitive benefit which will result from the challenged conduct.[15]

In any event, we should not be so quick to assume that there is no consumer interest in this case. Except in those cases involving restraints that maximize economic well-being in some demonstrable way, notably involving professional associations, *see, e.g., Professional Engineers*, 435 U.S. 679, 98 S.Ct. 1355, or sports ventures, *see, e.g., NCAA*, 468 U.S. 85, 104 S.Ct. 2948, the Court has never given us to believe that anything save unfettered competition is the key to consumer well-being. In *Union Leader*, 284 F.2d 582, the First Circuit was confronted with alleged antitrust violations in the competition of two newspapers to be the sole paper serving Haverhill, Massachusetts, a "one-paper town." The court noted in a footnote that it was an "interesting speculation" whether the antitrust laws were meant to protect one would-be natural monopolist from another. It concluded that, barring an "identity of performance," the public could only benefit from free competition, "even though that competition

---

**15.** The dissent does argue that a merger of two successive monopolists might result in lower consumer prices than would be the case if the monopolies were independently operated. *Infra* pp. 563–64. Under this theory, which is surely not in the mainstream of the antitrust laws, consumers might be better off if the Bulls and the Stadium were in the same hands. This argument was not brought to the attention of the district court nor was it argued to this court. It was therefore waived. But we will nonetheless attempt to briefly address it. While we do not have the benefit of briefing on the point, we believe that the dissent fails to take into account potential anticompetitive effects which might result if the Bulls and the Stadium were under common control. *See* IV P. Areeda & D.F. Turner, *Antitrust Law* ¶ 1011b (1980).

Also, even if integration of the successive monopolies in this case would result in lower prices to consumers, the purchase of the Bulls by CPSC did not result in the merger of two monopolists. Instead, after the sale of the franchise to CPSC, the Bulls were in the hands of a group of investors, one of whom was Arthur Wirtz, and the Stadium was controlled by William and Arthur Wirtz. While there was some overlap in the shareholders of CSC and CPSC, it is unrealistic to assume that these two corporations would act as a single monopolist since they were controlled by different sets of investors. Thus, we think the successive monopoly objection is not so simple as it might appear and can be addressed only if it is argued, and a record made on it, in the trial court.

be an elimination bout." *Id.* at 584 n. 4. In a similar vein, the District of Columbia Circuit noted in *Hecht,* 570 F.2d 982, that "we cannot say that it is in the public interest to have the incumbent as its sole theatre, or its sole newspaper, or its sole football team, merely because the incumbent got there first." *Id.* at 991. Part of the problem with requiring the plaintiff to pinpoint just how the public is harmed by a short-circuited competitive process is that the plaintiff has never been given an opportunity to compete freely and win the monopoly. We do not know whether IBI would be a better Bulls' owner; we know only that Rich could not have selected IBI had he wanted to.

The cases cited by the defendants concerning the termination of exclusive distributors and suppliers of goods and services are not on point. These cases involve no more than "plaintiffs' commercial disappointment at losing ... patronage—the recurrent case of the jilted customer, dealer or supplier who loses a ... franchise and accuses the [franchisor] and the new suitor of attempting to monopolize something." *Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.,* 691 F.2d 241, 243–44 (6th Cir.1982). *Without more,* the substitution of one competitor for another does not implicate the antitrust laws. "The exclusion of competitors is cause for antitrust concern only if it impairs the health of the competitive process itself." *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 394 (7th Cir.1984). *See also Car Carriers v. Ford Motor Co.,* 745 F.2d 1101, 1109–10 (7th Cir.1984) ("[T]he complaint does not in any way set forth facts to support the conclusion that [the alleged] conspiracy had any anticompetitive effect.").

This, too, is why we do not find *Brunswick Corp. v. Riegel Textile Corp.,* 752 F.2d 261 (7th Cir.1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985), dispositive. In that case, Brunswick had formulated a process for manufacturing antistatic yarn. It disclosed the process to Riegel, a yarn manufacturer. Instead of keeping the process confidential (as it had promised), Riegel applied for a patent in its own name. We ruled that no antitrust cause of action had been stated because only a competitor had been injured and "[f]rom the standpoint of antitrust law, concerned as it is with consumer welfare, it is a matter of indifference whether Riegel or Brunswick exploits a monopoly of antistatic yarn." 752 F.2d at 267. But in *Riegel* the competitive process, which the antitrust laws do protect, was not jeopardized. Brunswick and Riegel were not competing to acquire a natural monopoly— they were not competing at all. *Cf. Almeda Mall, Inc. v. Houston Lighting & Power Co.,* 615 F.2d 343 (5th Cir.), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980) (no antitrust violation because on the facts there was no competition to be affected). There would never have been competition between Brunswick or Riegel, with or without Riegel's misconduct.[16] In the present case, there would have been competition had Wirtz and CPSC not withheld the Stadium. We believe that Riegel must be read narrowly because the broader reading urged by defendants would conflict with *Otter Tail* and the other natural monopoly cases. Such a conflict was not even hinted at in *Riegel.*

The fact that the precise impact of defendants' conduct on the broad consuming public has remained unfocused here does not prevent a finding that the antitrust laws have been violated.

16. A patent is not a natural monopoly in the same sense as is a franchise for the provision of electric power at retail—or even a professional sports franchise. The market could accommodate two or more producers of antistatic yarn but—to advance policies wholly divorced from those informing the antitrust laws—an administrative decision is made to confer a temporary monopoly on one producer. A patent monopoly is acquired in an *ex parte* administrative proceeding without consideration of those factors that might lead a different producer to dominance in the marketplace. Market and competitive concerns are sufficiently foreign to the world of patents that we would consider it ill-advised to recreate the law of antitrust in reliance upon a decision addressing patent fraud.

## D. Stadium Lease Violations

The district court found that the Wirtzes and CSC had refused to give IBI a lease at the Chicago Stadium "as a purposeful means of excluding a competitor (IBI) and monopolizing a relevant market." Liability Opinion, 1981–2 Trade Cas. at 74,770. It also found that the Chicago Stadium was an "essential facility" that the Wirtzes and CSC did not make available to their competitors on nondiscriminatory terms. For these reasons, it ruled that the refusal to deal regarding a stadium lease violated section 2. The district court also found that "the refusal to deal was not merely the unilateral act of Arthur Wirtz, but rather was a critical element in a common scheme whereby the Crown-Wirtz group sought to prevent IBI from acquiring the Bulls." *Id.* at 74,774. Thus, it ruled that defendants CPSC, its individual shareholders, CSC and the Wirtzes had participated in a conspiracy to monopolize in violation of section 2. Finally, because this scheme was a concerted refusal to deal, the district court ruled that it was also a *per se* violation of section 1.

The so-called "essential facilities doctrine" imposes upon a firm controlling an essential facility—that is, a facility that cannot reasonably be duplicated and to which access is necessary if one wishes to compete—the obligation to make that facility available to competitors on nondiscriminatory terms. A refusal to deal in the context of an essential facility violates section 2 because control of an essential facility can "extend monopoly power from one stage of production to another, and from one market into another." *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d at 1132.

The trial court found that the Chicago Stadium was an essential facility and that the defendants had refused to deal by withholding a lease, although they had no legitimate business reason for the refusal. The defendants do not dispute that these facts, if true, make out a section 2 violation. Defendants do, however, dispute the necessary findings of fact, namely, that the Sta-

dium was an essential facility and that there was any refusal to deal, concerted or otherwise, at all.

To be essential, "a facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible and if denial of its use inflicts a severe handicap on potential market entrants." *Hecht*, 570 F.2d at 992 (football stadium could be an essential facility). *See also MCI*, 708 F.2d at 1132 (facility is essential if competitor cannot "practically or reasonably ... duplicate" it). The district court found that "the Chicago Stadium ... was the only Stadium in the Chicago Metropolitan area during the relevant time period which was suitable for the exhibition of professional basketball," Liability Opinion, 1981–2 Trade Cas. at 74,771, that it could not feasibly be duplicated by IBI, and that lack of access hurt IBI's status as a competitor. These findings are not clearly erroneous.

First, the district court stressed the "natural advantages" that the Chicago Stadium had over other sites in 1972. These included a seating capacity of 17,000, 6500 more than the Amphitheatre. It also noted that "the locker rooms, the lighting for color television, and the overall physical plant at the Stadium were significantly superior to that available at the Amphitheatre or any other arena in Chicago." *Id.* at 74,755. Conceding that a facility is not essential merely because it is better than or preferable to another, the court concluded that the Stadium was not just better—it was "unique." It found that the Stadium had a strategic dominance over the market for indoor team sports arenas in Chicago, noting that it could charge much higher prices than the other arenas without causing its patrons to switch. *Id.* It also noted in this regard that all groups interested in owning the Bulls wanted a lease at the Chicago Stadium notwithstanding the higher rent. Finally, the district court gave weight to the preferences of the NBA: "It was essential in order to obtain NBA approval, to acquire the Bulls, and to enter the market for the presentation of professional basket-

ball in Chicago, that the proposed transferee have access to the Chicago Stadium."
*Id.*

The Chicago Stadium was not duplicable without an expenditure that would have been unreasonable in light of the size of the transaction such duplication would have facilitated. There was testimony that a new arena would cost $19 million to build, an economically unrealistic sum where a substantially less expensive basketball team was the real goal. Defendants argue that IBI could have built a stadium, noting that a new indoor arena, the Rosemont Horizon, did go up in Chicago a few years later. But the test is not whether it would be impossible to duplicate the facility. Not every essential facility need be as extensive and complicated as the local distribution facilities of AT & T's operating companies. *Cf. MCI*, 708 F.2d at 1131–33. The point of the essential facilities doctrine is that a potential market entrant should not be forced simultaneously to enter a second market, with its own large capital requirements. Such a requirement would allow the owner of an essential facility to monopolize the market as to which his facility is the "bottleneck." *See Gamco, Inc. v. Providence Fruit & Produce Building, Inc.*, 194 F.2d 484, 487 (1st Cir.), *cert. denied*, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952) ("To impose upon plaintiff the additional expenses of developing another site ... is clearly to extract a monopolist's advantage.").

█ It is also clear that lack of access to the Chicago Stadium "inflicted a severe handicap" on IBI as a competitor. The defendants do not appear to contest the district court's finding that lack of access to the Stadium was a major factor in IBI's failure to acquire the Bulls; rather, they argue that it is improper to look at the "personal preferences" of the NBA governors in determining whether a facility is essential. Such a finding, they argue, can only be based upon "objective economic reality." Appellants' Brief at 74. But "objective economic reality" is often a function of personal preferences. Appellants concede that "economic tests established for cross-elasticity of supply and demand" suitably measure economic reality, *id.*, but the Stadium's proven ability to raise its rent without losing patronage to the Amphitheatre—in short, its market power—is itself a result of the "personal preferences" of basketball patrons. Thus, the mere existence of the Amphitheatre does not make the district court's finding clearly erroneous. "[A] monopolized resource seldom lacks substitutes; alternatives will not excuse monopolization." *Gamco*, 194 F.2d at 487. Both the NBA and the competitors preferred the Stadium because it is larger and better equipped for professional sports; these preferences are relevant in determining whether the Chicago Stadium is an essential facility.[17]

█ Nor did the district court err when it found that there had been a refusal to lease the Chicago Stadium and a conspiracy to refuse to lease. The record supports the finding that the Wirtzes and CSC had no legitimate business reason not to negotiate with IBI regarding a lease. Defendants argue that the ten-year lease offered Rich by Wirtz is evidence that Wirtz did not refuse to deal with IBI. We agree with the district court that this offer did not show that Wirtz was willing to deal with IBI on non-discriminatory terms: (1) Wirtz was

---

17. The objective economic reality argument is also at odds with the stress the defendants place on Fishman's asserted belief that the Amphitheatre was in fact the better site for Bulls games. *See* Appellants' Brief at 11–13, 70–73. If the preferences of individuals with the power to grant an NBA franchise are not relevant to this discussion, we do not see how Fishman's could be.

Whatever Fishman's views at various points (and the evidence was conflicting, with the district court characterizing the defendants' testimony at points as "lack[ing] in credibility" and "astoundingly unbelievable"), they were not consensus views and do not seem dispositive of whether the stadium was an "essential facility." Fishman became very interested in the Chicago Stadium when it became apparent that it was the key to NBA approval. Further, his statements to the NBA about the Amphitheatre after he signed a lease there were an understandable attempt to salvage his position.

not dealing with IBI; the proposed contract would be with Chicago Basketball; (2) Wirtz never followed up on this offer, as promised; (3) the offer was one that there was good reason to believe that Chicago Basketball would not accept. Further, it was not clearly erroneous to find that there was no business justification for requiring a ten-year guarantee by Chicago Basketball. Wirtz did not require the same from CPSC, and Wirtz never contacted Fishman to learn anything about IBI's finances. Agreeing to deal on unreasonable terms is merely a type of refusal to deal.

There is also sufficient evidence in the defendants' correspondence, both with each other and with the NBA, to support the conclusion that the Wirtzes and CSC agreed with CPSC and the individual defendants to withhold the Chicago Stadium from the plaintiffs and grant a lease only to CPSC. Defendants argue that there is no evidence of their state of mind at the time that CPSC entered into a contingent contract with CSC in April 1972. They argue that their later lobbying of the NBA shed no light on that earlier state of mind. Assuming *arguendo* that the defendants had no exclusionary intent in April of 1972, that does not absolve them of liability if they decided at any later time that IBI should be excluded from access to the Chicago Stadium.[18]

 We also approve the district court's ruling that the concerted scheme to withhold a lease from IBI was a *per se* violation of section 1. *"Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged con-

duct." *NCAA,* 468 U.S. at 103–04, 104 S.Ct. at 2962 (footnote omitted). Thus, a court's task is to distinguish between "naked" restraints of trade and those restraints that may have a salutary effect on competition or productivity. *See Polk Bros., Inc. v. Forest City Enterprises, Inc.,* 776 F.2d 185, 188–89 (7th Cir.1985). The district court found that there were no redeeming virtues to the agreement not to provide IBI with a stadium lease and, significantly, defendants have not challenged this finding or in any way suggested that such virtues existed.

 In *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), the Supreme Court noted that group boycotts may properly be characterized as *per se* illegal if the defendants have either "market power" or "exclusive access to an element essential to effective competition," *id.* at 2621. The rationale is that in such circumstances one is justified in concluding that the refusal to deal virtually always has an anticompetitive effect. *Id. See also Hecht,* 570 F.2d at 993 n. 45 (restrictive covenant covering an essential facility is unreasonable *per se* because, by definition, all competition is excluded). The defendants claim that they had neither market power nor exclusive access to an essential facility. As we have noted, the district court found that they had both and we have approved those findings. *See supra.* Because there was no arguable procompetitive justification for the stadium lease violation, the district court did not err in holding it a *per se* violation.[19]

---

**18.** The district court also briefly discussed the § 2 offense of "monopoly leveraging," although it is unclear whether it intended to distinguish this from the withholding of an essential facility. Defendants argue on appeal that this violation had not been proven because there was no proof that CSC possessed monopoly power in the adjacent arena market. However, the district court did make such a finding, Liability Opinion, 1981–2 Trade Cas. at 74,755, based on evidence that CSC could raise its rents to team sports events far above those being charged by

the Amphitheatre, without causing those events to switch arenas.

**19.** Contrary to the dissent's assertion, *infra* pp. 575–76, this opinion does not reinstitute the *Pick-Barth* doctrine under which business torts are *per se* violations of the Sherman Act. We would agree with the dissent that any such result would be uncalled for. Thus, we do not hold here that a conspiracy to commit a business tort results in a *per se* violation of the antitrust laws. We have affirmed the district court's finding of a *per se* violation in this case

## E. The NBA Boycott

The district court also ruled that the NBA's refusal to approve the transfer of the Bulls to IBI was a "concerted refusal to deal" or "group boycott" agreed to and carried out by CPSC, its individual members, the NBA no-votes, Chicago Blackhawks Hockey Team, Inc., Atlanta Hockey, Inc., [19a] and Emprise Corporation. It found:

> The Crown-Wirtz group (or others acting in their behalf) specifically invited and

requested the NBA members to deny approval to plaintiff in order that the Crown-Wirtz group subsequently could acquire the Chicago Bulls. Among other things, the telegram from the Crown-Wirtz group to each NBA member before the meeting of June 15, 1972, and the subsequent telegram, of July 6, 1972, were clearly an invitation to deny IBI league approval so that the Crown-Wirtz group could acquire the team and perpet-

because the defendants, who were found to have both market power and exclusive access to an essential facility, had engaged in a group boycott of IBI. As we have already stated, *supra*, this conclusion is consistent with the Supreme Court's decision in *Northwest Wholesale Stationers*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). Thus, our opinion in this case does not conflict with our earlier decisions rejecting the *Pick-Barth* doctrine. *See Havoco*, 626 F.2d at 554–56, and *Juneau Square Corp. v. First Wisconsin National Bank*, 624 F.2d 798, 812–13 (7th Cir.), *cert. denied*, 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980).

Even if we were to agree with the dissent that the § 1 claim in this case should be analyzed under the Rule of Reason, we would still conclude that the defendants' refusal to deal constituted a violation of that section. In applying the Rule of Reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977) (citation omitted). As we have already explained, the defendants' conduct in this case had the effect of foreclosing competition for the Bulls, *supra* p. 536, and the defendants have not suggested to this court any benefits to competition which would result from their decision to withhold the Stadium from IBI, *supra* p. 537 & n. 15.

The dissent also contends that we lack the plurality of actors necessary to find a contract or conspiracy in restraint of trade in violation of § 1. *Infra* pp. 576–77. While this argument·was not raised by the defendants on appeal or, apparently, anywhere else, we will nevertheless address it here. The district court found a conspiracy between CSC and CPSC (which is also referred to by the district court in its opinion as the "Crown-Wirtz group"). Liability Opinion, 1981–2 Trade Cas. at 74,774–75. The dissent argues that under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), an agreement between CSC and CPSC to withhold the Stadium from IBI cannot form the basis of a conspiracy for purposes of § 1. We disagree. The Supreme Court held in *Copperweld* that a firm and its wholly-owned subsidiary are not capable of conspiring in violation of § 1. The dissent ar-

gues that we should extend *Copperweld* so as to preclude us from finding a conspiracy between two corporations which have "common investors and [which] are under common control," *infra* p. 576. Even if we were to agree with this proposed extension of *Copperweld*, we do not believe that the facts of this case fit the hypothetical posited by the dissent. It is true that there was some overlap between the investors in CSC and CPSC since Arthur Wirtz owned and controlled CSC (along with his son, William Wirtz) and also invested in CPSC; however, CSC and CPSC were not under common control in the same sense as is a corporation and its wholly-owned subsidiary or as are two corporations owned in identical proportions by the same set of investors, *see Century Oil Tool, Inc. v. Production Specialties, Inc.*, 737 F.2d 1316 (5th Cir. 1984) (two corporations were commonly owned by three men, two of whom each owned 30% of each corporation and one of whom owned 40% of each) (*cited by* dissent, *infra* p. 576). A large number of individuals had invested in CPSC; there is no indication that Arthur Wirtz controlled or could control CPSC independent of the wishes of his co-investors. Thus, while there was some overlap in the ownership of CSC and CPSC, the two corporations lacked the "complete unity of interest" necessary to find them to be a "single enterprise for purposes of section 1." *Copperweld*, 467 U.S. at 771, 104 S.Ct. at 2742.

And, viewing matters more broadly, a multiplicity of antitrust actors is supported by the disparity of economic interests between the stadium owners and the team owners. Further, this is a case where CPSC is a corporation virtually "in formation," where the various investors can be seen as actors independent of the corporation itself. This is not some legal fiction of shareholders forming a conspiracy with their corporation; here the corporation was barely emerging from the interactions of the investors, who were certainly real economic actors in their own right. *Copperweld* eliminated the legal fiction of parent-subsidiary conspiracy as a basis of antitrust liability. It should not ·be extended to shelter independent actors having diverse economic interests acting jointly.

**19a.** Atlanta Hockey, Inc. did not appeal, and accordingly this opinion does not affect the entry of judgment against it.

uate NBA presence at the Chicago Stadium. The unwarranted attendance of representatives of the Crown-Wirtz group at the June 15th NBA meeting confirmed that invitation and offered assurances that the Crown-Wirtz group and the Chicago Stadium stood ready to uphold its end of the bargain. The admitted phone calls and letters from Arthur and William Wirtz to various NBA members (including Washington, Los Angeles, Houston, Atlanta, New York, and the NBA Commissioner) further confirms that the NBA members were "invited" to boycott the plaintiff and hold out for CPSC and the Chicago Stadium. By accepting that invitation, the NBA no votes entered into a conspiracy or combination within the meaning of Sections 1 and 2 of the Sherman Act.

Liability Opinion, 1981–2 Trade Cas. at 74,-779. The district court found that this boycott was for the anticompetitive purposes of excluding the plaintiffs from the market and depriving them of their "fairly won victory over CPSC." *Id.* at 74,782. As a *per se* illegal group boycott, the court ruled, it violated section 1, and since defendants obtained a monopoly as a result, it violated section 2 as well. We cannot approve the district court's treatment of this alleged violation, however, because the evidence supporting this common scheme shows only that CPSC shareholders successfully lobbied certain NBA members so as to ultimately win league approval for themselves.

 A group boycott occurs when the plaintiff's competitors are in a position to deal with the plaintiff but agree not to. *See, e.g., Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed.2d 2013 (1945). Those involved must be motivated by an anticompetitive purpose and the boycott must have an anticompetitive effect. "Anticompetitiveness" is the key: "if conduct is not objectively anticompetitive, the fact that it was motivated by hostility to competitors ... is irrelevant." *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 379 (7th Cir. 1986). Hostility to a rival is not a sure sign of anticompetitiveness because "[v]igorous competitors intend to harm rivals, to do all the business if they can. To penalize this intent is to penalize competition." *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.,* 784 F.2d 1325, 1339 (7th Cir.1986). The concern of the antitrust laws with the integrity of the competitive process, *see supra* Part I.C., means that we can only find a violation—*per se* or under the Rule of Reason—if we have reason to believe that the competitive process has been subverted.

We approved the district court's finding of liability for the concerted refusal to lease the Chicago Stadium because it was motivated by anticompetitive concerns—destruction of competition for the Bulls franchise—and because it had exactly that anticompetitive effect. Here, it cannot be gainsaid that the defendants approached their friends in the NBA and asked to have IBI rejected because they wished to own the Bulls themselves. But the issue is whether in lobbying the NBA (ignoring for the moment that they came armed with the results of the refusal to deal in stadium leases) defendants intended to compete vigorously or destroy competition. This is a distinction particularly important to make in natural monopoly cases such as this one, where "winning" by necessity means driving all of one's competitors from the market. *See* Hamilton & Caulfield, *The Defense of Natural Monopoly in Sherman Act Monopolization Cases,* 33 DePaul L.Rev. 465, 470–71 (1984) (control of a natural monopoly market must be distinguished from the methods used to obtain that monopoly).

The district court decided that the intent was to destroy competition. This conclusion was in large part influenced by its finding that "there was not, nor could there be, 'competition' between plaintiff and the Crown-Wirtz group 'at the NBA

level.'" Liability Opinion, 1981–2 Trade Cas. at 74,788. By this, the court meant that the NBA did not have the power actually to convey the Bulls to the defendants. Thus, the defendants had no business intermeddling with the fruits of IBI's victory—that is, the IBI–Chicago Basketball contract. We believe that this view of the competition between IBI and CPSC is short-sighted, especially in its characterization of the NBA's role. The NBA does effectively have the power to pick its members since it can reject everyone selected by the incumbent until the right new owner comes along. We think that the only possible conclusion is that IBI and CPSC were competitors, at least until July 1972, when the NBA rejected IBI as an owner of the Bulls.

 The "conspiracy" to withhold NBA approval had two main parts. First, the defendants "lobbied" the NBA to reject IBI as a potential co-venturer. Second, the NBA no-votes voted to reject the transfer. It is clear that the second step—the act of voting the rejection—cannot by itself give rise to an antitrust violation. This is demonstrated by another lawsuit that arose from the activities of the NBA Board of Governors at their June 1972 White Sulphur Springs meeting. At that meeting, the Board of Governors was also asked to approve the transfer of the Boston Celtics to certain new owners. The proposed transfer was rejected and those proposed owners brought suit, alleging that their ownership was defeated by an illegal group boycott, motivated by the Governors' antipathy for one "maverick" governor who supported the transfer. The court ruled:

> While it is true that the antitrust laws apply to a professional athletic league, and that joint action by members of a league can have antitrust implications this is not such a case. Here the plaintiffs wanted to *join* with those unwilling to accept them, *not to compete with them*, but to be partners in the operation of a sports league for plaintiffs' profit.

*Levin v. National Basketball Association*, 385 F.Supp. 149, 152 (S.D.N.Y.1974) (foot-notes omitted) (emphasis in original); *see also Seattle Totems Hockey Club, Inc. v. National Hockey League*, 783 F.2d 1347, 1350 (9th Cir.1986); *Mid-South Grizzlies v. National Football League*, 720 F.2d 772, 785 (3d Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984). In the case before us, the NBA decision, on its own, was not an anticompetitive act. The case before us may be distinguished by the presence of another investor group in the wings, but this does not make it an antitrust violation for the NBA to have picked the team it preferred, unless in so doing it involved itself in anticompetitive conduct.

The alleged exclusionary conduct here was that the defendants lobbied the NBA and persuaded a minority of the governors to vote against IBI. Since only one competitor could win NBA approval, it was not in itself anticompetitive for CPSC to suggest to the NBA that it should be the lucky one. Nor was it anticompetitive to contact NBA members to discuss CPSC's supposedly superior qualifications. Leaving to one side the stadium lease violations, there was no injury to competition and hence no antitrust violation. Both IBI and CPSC were free to vigorously compete for NBA approval. Indeed, as we noted in an earlier case involving lobbying alleged to be "an absolute bar to competition," "[w]hile one competitor succeeded and necessarily the other failed, unmistakably there was very strenuous competition. This unavoidable fact undermines the plaintiff's charges under §§ 1 and 2 of the Sherman Act." *Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794, 803, 804 (7th Cir.), *cert. denied*, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961).

### F. State Law Claims

The plaintiffs also brought pendent claims under Illinois law charging all defendants with tortious interference with contractual relations and tortious interference with prospective advantage. The district court ruled that the plaintiffs had

proven both of these claims as against all defendants:

> Here, plaintiffs' contract with the Bulls' owners, a contract which entitled plaintiffs to own and operate the Bulls should the NBA approve the proposed transfer of the Bulls set forth in that contract, was rendered valueless and impracticable, if not impossible, to perform by defendants' intentional and unlawful conduct directed toward obtaining the rejection of the transfer by the NBA and various NBA members.

> By successfully interfering with, and destroying, plaintiff's contractual rights to purchase the Bulls, defendants also succeeded in intentionally interfering with plaintiffs' prospective business advantage of owning and operating the Bulls.

Liability Opinion, 1981–2 Trade Cas. at 74,-783.

■ Tortious interference with contract requires proof of (1) a valid and enforceable contract between plaintiff and a third party; (2) defendant's knowledge of the existence of this contract; (3) inducement by defendant to the third party to breach the contract; (4) a breach; and (5) resulting damages. *E.g., Zamouski v. Gerrard,* 1 Ill.App.3d 890, 897, 275 N.E.2d 429, 433 (2d Dist.1971). We think that the district court erred in concluding that defendants had tortiously interfered with IBI's contract because IBI had no unconditional right under the contract to become the owner of the Bulls. In our view, this case is very close on its facts to *Belden Corp. v. InterNorth, Inc.,* 90 Ill.App.3d 547, 45 Ill.Dec. 765, 413 N.E.2d 98 (1st Dist.1980). In that case, Belden and Crouse-Hinds, Inc. entered into an agreement to merge. The contract stated that both corporations would recommend the merger to their shareholders,

who under Illinois law had the right to approve or reject the merger. InterNorth, which had been planning to make a tender offer for Crouse shares, learned of the agreement. It went forward with its tender offer, publicly announcing that the offer was conditioned upon defeat of the Belden-Crouse merger. The Crouse shareholders rejected the proposed merger, and Belden sued InterNorth for tortious interference with contract and with prospective economic advantage. The court noted that Belden had an enforceable contract with Crouse and thus an unequivocal right to Crouse's performance, *i.e.,* that the merger would be presented and recommended to the Crouse shareholders. But Belden had no more than a "mere expectancy" in the consummation of the merger because only the Crouse shareholders could approve the merger. Since Belden's only enforceable expectation was that Crouse's management would take the merger to the shareholders and since there was no allegation that this had not occurred, there was no tortious interference with the Belden-Crouse contract. *Id.* at 552–53, 45 Ill.Dec. at 769, 413 N.E.2d at 102.

■ Similarly, in the case before us, IBI executed a valid contract with Chicago Basketball, and there is no indication that Rich did not perform his obligations under the contract (using his best efforts to win the NBA's approval and transferring ownership of the Bulls in the event of NBA approval) as expected. IBI had an enforceable right in the performance of these obligations, but prior to NBA approval it had no more than an expectancy, however reasonable, in owning the Bulls. Thus, there could be no claim for tortious interference with the IBI–Chicago Basketball contract because that contract had not been breached.[20]

---

20. As plaintiffs point out, some cases do not require that the contract in question actually be breached but rather require only, for instance, that performance be rendered impossible, *see Bailey v. Meister Brau,* 535 F.2d 982, 987 n. 6 (7th Cir.1976), or that the terms of the contract be coercively modified, *see Hannigan v. Sears, Roebuck & Co.,* 410 F.2d 285, 291 (7th Cir.), *cert. denied,* 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 17

(1969). While these cases show the courts' unwillingness to unduly restrict the tort based on technicalities, we do not think that they speak to the point made in *Belden.* NBA approval of the sale—and thus the right to own the Bulls—was not what was bargained for in the IBI–Chicago Basketball contract.

The tort of unlawful interference with prospective advantage, on the other hand, does not depend on the existence of a contract. The essential elements are (1) plaintiff's reasonable expectation of entering a business relationship; (2) defendant's knowledge of that expectation; and (3) intentional interference by defendant that prevents plaintiff from realizing that expectation. *E.g., Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.*, 16 Ill.App.3d 709, 713–14, 306 N.E.2d 549, 553 (1st Dist.1973). As the court noted in *Belden,* this tort is similar to tortious interference with contract in that both recognize that a person's business relations are a form of property entitled to protection from unjustified tampering by others. The difference, however, lies in the degree of protection afforded:

> An individual with a prospective business relationship has a mere expectancy of future economic gain; a party to a contract has a certain and enforceable expectation of receiving the benefits of the contract. When a business relationship affords the parties no enforceable expectations, but only the hope of ... benefits, the parties must allow for the rights of others. They therefore have no cause of action against a bona fide competitor unless the circumstances indicate unfair competition, that is, an unprivileged interference with prospective advantage. In sum, as the degree of enforceability of a business relationship decreases, the extent of permissible interference by an outsider increases.

*Belden,* 90 Ill.App.3d at 552, 45 Ill.Dec. at 769, 413 N.E.2d at 102 (footnote omitted).

Thus, there could not be a claim for tortious interference with prospective advantage in this case if CPSC did not lose its "competitor's privilege" through some sort of "unfair competition." *Cf. Belden,* 90 Ill.App.3d at 553, 45 Ill.Dec. at 770, 413 N.E.2d at 103; *see also Galinski v. Kessler,* 134 Ill.App.3d 602, 610, 89 Ill.Dec. 433, 439, 480 N.E.2d 1176, 1182 (1st Dist.1985) (lawful competition serves as privileged interference with another's business); *Scheduling Corp. of America v. Massello,* 119 Ill.App.3d 355, 363, 74 Ill.Dec. 796, 802, 456 N.E.2d 298, 304 (1st Dist.1983) (same).

The district court here ruled that the competitor's privilege was not available to defendants because no competition was possible after the contract was signed. We have explained why we think this is clearly erroneous. Lawful competition before the NBA was a distinct possibility in this case. However, as we have noted, defendants competed unlawfully when they withheld the Chicago Stadium from IBI, and the district court also found that CPSC's competition was not privileged because the acts by which it interfered with IBI's expectancy were independently violations of federal antitrust law. Liability Opinion, 1981–2 Trade Cas. at 74,789. The parties do not enlarge upon this point on appeal. Nevertheless, we believe that Illinois law is clear on this point. In *Galinski,* 134 Ill.App.3d at 610, 89 Ill.Dec. at 439, 480 N.E.2d at 1182, the court discussed what constitutes lawful competition in the area of interference with business relationships. It adopted the formulation of the Restatement (Second) of Torts, § 768 (1979):

> (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor ... does not interfere improperly with the other's relation if
>
> (a) the relation concerns a matter involved in the competition between the actor and the other and

---

Nor do we think that the cases holding that the plaintiff's interest need not be enforceable under the contract will support the weight the plaintiffs seek to place on them. For instance, in *Kemper v. Worcester,* 106 Ill.App.3d 121, 62 Ill.Dec. 29, 435 N.E.2d 827 (5th Dist.1982), the court held that interference with an at-will employment contract is actionable even though the plaintiff had no more than a reasonable expectation of future employment. This is completely consistent with *Belden:* The at-will employment contract represented a "foundation for an on-going business relationship." *Id.* at 124, 62 Ill.Dec. at 32, 435 N.E.2d at 830. This is entitled to protection, as was the contingent contract in *Belden.* The point is, however, that the protection it merits is not so extensive as the protection afforded an unconditional contract right.

(b) the actor does not employ wrongful means and

(c) his action does not create or continue in an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

*See also Candalaus Chicago, Inc. v. Evans Mill Supply Co.*, 51 Ill.App.3d 38, 9 Ill.Dec. 62, 366 N.E.2d 319 (1st Dist.1977) (relying on substantially same § 768 of First Restatement); *Getschow v. Commonwealth Edison Co.*, 111 Ill.App.3d 522, 67 Ill.Dec. 343, 444 N.E.2d 579 (1st Dist.1982), *aff'd in relevant part*, 99 Ill.2d 528, 77 Ill.Dec. 83, 459 N.E.2d 1332 (1984) (third party's acts must be legal and not unreasonable in the circumstances); *Petit v. Cuneo*, 290 Ill.App. 16, 7 N.E.2d 774 (1st Dist.1937) (interference not actionable because not independently illegal); *Doremus v. Hennessy*, 176 Ill. 608, 54 N.E. 925 (1898) ("lawful competition" that may injure the business of another not actionable); *see generally* 34 Illinois Law and Practice, *Torts*, § 10, at 365 ("if unlawful means are used, the conduct of the person is not justified or privileged as a competitor"). Relying on these authorities, we conclude that under Illinois law the defendants' actions were not privileged as those of a competitor.

■ IBI had a reasonable expectation of entering a valid business relationship with Rich. Defendants knew of this expectancy. Defendants intentionally interfered with this expectancy, through an unfair and anticompetitive act—the concerted refusal to lease the Stadium—that lost them their competitors' privilege.[21] Thus, we approve the finding of liability on state law grounds, insofar as it is premised upon tortious interference with prospective advantage.

## II. DAMAGES ISSUES

### A. The District Court's Calculation of Damages

The district court found:

> By their unlawful conduct, defendants precluded plaintiff IBI from acquiring the Chicago NBA franchise in the summer of 1972 and from enjoying the anticipated economic benefits of owning and operating that business. Rather, certain of the defendants have had the opportunity to enjoy and exploit the very same business over the past ten years.

*Fishman v. Estate of Wirtz*, 594 F.Supp. 853, 858 (N.D.Ill.1984) ("Damages Opinion").[22] Since CPSC had acquired and operated "the very same business sought by IBI," the district court found it "just and reasonable" to calculate plaintiff IBI's

---

**21.** The dissent takes issue with our conclusion that the defendants' violation of the federal antitrust laws eliminates their competitors' privilege. *Infra* pp. 577–78. While we recognize that there are no Illinois cases which have used the Sherman Act as the basis of tort liability, we do not believe that Illinois case law precludes this result. We have found no cases which indicate that the illegality or wrongfulness of the conduct of a competitor is to be judged solely by reference to state law.

Also, the defendants' conduct in this case might well be unlawful under the Illinois antitrust law. Ill.Ann.Stat. ch. 38, para. 60–1 *et seq.* (Smith-Hurd Supp.1986). This statute contains provisions similar to §§ 1 and 2 of the Sherman Act. *See* Ill.Ann.Stat. ch. 38, para. 60–3 (Smith-Hurd Supp.1986). While we have found no essential facilities cases decided under the Illinois antitrust law, Illinois courts are required by this statute to "use the construction of the federal [antitrust] law by the federal courts as a guide in construing" the state act "[w]hen the

wording of [the state act] is identical or similar to that of a federal antitrust law...." Ill.Ann. Stat. ch. 38, para. 60–11 (Smith-Hurd Supp. 1986). This puts a reverse twist on the *Erie* doctrine. An Illinois court might find that the conduct of the defendants in this case violates the state antitrust law and that the defendants, therefore, are not shielded by the competitor's privilege. Thus, contrary to the dissent's assertion, there might be tort liability in this case even without the Sherman Act.

**22.** This section addresses only the damages of plaintiff IBI. Plaintiff Fishman had also sought $318,000 in damages representing his lost salary as IBI's chief executive officer. Since Fishman would have had to stop working full-time in real estate to become IBI's chief executive officer and since he had earned more than $318,000 in real estate, the district court ruled that Fishman could collect no damages on his lost salary claim. Fishman has not appealed this ruling.

damages according to the "yardstick" of CPSC's actual financial experience from 1972 until 1982. It supported that decision with two findings: (1) IBI and CPSC had similar investment objectives for the Bulls; and (2) the financial success of the Bulls during the relevant ten years was not "attributable to any skill or resources contributed to the business by CPSC." *Id.* at 859. We will outline the steps that the district court took in calculating IBI's damages and then will discuss the objections raised to both its methodology and results, both by defendants and by IBI in its cross-appeal.

The district court started with the proposition:

> The financial benefits specifically realized by CPSC flowed (i) from the increasing going concern value of the business and (ii) from the cash generated from operation. These are the same sources that NBA owners generally attempt to exploit and are the sources IBI specifically intended to exploit.

*Id.* at 861.[23] Thus, the court determined that IBI should receive as damages its lost financial gain, which could be computed by determining the net value of CPSC's assets on May 31, 1982 (*i.e.*, the fair market or going-concern value of the assets minus all liabilities) and then subtracting the net contributions made to CPSC by its shareholders. This "yardstick" figure would then be adjusted by a series of predictable differences in value attributable to IBI rather than CPSC ownership to determine a hypothetical "total financial gain" for IBI.

The first and most difficult step was to determine the fair market value of the Chicago Bulls franchise in 1982. This was accomplished by looking at recent sales prices of "comparable" NBA franchises.[24] The plaintiffs and defendants disagreed as to how the "sales price" of a professional sports franchise should be computed. A common way to pay for a professional sports team is to tender cash and notes and also assume the liabilities of the franchise. The district court agreed with the plaintiffs that assumed liabilities properly comprise part of the "price" of a franchise.[25] But it did not adopt the plaintiffs' proposed valuation method in its entirety because one class of assumed liability—liability for deferred compensation—would create problems in valuing the comparable teams:

> The problem with plaintiffs' approach is not in their inclusion of deferred compensation in assessing the sale price of the assets *of the comparable teams.* Rather, it is an assumption that those asset values can be used directly to compute the value of the assets *of the Bulls.* The Bulls have their own unique structure of player contracts. Those player contracts undoubtedly will be of shorter duration and for lower dollar amounts than those of some NBA teams and will be of longer duration and for higher dollar amounts than other teams. The player contract assets of the teams, therefore, are not comparable.

> The problem arising out of the incomparability of player contracts of otherwise reasonably comparable teams can be solved by simply eliminating deferred compensation entirely from all computations of the sales price of the comparables. In addition, the Bulls' actual deferred compensation will not be deducted

---

**23.** The district court decided to count only those benefits directly accruing to CPSC (and thus, hypothetically, to IBI) in its damages calculation. It noted that the individual defendants had enjoyed substantial benefits from: (1) the "ego" satisfaction and publicity inherent in owning a professional sports team; and (2) the significant tax losses that can be passed through to the shareholders of a subchapter S corporation like either CPSC or Chicago Basketball. Neither of these benefits are enjoyed by the corporation itself. *See infra* note 36.

**24.** Factors making franchises "comparable" included: (1) the size of the home city; (2) the degree of population growth in the home city; (3) the city's interest in basketball; and (4) whether the franchise was an "expansion" franchise. Damages Opinion, 594 F.Supp. at 865–67.

**25.** Defendants had proposed a method of valuation variously called "stock value" or "cash to seller." Basically, this method would look only at the cash paid for comparable teams, ignoring any assumed liabilities. *See* Appellants' Brief at 83–86; Appellants' Reply Brief at 45–47.

from our valuation of the Bulls' assets to determine the Bulls' net market value. *Id.* at 863–64 (emphasis in original). Central to this "hybrid" method of valuation was the district court's assumption that the relative length or brevity of a team's player contracts does not influence the fair market value of a team:

> Team ownership does not become more attractive the more player contracts a team has and the more it is obligated to pay for them. The accounting *worth* of a team is not enhanced by simply adding equal amounts of assets and liabilities to its balance sheet. Teams with longer term, higher dollar player contracts will have a higher value on their balance sheets for their basketball assets, but not a higher net worth.

> A team can, of course, either increase or decrease its market worth by entering into player contracts. It increases its net worth by making good deals, *i.e.*, negotiating contracts which set player compensation low relative to their incremental contribution to the team[']s revenue so that the contracts add to the team's profitability. Conversely, a franchise can decrease its market worth by making bad deals.

*Id.* at 863 n. 9. Since the district court would later in the damages calculation subtract CPSC's *actual* liabilities (since IBI, in fact, assumed no liabilities at all), it elected to omit liabilities for deferred compensation assumed by the buyers in the comparable NBA transactions from the "comparable" fair market value and then not subtract those actual liabilities for deferred compensation. The district court thus found an approximate fair market value (not including liabilities assumed for deferred compensation) for five NBA franchise transactions that it deemed comparable to a 1982 sale of the Bulls.

Armed with this indicator of a comparable fair market value, the district court then examined a number of other factors "[b]ecause of the limited number of transactions, the less than perfect comparability of [other] clubs to the Bulls, and the advent of developments subsequent to some of the comparable transactions," *id.* at 873, and ultimately adjusted the Bulls' value upward to account for developments in pay television and the construction of the Rosemont Horizon (which gave the Bulls greater choice in arena sites than many other teams). It adjusted the Bulls' value downward to account for changes in the tax laws applicable to professional sports franchises and for changes in the NBA free agency rules. At this point, the district court had an approximate fair market value of $11.5 million for CPSC's "basketball" assets (*i.e.*, the Bulls franchise) as of May 31, 1982. To this it added the undisputed value of CPSC's "non-basketball" assets for a total CPSC asset value of $12,667,602.

The court then subtracted all of CPSC's liabilities (with, for the reasons stated above, the exception of its liabilities for deferred compensation) in order to account for the fact that IBI never in fact assumed any liabilities. This left it with a net value of $10,812,090 for CPSC's assets. To determine the total gain realized by CPSC as a result of its ownership of the Bulls, the court next deducted the $4,310,000 that CPSC's shareholders had invested in the franchise; thus, the total gain realized by CPSC was $6,502,090. Finally, this figure was adjusted to reflect predictable differences between IBI's hypothetical costs in owning and operating the Bulls and those of CPSC. This included the $1,190,281 that CPSC had incurred in defending this and related lawsuits and the $50,000 difference between CPSC's and IBI's offers for the franchise. It declined to adjust the total gain to reflect the purportedly higher interest rate that defendants argued IBI would have had to pay on funds borrowed to purchase the Bulls and operate the team from 1972 to 1982. The district court did, however, deduct $3.6 million from the total gain to reflect the "opportunity cost" associated with IBI's hypothetical equity contributions, that is, that part of the purchase price and initial working capital that IBI would have funded by equity instead of debt. The rationale behind this opportunity cost deduction was that

[h]ad IBI acquired the Bulls, it would have incurred operating losses which it would have funded through equity obtained from its shareholders. Because IBI was prevented from acquiring the Bulls, it did not have to fund these losses with equity contributions. IBI, therefore, would have had the use of the funds contributed by the shareholders. If the court did not deduct for opportunity cost, IBI's damages would be inflated by the court's prior conclusion that IBI would have funded operating losses through equity rather than debt, even though IBI had realized the benefits of use of that same equity for other purposes. This would put IBI in a better position than it would have been in had it acquired the team.

*Id.* at 879. This opportunity cost was computed by multiplying the amount of equity invested annually by IBI or its shareholders by the period of time invested, and applying an applicable "opportunity cost" compound interest rate. Here, the district court used the rate of return on "the most nearly riskfree security on the market," *id.*, the three-month treasury bill.

Following these adjustments, the court concluded that IBI's hypothetical gain from ten years of Bulls ownership—thus, also IBI's actual damages from having been deprived of the Bulls—was $4,142,371. Upon a motion to amend,[26] it revised this finding of actual damages to $4,692,238.

Pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15 (1982), these actual damages were trebled and the $750,000 that IBI had received in settlement from the NBA defendants, *see supra* note 6, was deducted after trebling. Judgment on the antitrust counts was entered in the amount of $13,-326,734, with all defendants jointly and severally liable. IBI was also awarded costs

and attorneys' fees, under section 4, and post-judgment interest.

The district court also found that defendants' violation of Illinois law injured IBI in the amount of $4,692,238. It entered judgment against all defendants, jointly and severally, in the amount of $3,942,238 ($4,692,238 less the $750,000 NBA settlement). It also entered judgment for punitive damages, $2 million against the estate of Arthur Wirtz (who had died during the litigation), $2 million against Lester Crown and $500,000 against William Wirtz.

The antitrust and tort judgments were expressly entered in the alternative. IBI could only execute on one award of damages or the other, but not both. Further, the district court declined to exercise its discretion under Illinois law to award the Bulls franchise to IBI as restitution in lieu of money damages.

## B. Appropriateness of the Yardstick Measure of Damages

We note at the outset that our review of the district court's damages calculation must be deferential. An antitrust plaintiff does not bear as onerous a burden in proving the dollar amount of his damages as he does in showing the fact of his antitrust injury. *MCI*, 708 F.2d at 1161; *see also Blanton*, 721 F.2d at 1215; *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 995 (5th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984). This is because an antitrust plaintiff is given an exceedingly difficult task: quantifying the difference between what actually happened and what would have happened in a hypothetical free market. Also, defendants, whose illegal conduct kept IBI from winning the Bulls, should not benefit because their wrongdoing made it difficult to establish the exact amount of injury. The need to tolerate a degree of imprecision in the

---

**26.** In a motion to amend, plaintiff IBI had challenged the $3.6 million figure for opportunity cost. The district court had assumed that IBI would have used the same pattern of using equity to fund operating losses as CPSC. Damages Opinion, 594 F.Supp. at 877. IBI argued that the amount of equity was overstated by the

inclusion of CPSC's higher purchase price, CPSC's *Fishman* litigation expenses, and opportunity cost accruing after the date as of which damages were measured. The district court agreed and revised the deduction for opportunity cost downward. *Fishman v. Estate of Wirtz*, 609 F.Supp. 982 (N.D.Ill.1985).

plaintiffs' proof of damages implies that the district court has a degree of leeway in its damages calculation. Thus, "while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). *Accord MCI*, 708 F.2d at 1161.

It is well settled that an antitrust plaintiff is entitled to recover "in full for the preventable and established loss sustained by reason of tortious or proscribed acts." *Albrecht v. Herald Co.*, 452 F.2d 124, 128 (8th Cir.1971). *See also Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 47 (5th Cir.), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972) (proper measure of damages when business is destroyed by antitrust violation is "what financial advantage would the plaintiff have gained but for the actions of the defendant?"). The concept of a "yardstick" measure of damages, that is, linking the plaintiff's experience in a hypothetical free market to the experience of a comparable firm in an actual free market, is also well accepted. *See, e.g., Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 257–58, 66 S.Ct. 574, 576, 90 L.Ed. 652 (1946); *Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.*, 773 F.2d 1506, 1511 (9th Cir.1985); *Lehrman*, 464 F.2d at 42; *Milwaukee Towne Corp. v. Loew's, Inc.*, 190 F.2d 561, 566 (7th Cir.1951), *cert. denied*, 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680 (1952). The yardstick is usually used to calculate either lost future profits or lost going-concern value of a business damaged, destroyed or never started because of an antitrust violation, *see* Rulon, *Proof of Damages for Terminated or Precluded Plaintiffs*, 49 Antitrust L.J. 152 (1980) (collecting cases). We see no reason why the plaintiffs in this case, who lost the opportunity to buy an ongoing business to the defendants because of the latter's illegal conduct, may not seek to prove lost "total financial gain" if they can make the required showing. "The law has not set

down any mechanical test or formula as regards the required proof." *Locklin v. Day-Glo Color Corp.*, 429 F.2d 873, 880 (7th Cir.1970) (citation omitted), *cert. denied*, 400 U.S. 1020, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971). A plaintiff can "use a method of proof 'specially tailored' to the individual case [although] he cannot engage in pure speculation." *Park v. El Paso Board of Realtors*, 764 F.2d 1053, 1068 (5th Cir.1985), *cert. denied*, 474 U.S. ——, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986), quoting *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 668 (5th Cir.1974). We must affirm the district court unless we are left "with the definite and firm conviction that a mistake has been committed." *Locklin*, 429 F.2d at 880, quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 369, 68 S.Ct. 525, 529, 92 L.Ed. 746 (1948). Here, we agree generally with the district court that plaintiffs' "lost appreciation in value" theory provides one acceptable basis for estimating the financial advantage that IBI would have enjoyed: the net gain to be realized from owning the Bulls for ten years. We think, however, that the district court's methodology requires substantial revision in several aspects.

In this connection, defendants first object to the district court's approach by arguing that damages must be computed as of the date of the injury—in this case, as of July 1972. While this rule may generally govern simple contract damages, it is not necessarily controlling in cases such as the one before us where the injury is continuing or where damages from the injury continue to accrue. The defendants' wrongful conduct deprived IBI of the benefits derived from operating the Bulls for ten years. For example, in *Farmington Dowel Products Co. v. Forster Manufacturing Co.*, 421 F.2d 61 (1st Cir.1969), the plaintiff's business had been destroyed by the defendant's antitrust violation, and plaintiff asked for damages representing his lost profits from the first date of injury to trial plus a hypothetical lost going-concern value of his business as of the date of trial. The court rejected this measure of dam-

ages, not because it did not plausibly delineate plaintiff's damages in the abstract, *id.* at 82 n. 47, but rather because the court thought that it was too speculative to try to calculate the going-concern value of a firm ten years after it had ceased to exist. *Id.* at 80–81.[27] We are not, of course, concerned about over-speculative damages in the instant case. The Bulls did not go out of business but instead continued in business in the hands of CPSC, giving the court, as we have noted, an exceptionally helpful guide to IBI's damages.

Defendants argue that the going-concern value of the Bulls in July 1972 represents a full recovery for IBI because that going-concern value—that is, what a willing buyer given all available information would have paid for the team in 1972—is by definition a future income stream discounted to present value. The district court's valuation, on the other hand, is based on *actual* gain experienced by the Bulls over ten years. (The 1972 going-concern value was affected by a number of *ex ante* predictions, which were proved either true or false and were reflected in the 1982 value). We do not understand defendants' objection to using this adjusted value (which is not speculative, *cf. Farmington Dowel Products,* 421 F.2d 61) because we know of no case that suggests that a value based on expectation of gain is more relevant and reliable than one derived from actual gain. "To correct uncertain prophecies . . . is not to charge the offender with elements of value non-existent at the time of his offense. It is to bring out and expose to light the elements of value that were there from the beginning." *Sinclair Refining Co. v. Jenkins Petroleum Process Co.,* 289 U.S. 689, 698, 53 S.Ct. 736, 739, 77 L.Ed. 1449 (1933) (citations omitted); *see also A.C. Becken Co. v. Gemex Corp.,* 314 F.2d 839, 840 (7th Cir.), *cert. denied,* 375 U.S. 816, 84 S.Ct. 49, 11 L.Ed.2d 51 (1963) ("a

*forecast* of tomorrow's weather is always subject to confirmation or modification by tomorrow's *observation* ") (emphasis in original); *Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp.,* 194 F.2d 846, 856 (8th Cir.), *cert. denied,* 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952) (passage of time permits better proof of extent of harm).

We know of no requirement that damages must always be computed as of the time of the injury or, if not, reduced by some appropriate discount rate to produce a value as of that date. *Cf. Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971) ("Thus, if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date."); *Fontana Aviation, Inc. v. Beech Aircraft Corp.,* 432 F.2d 1080, 1087 (7th Cir.1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 872, 27 L.Ed.2d 923 (1971) ("Where the alleged damages are the result of acts occurring prior to the filing of the complaint, there can be no doubt that they may be recovered even though they may have accrued following such filing.").

■ Finally, there is an important reason for not limiting a plaintiff's damages to the presumed present value of a future loss as of the date of the injury. Defendants argue that IBI's loss is the difference between the fair market value of the Bulls in July 1972 (which they peg at CPSC's offer, $3.35 million)[28] and the $3.3 million that IBI contracted to pay for the franchise. But this approach is premised on the assumption that a competitor is always free to acquire an asset by illegal means because the victim is similarly free to go

---

**27.** Neither of the other two cases relied upon by the defendants squarely address the issue before us.

**28.** It is not indisputable that CPSC's offer should establish the market value of the Bulls in 1972. CPSC's control of the Stadium effectively gave it

the power to exclude other bidders; therefore, one may not necessarily conclude that the $3.35 million paid by CPSC represents the price which the Bulls could have commanded under the conditions of an unfettered market.

spend its money elsewhere.[29] However, if a victim is deprived of what may turn out to be an unusually successful investment, his damages should reflect that fact.[30]

Like the defendants, the dissent argues that the plaintiffs should be limited to the difference between the price at which the plaintiffs contracted to buy the Bulls and the price paid for the franchise by CPSC; the dissent's analysis, however, differs in form, if not in fundamental substance, from that of the defendants. Essentially, the dissent argues that IBI could have "covered" once it was foreclosed from buying the Bulls by the defendants' illegal conduct. While IBI lost one business opportunity, it could go out and invest in the next best business opportunity. IBI should thus be awarded only the bargain element of its contract with Rich, *i.e.*, the amount at which IBI would have been able to buy the Bulls below their "market" price. *Infra* p. 579.

We find the dissent's analysis unpersuasive insofar as it may suggest that IBI should have invested promptly in another basketball team. *Infra* pp. 579–80. The dissent seems to treat basketball teams as fungible commodities. But the record does not disclose that there is anything like an auction market in basketball teams. As far as we know, the law imposes no duty on a buyer who has been unlawfully done out of a purchase of the Bulls to cover immediately with the Bucks, the Celtics or the Lakers. The record does not disclose that these teams were either fungible or available.[31]

Defendants also assail the district court's "assets-based" method of valuing the Bulls, arguing that it is inaccurate because: (1) different franchises own different assets; and (2) different franchises treat their assets differently for accounting purposes. As for the first objection, defendants mention only two instances of "different assets"—pay television interests and arena rights. The district court dealt adequately with both. Damages Opinion, 594 F.Supp. at 870–73. The second objection is rather more involved but perhaps comes to as little in the end.

Many NBA franchises list their player contracts as an asset on their balance

---

**29.** *Cf. Sinclair Refining*, 289 U.S. at 699, 53 S.Ct. at 739 (damages for breach of contract to assign a patent):

> Value for exchange is not the only value known to the law of damages. There are times when heed must be given to value for use, if reparation is to be adequate. [citations omitted]. An imaginary bid by an imaginary buyer, acting upon the information available at the moment of the breach, is not the limit of recovery where the subject of the bargain is an undeveloped patent. Information at such a time might be so scanty and imperfect that the offer would be nominal. The promisee of the patent has less than fair compensation if the criterion of value is the price that he would have received if he had disposed of it at once, irrespective of the value that would have been uncovered if he had kept it as his own.

**30.** The dissent criticizes the yardstick measure because it ostensibly does not recognize distinctions between price gain in basketball teams in general and price gains unique to the Bulls. *Infra* pp. 579–80. But these distinctions (while perhaps academically defensible) were not argued to us, and we think it unnecessary to address them. In any event, gains in value from price inflation are at least partially offset (and perhaps fully offset) by the higher opportu-

nity costs attributable to inflation which should be offset against the gain in value of the Bulls. *See infra* section C. 2 at p. 556.

Similarly, the dissent argues that the district court has ignored any discrepancies due to transfer prices between the Stadium and CPSC. *Infra* p. 580. This point has not been argued as a ground for error on appeal, and we see no need to address a "problem" which does not appear of record.

The dissent also suggests that the damage award should be adjusted to take into account the increase in value of the Bulls that is due to the entrepreneurial skills possessed by CPSC but not by IBI. *Infra* p. 580. Again, the defendants did not raise this possible criticism of the damage award before this court, and as the dissent itself suggests, there is no evidence that any of the increased value was due to "extraordinary entrepreneurial gains."

**31.** While the district court computed the 1982 value of the Bulls by examining the purchase price of "comparable" teams, the use of this method is not incompatible with saying that these teams are not fungible. To compute damages one must use the most comparable figures available and other basketball teams provide such baseline figures, which may be adjusted to take into account, to the extent practicable, the actual experience of the Bulls.

sheets and also enter a corresponding liability for unearned deferred compensation, that is, the sums to be paid players in the future under those contracts. Others, including the Bulls, do not list either player contracts or unearned deferred compensation in their books. The only liability for deferred compensation that these teams carry (also carried by the franchises that enter unearned deferred compensation) is for *earned* deferred compensation, *i.e.*, sums owed to players for services already rendered. The trial court did not distinguish between earned and unearned deferred compensation in its damages calculation. The defendants argue:

> Because the trial court did not distinguish between earned and unearned deferred compensation, the "comparable" sales from which it derived the value of CPSC's basketball assets were not at all comparable. Some included an asset valuing the future services of the team's players, others did not. The calculation was further distorted when the court refused to deduct CPSC's actual liability for deferred compensation when no offsetting asset for player services existed.

Appellants' Brief at 86.

■ We do not believe that the district court's method was clearly erroneous; rather, we think that the defendants have mischaracterized it. The district court correctly held that an accurate sales price or fair market value would be equal to what a willing buyer would pay for the entire package, assets and liabilities. Assumed liabilities of any sort, earned or unearned, are part of that fair market value because the total of cash, notes and assumed liabilities represents the financial obligation a buyer would undertake to own a particular team.[32] This is the fallacy in the defendants' dramatic argument that the district

court's method means that "an NBA franchise escalates in value the more liabilities it has and the closer it approaches bankruptcy." Appellants' Reply Brief at 45–46 n. 31. If someone buys a franchise that has that many liabilities to be assumed, it must be because he values the purchase at least that highly.

■ Further, the fact that the Bulls list no "asset" in their books for player contracts or liabilities for unearned deferred compensation is in itself irrelevant. The district court was not valuing the teams according to how they appear on a balance sheet; rather, it was assessing how the market valued the teams' "assets," in the layman's sense of that term. No one suggests that the Bulls had no player contracts in 1982. Conversely, if the Bulls had player contracts, they had incurred a liability to pay the athletes in the future, whether or not this was listed as a liability on the balance sheet. A prospective purchaser of any franchise—including the Bulls—would decide how much cash to offer by looking at the quality of the player contracts and the amount they were already "paying" for those contracts by assuming the owners' obligations to the players. Thus, the defendants are wrong to suggest that the Bulls' choice of accounting procedures somehow affects their "comparability" with other NBA franchises. The district court's method of computing a 1982 fair market value for the Bulls was reasonably accurate and not clearly erroneous.

As noted above, the district court saw a potential problem with its valuation method, and it adjusted the calculation to account for this. Based on its finding (not clearly erroneous) that the lengths of a team's player contracts leave the value of the team unaffected,[33] it decided not to add

---

**32.** This is the problem with the defendants' "stock value" methodology. Taken alone, the cash component of these franchise purchases is as unenlightening as everyone agrees looking only at liabilities assumed would be.

**33.** Unlike liabilities for unearned deferred compensation, differing liabilities for *earned* deferred compensation can change the value of a

franchise. Thus, if the "comparable" five NBA teams had had very small liabilities for earned deferred compensation and if the Bulls had had quite large ones, the district court's methodology would have led to an overstatement of the Bulls' net value in 1982. The district court has not addressed this specific problem (and it is questionable whether the defendants raised it there). Since the determination of damages

to the "comparable" fair market value the liabilities for deferred compensation and correspondingly declined to subtract the Bulls' actual liabilities for deferred compensation in reaching its "net" value. This resulted in a relatively accurate and workable method of finding a net value for the Bulls. Since, however, the district court did not separately treat CPSC's *actual* liability for *earned* deferred compensation, it may reconsider this issue on remand, in accordance with the discussion in footnote 33, *supra*. We emphasize, however, that defendants have not pointed to any reason to expect a disparity in earned deferred compensation between the Bulls and the comparable teams.

## C. Cost of Capital

The district court derived its yardstick measure of IBI's hypothetical gain from ownership of the Bulls by assuming that IBI would have funded the purchase and working capital needs of the franchise through debt and equity contributions in the same proportions as did CPSC. It further found that IBI would have borrowed funds at the same rate as did CPSC and so declined to adjust the yardstick gain figure for the assertedly higher interest rate that CPSC argued IBI would pay. But, for the hypothetical equity contributions, the district court reduced IBI's damages by its "opportunity cost," or the return it could have made on an alternative investment with those funds.

Defendants argue on appeal that the finding that IBI would have had no greater a cost of debt capital than CPSC was clearly erroneous. Both parties are dissatisfied with the result regarding opportunity cost, the plaintiffs arguing that it was inappropriate to deduct it at all and the defendants arguing that the interest rate chosen by the district court was too low.

*1. Interest Rate on Debt.* The district court concluded that, although there was conflicting testimony, the evidence supported plaintiffs' position that IBI would

have paid interest at the same rate as CPSC (prime plus ½%) on funds borrowed over the ten years from 1972 to 1982:

> [T]he court gives great weight to the substantial and rapid appreciation in value of the franchise. In addition, plaintiffs would have been operating the very same going concern that defendants operated. These are factors which, over virtually the entire 10 year period[,] would have been most important to a lending institution considering an extension of credit to IBI.

Damages Opinion, 594 F.Supp. at 877–78. Defendants assert that it was clearly erroneous to consider the appreciation in the value of the Bulls the deciding factor as to this issue. They note that CPSC was able to arrange a start-up loan for prime plus ½% on the strength of a personal guarantee from each CPSC shareholder. IBI, on the other hand, arranged for an initial line of credit from the same bank but at prime plus 3%, also to be personally guaranteed by the IBI shareholders. This, they argue, shows that the bank was looking at the creditworthiness of the shareholders of the two corporations, not the value of the investment, in setting the interest rate.

 The matter is not without doubt and this court, had it been the trier of fact, might have been inclined to give greater weight to the lending institution's assessment of the (initial, at least) relative creditworthiness of the two ventures. But, although the question seems close, we cannot say that the district court's finding was clearly erroneous. It noted that the defendants' evidence mainly involved only 1972, when the two groups were starting up, and that Continental Bank released all personal guarantees of CPSC shareholders by 1975. The bank elected to concentrate its analysis on the financing of working capital needs in the later years of ownership. One of the benefits of the "yardstick" method of computing damages is that once the plaintiff shows relative comparability between his hypothetical firm

will be remanded for other reasons, the district court may consider on remand any issue which

may have been raised with respect to the treatment of earned deferred compensation.

and the unaffected yardstick firm, he is allowed to borrow liberally from that firm's experience. Given the close comparability of CPSC and the hypothetical IBI, we do not think it was clearly erroneous to presume that the same, or a closely comparable, interest rate would have been charged over most of those ten years. This conclusion can stand even in the face of the apparently substantial disparity in creditworthiness of the respective sets of stockholders.

*2. Opportunity Cost of Equity.* IBI, in its cross-appeal, argues that the district court erred when it deducted from its yardstick measure of damages an amount representing the return IBI would have earned on an alternative, risk-free investment funded by the equity that it did not, as a result of defendants' conduct, actually invest in purchasing and running the Bulls. First, it argues that the courts have never recognized "opportunity cost" as a limiting element in the calculation of antitrust damages. Second, it asserts that there is no opportunity cost involved in a hypothetical purchase of the Bulls by IBI because IBI, which was never funded, was not able to realize the benefits of the use of that equity in any alternative investment. Defendants appeal the opportunity cost setoff as well, arguing that the interest rate applied was too low.

The economic concept of "opportunity cost" has been used in a variety of cases as a loose label for any of a number of adjustments to value involving the idea that for every use of one's resources there is an alternative use, with its own return, foregone. *See, e.g., Afram Export Corp. v. Metallurgiki Halyps, S.A.,* 772 F.2d 1358, 1369–70 (7th Cir.1985) (seller incurred an opportunity cost on funds laid out to "cover" buyer's breach, but this loss is not recognized as incidental damages); *Multi-*

*flex,* 709 F.2d at 996 (antitrust defendant incurred an opportunity cost on profits lost in years before trial for which it must be reimbursed); *People of State of Illinois v. Interstate Commerce Commission,* 698 F.2d 868, 875 (7th Cir.1983) (regulated industry incurred an opportunity cost when alternative undertaking foreclosed by regulation would have brought a greater profit; this is properly part of its cost of service). The opportunity cost of an investment may be defined as the return on the most lucrative alternative investment, that is, the return on the "next-best" investment.

The opportunity cost theory advanced by defendants here is different from those employed in the cases we have cited. In one sense, "cost" is not being measured here at all; rather, defendants are attempting to isolate a benefit that has accrued to IBI or (strictly speaking) to IBI's investors. That benefit is the investors' use of money over a ten-year period that they otherwise would have used to subscribe to stock in IBI. The defendants assert that the proper way to measure that benefit, so as to deduct it from the yardstick measure of damages, is to find the opportunity cost of acquiring the Bulls, *i.e.,* the return from the IBI investors' next-best investment.

 We agree with both the defendants and the district court that, under facts like the ones in this case, antitrust damages may be offset by a figure that accounts for the fact that the plaintiffs actually had use of money that, but for the violation, would have been tied up in the lost business opportunity. This figure can be labeled the "plaintiffs' opportunity cost" in the context of this case. Under the unique facts here, we think this "plaintiffs' opportunity cost" is, for all practical purposes, equivalent to mitigation,[34] and we agree that the tort

---

**34.** Defendants are at great pains to explain that opportunity cost is entirely different from mitigation of damages. They contend that opportunity cost "is an economic concept which must be utilized to accurately measure gain." Appellants' Reply Brief at 51. They are only half right—opportunity cost is a concept that is used to measure *relative* gain. If someone has

earned $100, he does not have only $10 because the next-best investment would have earned him $90: he has $100. And if he loses $100 but could have salvaged his position and lost only $90, it is still true that he has lost $100. Opportunity cost is a "real" but not an "out of pocket" cost. *Afram Export Corp.,* 772 F.2d at 1369. The law may turn the real but hypothetical cost

rules regarding mitigation of damages can have their place in the law of antitrust. However, we disagree with the district court's method of computing opportunity cost.

We reject plaintiffs' contention that opportunity cost should be zero. Plaintiffs argue that IBI had no opportunity cost (or, to state it another way, could not mitigate its damages) because without an NBA-approved contract to purchase the Bulls, IBI had no equity to place in an alternative investment. IBI was "formed for the sole purpose of acquiring the Bulls. Absent that acquisition, it had no obligation, ability or right to obtain any funds from its shareholders for other investments." Damages Opinion, 594 F.Supp. at 878. The members of Fishman's investment group were not obligated to subscribe for shares of IBI until NBA approval had been obtained, and in fact no IBI stock was issued in 1972.[35]

Technically, of course, the plaintiffs' position is correct: IBI is the plaintiff; yet the district court imposed a duty to mitigate damages upon IBI's organizers and would-be shareholders. In this connection, we have in this case a peculiar fact-pattern: the corporate plaintiff was not funded and has never been more than an empty shell. It is clear that the district court considered it inequitable to conclude this case with a measure of damages that would make the potential investors better off than if IBI had actually owned and operated the Bulls for ten years. The IBI organizers were able to keep, as a result of the antitrust violation, what would have been their equity contributions to IBI. Presumably, they invested, or could have invested, this money in some other way and received a return on it between 1972 and 1982. Accordingly, the district court "pierced" the corporate veil at least so far as to account for the "passive" retention by the IBI investors of their contribution over ten years. In view of the very unusual facts presented here, we see nothing wrong with this exercise of

into an out-of-pocket cost by making the alternative investment legally relevant; this it does through the rule regarding mitigation of damages.

The dissent contends that we should consider CPSC's opportunity cost as critical and not IBI's mitigation efforts. Rather than deducting the profits which IBI could have made in an alternative investment, the dissent argues that we should instead reduce the increase in value of the Bulls, which is the starting point of the district court's damage calculation, by the imputed cost of CPSC's equity capital. Essentially, the dissent appears to contend that since IBI did not take the risk associated with an investment in the Bulls, it should not be awarded as damages the return associated with that risk. This approach may not be economically incorrect, but it seems to us to ignore the crucial distinction in law between the wrong-doer and the wronged.

IBI wanted to buy the Bulls and assume the attendant risks, but the defendants' illegal conduct precluded IBI from taking this particular risk and from reaping the corresponding return. Instead, as the dissent points out, CPSC put its capital at risk and received a return commensurate with the risk-bearing service it supplied. If we were to accept the dissent's approach and reduce the damages by the value of the risk assumed by CPSC (*i.e.*, the imputed cost of CPSC's equity investment), IBI's potential recovery would be drastically reduced or eliminated. *Infra* p. 581. This result, according to the dissent, would be appropriate because IBI could have invested in some alternative opportunity, as risky as the Bulls, which would have returned a profit in line with that risk. *Infra* p. 582. Thus, under the dissent's approach, IBI would really recover no damages but would have instead the profits from its alternative and equivalently risky investment. Under this analysis, in being pushed from an investment it wanted (the Bulls) to a theoretically equivalent investment it may not have wanted, IBI would have suffered no damage. It would be kept whole by another investment as risky as the Bulls. While the dissent's economic approach is understandable, it seems not to take account of the well-accepted legal concept that undue risk may not be forced on the wronged party, *see infra* p. 558. While that party may have been willing to accept a particular (and perhaps unique) business risk and opportunity, it may not be required, when wrongfully done out of that investment, to invest immediately in another line of business with its own unique configuration of risks.

35. IBI issued its first stock in 1974, when Fishman caused IBI to issue three shares to himself in preparation for this lawsuit. *See* Damages Opinion, 594 F.Supp. at 881–82.

the district court's discretion.[36] As a matter of equity, on these facts there is no good reason to give a shell corporation advantages unavailable to one that was fully funded and operational.

While we agree with the district court that the plaintiffs' opportunity cost should be deducted from the damage award, we disagree with the way in which the trial court calculated this amount; we think that the method employed by the district court substantially overstated the amount of damages. We thus turn our attention to determining acceptable ways of calculating opportunity cost under the unusual facts of this case.

The principle of mitigation of damages, which as we have noted is in this case only opportunity cost by another name, requires a plaintiff to use his best efforts to minimize the damages caused by a defendant's wrongful conduct. In most cases, a court can determine the amount by which a plaintiff's damages should be reduced by looking to the actual experience of the plaintiff and determining whether the plaintiff's mitigation efforts were reasonable. *Lehrman*, 464 F.2d at 46–47. *See also* 11 *Williston on Contracts* § 1353 (W. Jaeger 3d ed. 1968); 5 *Corbin on Contracts* § 1039 (2d ed. 1964); Note, *Private Treble Damage Suits: Damages for Destruction of All or Part of a Business*, 80 Harv.L.Rev. 1566, 1579 (1967). Under the facts of this case, however, a court cannot proceed by examining the actual experience of IBI after it was foreclosed from buying the Bulls;

as we noted earlier, IBI was a shell corporation which was never funded.

Nonetheless, we agree with the district court that some reasonable amount must be charged against plaintiffs' recovery as the opportunity cost of equity to represent the returns which may reasonably be imputed to IBI or its shareholders from investments made as alternatives to investment in the Bulls.[37] Since we cannot look to the plaintiffs' actual investment experience, we are forced to hypothesize what we could reasonably expect IBI's shareholders to have done after IBI's investment in the Bulls was precluded. In approaching this problem, we are mindful of two apparently conflicting policies. On the one hand, we agree with the district court that while a plaintiff has a duty to mitigate damages, he should not be required to take undue risks. Damages Opinion, 594 F.Supp. at 879. On the other hand, we cannot adopt a measure of opportunity cost which would reward a plaintiff for letting his capital lie fallow while he waited passively for many years to collect his treble-damage award. While, as we have noted, an investor of risk capital may have no duty of "cover" in the same sense as a commodity trader's duty, the loss of one investment opportunity does not negate the assumption that the capital will seek out some comparable opportunity.

The district court chose to hypothesize that IBI decided to put its money in the most riskless of all investments, three-month treasury bills. The district court's

---

**36.** Plaintiffs argue that IBI shareholders were going to put equity into the Bulls, not because they were expecting a great return (3% over prime according to the defendants), but rather because they planned to use the Bulls as a tax shelter. Plaintiffs note that between 1972 and 1975 tax benefits had returned to CPSC's shareholders almost 70% of their equity investment. They assert that it is unfair to "pierce" the corporate veil to deduct a return on the investors' uninvested capital yet to ignore the tax benefits those investors lost when they were unable to buy the Bulls. We do not think that this analysis is inequitable. The value of the tax benefits to each of the investors depends on so many factors personal to each investor that we think that it would obviously be very difficult to

try to ascertain their "value." In any event, the district court did not ignore this aspect of the damage problem in its calculations since the value of these tax benefits to an NBA owner is certainly reflected in the market prices of the comparable NBA franchises, which are the bases for the district court's damages award. A recognized tax shelter will be valued, at least in part, to reflect the tax benefits it makes available.

**37.** We are assuming for the purpose of calculating opportunity cost that IBI's organizers did in fact invest in that corporation and that IBI then placed these funds in an alternative investment.

theory recognizes that, while IBI may have actually had a greater return on its alternative investment than the relatively low treasury bill rate, it may also have lost money on its investment; since these possible losses cannot be determined and taken into account in calculating the antitrust damages in this case, the district court declined to assume that IBI had in fact made, or had any duty to make, alternative investments which would entail any but the most minimal risk.

The district court decided in effect that IBI had no duty to invest its money in anything riskier than treasury bills for a period of about ten years. While we recognize the policy of limiting risk in carrying out the duty to mitigate damages, we think that under the particular circumstances of this case it would be error to use the treasury bill rate indefinitely in calculating IBI's opportunity cost. Such an approach could encourage the immobilization of capital for a long period while antitrust damages were being sought. At some point, IBI might be expected to make an alternative investment yielding an equity return—albeit not necessarily the highest and riskiest one available.

For one thing, time is a factor. IBI cannot be expected to make an alternative equity investment instantaneously.[38] Where, as here, making an equity investment involves making many subjective assessments and possibly elaborate preparations, we doubt that two or three years would be too long a period of time to allow IBI to identify and structure such an investment. Under some circumstances five years might not be too long. And, during this period of searching for and identifying alternative equity investments, leaving the money in treasury bills would seem appropriate.

The question remains what alternative equity return should be assumed as an opportunity cost (or investment by way of mitigation) given a preliminary period of several years during which the funds are left in treasury bills. We believe that this estimate should, if anything, err on the side of conservatism since the alternative may be to force undue risks on a victim of wrongdoing. The district court has found, and we have accepted, a cost of debt for IBI as the owner of the Bulls of the prime rate plus ½%. Damages Opinion, 594 F.Supp. at 877–78. We think it would be reasonable to assume that, considering the need to cover interest expense, normal investor expectations and like factors, the cost of equity in IBI's Bulls investment would be at least as high as the cost of debt. If such an assumption were correct, an equity return from an alternative to an investment in the Bulls would be at least prime plus ½%.

The defendants have also argued that since the IBI investors had contracted with Continental Bank to borrow their equity contributions at prime plus 3% and since (in their view) IBI would have borrowed at that rate, they would expect at least that return on their equity. Therefore, the defendants argue that prime plus 3% is an appropriate opportunity cost. It is conceivable that at some point in time a return at this general level might be supportable, but we have no basis at this juncture to express any opinion on the matter. (And we have, of course, sustained prime plus ½% as an acceptable cost of *debt* to IBI.) The district court has made no finding on the interest rate at which the investors could have borrowed their equity contributions. On remand the district court is at liberty to bear this factor in mind to the extent it may deem it relevant and appropriate.

We believe therefore that it is necessary to vacate the damage award and remand this case to the district court to reconsider the question of an appropriate opportunity cost. The district court should bear in mind that, while undue risk may not be forced on a victim of wrongdoing, leaving equity funds indefinitely in treasury bills

---

**38.** Anent the dissent's contention that IBI should "cover" its lost purchase, *infra* pp. 579–80, finding a new investment opportunity for equity investors is certainly not as simple or routine a task as the dissent seems to imply.

could discourage enterprise and would not be a proper assumption for the computation of the opportunity cost of equity in the long run. On remand an opportunity cost of equity must be established for the period *after* the initial term when funds could be quite justifiably left in treasury bills.

## D. Punitive Damages

The district court assessed punitive damages for the state law violations against the estate of Arthur Wirtz and against William Wirtz and Lester Crown. Defendants argue that: (1) the facts of this case do not warrant an award of punitive damages; (2) the amounts awarded plaintiff IBI were "grossly excessive"; and (3) punitive damages should not have been awarded against Arthur Wirtz's estate. We need only reach the first of these issues.

We have in the liability portion of this opinion substantially narrowed the bases of liability upon which punitive damages may be awarded. We declined to approve the district court's conclusion that the defendants interfered with IBI's rights under the IBI–Chicago Basketball sales contract and its finding that it was an anticompetitive act to have lobbied the NBA for rejection of IBI's application for approval. The tort that remains following these modifications is the withholding of the Chicago Stadium: The defendants knew that IBI had signed a contract with Chicago Basketball and thus had a reasonable expectation of acquiring the Bulls franchise. Wanting the Bulls for themselves, defendants set out to ensure that that expectation would not be realized. They withheld the Stadium lease from IBI, knowing that IBI needed the lease to compete effectively before the NBA. The "stadium lease boycott" was, however, an illegal act, and defendants therefore lost their "competitor's privilege" to try to wrest the Bulls from IBI's grasp.

 Under Illinois law, "punitive damages should not be awarded if the defendant's misconduct is not above and beyond the conduct needed for the basis of the action." *O'Brien v. State Street Bank & Trust Co.*, 82 Ill.App.3d 83, 87, 37 Ill.

Dec. 263, 266, 401 N.E.2d 1356, 1359 (4th Dist.1980); *Parsons v. Winter*, 142 Ill. App.3d 354, 361, 96 Ill.Dec. 776, 781, 491 N.E.2d 1236, 1241 (1st Dist.1986). We think that, as a matter of law, the modified basis upon which liability now rests does not justify the imposition of punitive damages because the facts on which liability is based do not go beyond what is necessary to fulfill the elements of the tort of interference with prospective advantage, *see Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 186, 23 Ill.Dec. 559, 563, 384 N.E.2d 353, 359 (1978) ("preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly one of law"). The competitors' privilege to interfere with prospective advantage is broader than the privilege to interfere with a contract right. A bona fide competitor (that is, one who is seeking profits for himself) is privileged to interfere with another's expectancy unless he does so in an unlawful fashion. *See* W. Prosser, Torts § 130, at 955–56; sources cited *supra* Part I.F. The defendants in this case did interfere unlawfully and are being held liable for this intentional tort. But the findings of the district court, as modified, will not support an award of punitive damages.

## E. Treble Damages Against The Estate of Arthur Wirtz

 Defendants also argue that the trial court erred in trebling the antitrust damages assessed against Arthur Wirtz's estate. The district court noted that there were cases in other jurisdictions to the effect that the death of a defendant abated a plaintiff's claim for treble damages, but the court declined to follow them. Those cases, mostly quite old, are based on the notion that treble damages are exclusively penal in character and should not be assessed when the malefactor is no longer around to learn his lesson. However, as the district court noted, Damages Opinion, 594 F.Supp. at 892, treble damages in antitrust suits were "provided in part for puni-

tive purposes ... but also to make the remedy meaningful by counterbalancing 'the difficulty of maintaining a private suit....' " *Bowl-O-Mat*, 429 U.S. at 486 n. 10, 97 S.Ct. at 696 n. 10, quoting 21 Cong. Rec. 2456 (1890); *see also American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 574–76, 102 S.Ct. 1935, 1946–47, 72 L.Ed.2d 330 (1982); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746–47, 97 S.Ct. 2061, 2074–75, 52 L.Ed.2d 707 (1977). In view of these Supreme Court statements, we believe that the analysis of the district court was correct. The better rule is that, particularly under the precise circumstances before us, the award of treble damages did not abate upon the death of Arthur Wirtz.

## F. Other Cross-Appeal Issues

Plaintiff IBI makes two further arguments on appeal, the first of which presents a question of some difficulty.[39]

*1. Prejudgment Interest.* The district court declined to award prejudgment interest in this case relying on our decision in *Locklin v. Day-Glo Color Corp.*, 429 F.2d 873 (7th Cir.1970), as well as on inferences the district court drew from recent amendments to the Clayton Act. *Fishman v. Estate of Wirtz*, Nos. 74–C–2814, 78–C–3621 (N.D.Ill. Nov. 20, 1984) ("Order Relating to Judgment") at 6–7. The plaintiffs argue that the district court should have awarded prejudgment interest from May 31, 1982, the end of the damage computation period, until the entry of judgment on November 21, 1984. Appellees' Brief at 118–21. For the reasons discussed below, we agree with the district court's denial of prejudgment interest.

The rule in this circuit has been that prejudgment interest is not available on judgments for treble damages in federal antitrust cases. *Locklin*, 429 F.2d at 877. Plaintiffs urge us to reconsider, arguing that the rationale behind *Locklin* is now discredited. In *Locklin*, we relied upon the fact that the Clayton Act did not provide for prejudgment interest and upon the presumption that this statutory silence meant that Congress did not wish to authorize such interest.

It is true that this circuit's most recent cases have moved away from the position that congressional silence is dispositive on this subject, *see, e.g., Myron v. Chicoine*, 678 F.2d 727, 733–34 (7th Cir.1982) (prejudgment interest available under Commodities Exchange Act); *Taylor v. Philips Industries, Inc.*, 593 F.2d 783, 787 (7th Cir. 1979) (prejudgment interest available under Civil Rights Act of 1964), and, for the reasons stated by the dissent, these appear to be healthy developments. We agree with the district court, however, that in light of the recent amendment of section 4 of the Clayton Act, 15 U.S.C. § 15(a) (1982), which now expressly allows the award of prejudgment interest to private litigants under limited circumstances,[40] we cannot conclude that Congress intended to allow the recovery of prejudgment interest in cases filed prior to the effective date of this amendment. The Clayton Act as amended only permits a private antitrust plaintiff to recover prejudgment interest if the defendant is guilty of unnecessary delay. While we agree with the dissent that prejudgment interest is necessary in some cases if a plaintiff is to be made whole,[41] Congress has not yet provided that prejudgment interest can be awarded as a matter of course to private litigants in antitrust

---

**39.** IBI also appealed the district court's refusal to adopt its proposed judgment order, which would have allowed IBI to execute upon both the federal antitrust treble damages and the Illinois common law punitive damages in such a way that no one defendant would have to pay both types of damages. Because we have reversed the district court's judgment on punitive damages, we do not have to reach this issue.

**40.** Antitrust Procedural Improvements Act, Pub.L. No. 96–349 (1980) (effective Sept. 12, 1980).

**41.** The plaintiffs make no claim for interest on any amounts prior to May 31, 1982. The need for interest to compensate the plaintiffs fully in this case is not so great as if the damages all occurred as of July 1972 when IBI's contract to purchase the Bulls was terminated.

562

suits.[42] *See Strobl v. New York Mercantile Exchange*, 590 F.Supp. 875, 882–83 (S.D.N.Y.1984); *Smith v. Pro-Football, Inc.*, 528 F.Supp. 1266, 1275 (D.D.C.1981). We must therefore continue to rely on our decision in *Locklin* and accordingly, agree with the district court that prejudgment interest should not be awarded in this case.[43]

■ *2. Equitable Relief.* Finally, the plaintiffs contend that the district court abused its discretion when it refused to order the defendants to divest the Bulls franchise as an equitable remedy for their illegal conduct. The court properly weighed the potential benefits to IBI against the harm defendants, third parties and the court would experience and decided not to make the award. It found that the expectations of third parties would be hurt, that judicial administration would be too difficult and that the plaintiffs had an adequate remedy in money damages. This determination was not outside the district court's discretion.

## III. CONCLUSION

Because we agree with the district court that the "stadium lease boycott" violated sections 1 and 2 of the Sherman Act, we affirm the judgment with respect to liability only against CPSC, CSC, the estate of Arthur Wirtz, William Wirtz, Albert Adelman, Lester Crown, Philip Klutznick and James Cook with respect to Counts I and II of the Consolidated Complaint. Because we do not believe that the NBA lobbying formed the basis for any antitrust violation, these activities cannot form the basis of a judgment against these eight defendants with respect to Count VIII.[44] Finally, the judgment with respect to Count VII, the state law violation, with respect to liability only, is affirmed as against these eight defendants.

Because the district court, in its liability opinion, found that Emprise Corporation, Chicago Blackhawks Hockey Team, Inc. and Atlanta Hockey, Inc. were involved in the alleged NBA boycott only and not in the refusal to lease the Chicago Stadium, we reverse the judgment against these three defendants on all counts. For the same reason, the judgment against these three defendants on state law grounds must also be reversed.

The judgment against the estate of Arthur Wirtz and against William Wirtz and Lester Crown insofar as it assesses punitive damages is reversed. The judgment with respect to damages on the antitrust counts and actual damages awarded pursuant to the state law claim is vacated, and the cause remanded for reassessment of these damages in a manner consistent with the principles set forth in this opinion. Circuit Rule 18 shall not apply. The parties shall bear their own costs.

**42.** Congress also amended the Clayton Act to permit the government to recover prejudgment interest when it prevails in antitrust suits. 15 U.S.C. § 15a (1982). In contrast to section 15(a), a court can award the government prejudgment interest, not only when the other party engages in delaying tactics, but also when it is necessary to "compensate the United States adequately for the injury sustained...." 15 U.S.C. § 15a(4) (1982). Therefore, although Congress was well aware of the policy of allowing prejudgment interest to make a plaintiff whole, it chose not to give courts the authority to consider this policy in the context of awarding prejudgment interest to the private antitrust plaintiff.

**43.** We agree with the defendants and the dissent that the Supreme Court suggested in *General Motors Corp. v. Devex*, 461 U.S. 648, 657, 103 S.Ct. 2058, 2063, 76 L.Ed.2d 211 (1983), that

there is a presumption in favor of prejudgment interest even if a statute is silent on the question of interest. We do not believe, however, that this presumption necessarily applies under the Clayton Act given its subsequent amendment by Congress to specifically provide for the award of such interest only in very limited situations.

**44.** The district court also entered judgment in favor of plaintiffs and against all defendants on Count III (restraint of trade in indoor sports arena market) and Counts V and VI (monopolization of market for professional winter sports in Chicago and restraint of trade in that market). We must reverse these as not consistent with the district court's findings of liability. It found that plaintiffs lacked standing to allege antitrust violations in the arena market (Count III) and never mentioned Counts V and VI at all.

AFFIRMED IN PART, REVERSED IN PART, VA-
CATED IN PART AND REMANDED.

EASTERBROOK, Circuit Judge, dissent-
ing in part.

In 1972 Chicago had one professional
basketball team, playing at the Stadium.
In 1973 Chicago had one professional bas-
ketball team, playing at the Stadium. The
district court found the team to be a natu-
ral monopoly and the Stadium to be an
"essential facility", so no matter who
owned the Bulls, Chicago was doomed to
have one professional basketball team,
playing at the Stadium. The change of
ownership in July 1972 did not alter the
structure of the market or the potential for
new entry. It did not reduce the quantity
produced, increase the price charged, or
affect the quality supplied. There is no
claim of consumers' injury, actual or poten-
tial, now or in the future. For their role in
this non-event, the defendants have been
ordered to pay more than $12 million under
the Sherman Act.

### I

Although consumers, the beneficiaries of
the antitrust laws, did not lose from the
transfer to CPSC rather than IBI, they
may have gained. On the district court's
findings, the Bulls and the Stadium are
monopolies. One is a supplier to the other.
(The Bulls supply fans to the Stadium or
the Stadium supplies an arena to the Bulls;
it doesn't matter which.) When two mo-
nopolists stand in succession on the way to
the final product, each may try to charge a
monopoly price. If each does so, the final
price to the consumers will exceed even the
price a single, rational monopolist would
charge. The first monopoly price in the
chain will present the other firm with a
higher cost of doing business. The second
firm then will try to monopolize the mar-
ket, but because his cost of doing business
is higher, his monopoly price to the con-
sumer also will be higher. The final price
to the consumer is higher, and output low-
er, than it would be if a single firm operat-
ed both stages of production. A merger of
the two monopolists therefore makes con-
sumers better off. See IV Philip Areeda &
Donald F. Turner, *Antitrust Law* ¶ 1012b
(1980); Roger D. Blair & David L. Kaser-
man, *Law and Economics of Vertical In-
tegration and Control* 31–36 (1983); Rob-
ert H. Bork, *The Antitrust Paradox* 230
n.* (1978); F.M. Scherer, *Industrial Mar-
ket Structure and Economic Perform-
ance* 300–02 (2d ed. 1981); Frederick R.
Warren-Boulton, *Vertical Control of Mar-
kets* 51–63, 80–82 n. 1 (1978). Propositions
about the economics of mergers often are
filled with ifs and maybes; competing
schools of thought produce different pre-
scriptions. That successive monopolies in-
jure consumers is a proposition on which
there is unanimous agreement.

The two monopolists might be able to
work things out by contract so that they do
not try to collect two monopoly profits.
But such contracts may be hard to negoti-
ate and enforce as conditions of demand
change. Any change will create opportuni-
ties for one party to take advantage of the
other, and in the process injure consumers.
Vertical integration is an especially durable
and flexible long-term contract, and it
takes care of the problem of successive
monopolies. Cf. Oliver E. Williamson,
*Markets and Hierarchies* 104–05 (1975) (in-
tegration is beneficial when parties have
long-term relations that create opportuni-
ties for exploitation); Benjamin Klein, Rob-
ert G. Crawford & Armen A. Alchian, *Ver-
tical Integration, Appropriable Rents,
and the Competitive Contracting Process,*
21 J.L. & Econ. 297 (1978).

So long as the Stadium was in a position
to charge the Bulls a monopoly price, the
consumers might have been injured not
only by double monopoly pricing but also
by receiving lower quality. The owner of
the Bulls had less reason to improve the
team's standing if the Stadium could cap-
ture the benefits through higher rent.

Ownership by CPSC rather than IBI also
made the NBA happy, which implies bene-
fits to the league as a whole (and thus
consumers of basketball throughout the na-
tion). The source of benefits to the league

as a whole may be conjectural, but when the challenged acts do not produce demonstrable losses to consumers, inability to quantify the benefits is of no moment. *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 n. 11 (D.C. Cir.1986).

## II

Let us now suppose, however, that consumers are indifferent between IBI and CPSC as owners of the Bulls. That is the assumption most favorable to IBI. It may be forced on us by the defendants' failure to articulate in the district court, or here, the potential efficiencies I have discussed. Still, IBI did not argue, and the district court did not find, that there is any potential injury to consumers. This silence all around marks the case for what it is—a spat among business rivals, in which consumers have no real interest. Litigation isn't basketball. There is no overtime, and ties go to the defendant.

If Rich had accepted CPSC's offer of June 13, 1972, everything would have come out the same way it did—CPSC would have had the team, IBI would have lost profits, the Bulls and the Stadium would have been in common control. My brethren think this would have been lawful. So, too, if the NBA had turned down IBI on its own and CPSC had prevailed by default, this would have been lawful. Their objection is to CPSC's tactics in corralling the Bulls. Yet the choice of tactics had no effect on consumers. Antitrust law condemns *results* harmful to consumers; it condemns bad means to the extent they have a tendency to bad results. Bad means that injure only business rivals—that is to say, business torts—are outside the scope of antitrust law. The Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Hunt v. Crumboch*, 325 U.S. 821, 826, 65 S.Ct. 1545, 1548, 89 L.Ed. 1954 (1945). Acts that do not harm consumers need not be justified.

The Supreme Court has dealt with business torts several times, and in each the possibility that the wrong might injure consumers was a linchpin. For example, in *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), a newspaper refused to take ads from anyone who also advertised on a fledgling radio station. The newspaper wanted to knock the radio station, a competitor for advertising revenues, out of the market. Success in the campaign would have reduced the number of suppliers and allowed the newspaper to raise its prices. In *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), the wrong was fraud on the Patent Office. One firm secured a patent that gave it a great, maybe dispositive, advantage. This undoubtedly stamped out effective competition between the two firms. Still, the Supreme Court said, the elimination of rivalry violates the antitrust laws only if it enables the defrauder to destroy competition in a relevant market—the market for knee-action swing diffusers, a market defined from consumers' perspective. Injury to the business rival was insufficient; the Court remanded for an inquiry into whether purchasers of the product would be victimized by overcharges. See also, e.g., *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986 (9th Cir.1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980); *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 851 (1st Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1148, 89 L.Ed.2d 312 (1986), both holding that the antitrust violation lies in enforcing the patent (or trade secret) in such a way that existing competition in the product market is destroyed, and that fraud or other nasty acts in getting the rights are not antitrust problems. This is the unanimous view of thoughtful commentators. All believe that business torts violate the antitrust laws only if they produce injury to consumers by monopolizing a market that is otherwise competitive. E.g., III Areeda & Turner at ¶¶ 736–39, 828–29; Bork at 330–64; Herbert Hovenkamp, *Economics and Federal Antitrust Law* § 5.6 (1985); Lawrence A. Sullivan, *Antitrust* 512–13 (1977); cf. Note, *Antitrust Treat-*

*ment of Competitive Torts: An Argument for a Rule of Per Se Legality Under the Sherman Act*, 58 Tex.L.Rev. 415 (1979). If consumers are indifferent between IBI and CPSC, why should the antitrust laws interfere? To protect Rich's autonomous selection of a buyer for his team? Autonomy is an important value, but it is not within the domain of antitrust. See *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 n. 21, 97 S.Ct. 2549, 2559 n. 21, 53 L.Ed.2d 568 (1977).

Antitrust is about competition, and the majority concludes that CPSC "succeeded in driving out all competition for ownership of the Bulls" (maj. op. 536). At the end of the bidding, only CPSC was in the running. But at the end of any bidding only one contestant remains. Should we say that Rich's contract with IBI on June 14 "[drove] out all competition for the Bulls"? Or should we say that the contract was a *result* of competition, and that CPSC's sin was that when Rich wanted to end the competition CPSC wouldn't say die? How did CPSC's strategy cut off competition, when the problem (as IBI perceived it) was that competition continued uncomfortably long? At the end of the process in July 1972, Rich got an extra $50,000, the NBA got an owner it preferred, and the fans of the Bulls had the same basketball team.

The problem is one of characterization. Almost any contract can be characterized either as the outcome of competition or as a reduction in competition. Tampa Electric Co. signs a 20–year exclusive contract for coal. Does this "drive off all competition" from excluded suppliers for the next 20 years, or is the contract the outcome of a competitive process? GTE Sylvania gives its dealer an exclusive territory, forbidding competition from other dealers. Is this a competitive move against Zenith or is it an extinguishment of competition among dealers? Ford Motor Co. signs a long-term contract for shipment of its cars to dealers, and then replaces one motor carrier with another. Is the contract (and the replacement) the extinguishment or the outcome of competition? We held in *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985), that a swap of one contractor for another cannot violate the antitrust laws. Would it make an antitrust difference if Ford changed contractors because one of its officials was bribed? Because the winning bidder misrepresented the quality of its service? It is easy to see why fraud and bribery are wrong, but what makes them antitrust wrongs? Or suppose the Stadium had given IBI the lease it requested, but CPSC then had whispered in Rich's ear that one investor in IBI is a Buddhist, and religious intolerance had led Rich to sell the team to CPSC?

"[T]he legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence." *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). To decide whether a process that ends in a single winner, or in a restraint of some sort, is an antitrust wrong, we must ask what the antitrust laws are for. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 687–92, 98 S.Ct. 1355, 1363–65, 55 L.Ed.2d 637 (1978). Every contract ends one form of competition and may create another. A law firm suppresses competition among its partners to create competition against other firms. So to observe that there has been a suppression of some competition—among the partners of the law firm, in *Chicago Board of Trade* among the members of the Board, here between IBI and CPSC—is to state rather than answer the antitrust question. The rule in *Chicago Board of Trade* injured all who wanted to trade at new prices while the Board was closed. It stamped out this form of competition, yet the Court sustained the rule because the Court thought it did not lead to higher prices for grain.

Does the "suppression" at hand create the sort of injury about which antitrust laws are concerned? Suppose IBI and

CPSC had merged, which would have stamped out competition more fully. No, in either event. The plaintiffs conceded as much when they declined to argue that the suppression of competition between IBI and CPSC injured consumers. It may have injured Rich by depressing the price he received, but Rich did not complain.

The majority's answer is that injury (at least a potential for injury) to consumers is not an essential ingredient of an antitrust case. The Supreme Court and this court have said that it is, however. E.g., *Associated General Contractors v. Carpenters,* 459 U.S. 519, 538, 103 S.Ct. 897, 908, 74 L.Ed.2d 723 (1983) ("the Sherman Act was enacted to assure customers the benefit of price competition"); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979) ("Congress designed the Sherman Act as a 'consumer welfare prescription.' "), repeated in *NCAA v. Board of Regents,* 468 U.S. 85, 107, 104 S.Ct. 2948, 2964, 82 L.Ed.2d 70 (1984); *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 500–01, 60 S.Ct. 982, 996–97, 84 L.Ed. 1311 (1940) ("Restraints on competition or on the course of trade in the merchandising of articles moving in interstate commerce is not enough, unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition."); *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 379 (7th Cir.1986) ("Most businessmen don't like their competitors, or for that matter competition. They want to make as much money as possible and getting a monopoly is one way of making a lot of money. That is fine, however, so long as they do not use methods calculated to make consumers worse off in the long run."); *In re Wheat Rail Freight Rate Antitrust Litigation,* 759 F.2d 1305, 1315–16 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2275, 90 L.Ed.2d 718 (1986) (rejecting a claim because "[i]ncreased competition, in the sense of gaining a lower price or some other benefit for the consumer, could not be the result of an imposition

of antitrust liability" in the circumstances); *Brunswick Corp. v. Riegel Textile Corp.,* 752 F.2d 261, 266 (7th Cir.1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985) ("The purpose of the antitrust laws as it is understood in the modern cases is to preserve the health of the competitive process—which means ... to discourage practices that make it hard for consumers to buy at competitive prices—rather than to promote the welfare of particular competitors."); *Products Liability Insurance Agency, Inc. v. Crum & Forster Insurance Cos.,* 682 F.2d 660, 663–65 (7th Cir.1982) ("there is a sense in which eliminating even a single competitor reduces competition. But it is not the sense that is relevant in deciding whether the antitrust laws have been violated. Those laws, we have been told by the Supreme Court repeatedly in recent years, are designed to protect the consumer interest in competition. ... The consumer does not care how many sellers of a particular good or service there are; he cares only that there be enough to assure him a competitive price and quality.... This private squabble does not threaten consumers' welfare even remotely. If [the plaintiff] thinks he is wronged he must look to state law for his remedy."); *Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 554 (7th Cir.1980) ("the absence of a sufficient allegation of anticompetitive effects in a Sherman Act complaint is fatal to the existence of a cause of action. It was a desire to eliminate the *public injury* of diminished competition which impelled Congress to enact the antitrust laws") (emphasis in original). We are by no means the only court to take this view. E.g., *Assam Drug Co. v. Miller Brewing Co.,* 798 F.2d 311, 315–16 (8th Cir.1986); *Westman Commission Co. v. Hobart International, Inc.,* 796 F.2d 1216, 1220 (10th Cir.1986); *Rothery Storage,* 792 F.2d at 219, 228–29; *Business Electronics Corp. v. Sharp Electronics Corp.,* 780 F.2d 1212 (5th Cir.1986), and *id.* at 1221–22 (Jones, J., concurring).

Granted, each case is a little different from ours. One involved standing (*Reit-*

er ), another patents (*Riegel*), etc. So be it. The proof that antitrust is about consumers' injury (and its cousin, allocative efficiency) lies in the structure of the rules, not in selected phrases. The structure is unmistakable. Judge Bork summed things up in *Rothery Storage*, 792 F.2d at 214–30. I offer a few more illustrations.

1. Zenith Radio Corp. complained that it was being oppressed by a conspiracy to charge low prices, which would drive it out of the market. The Supreme Court held that injury to Zenith was irrelevant unless Zenith could show that it was harmed by something that also harmed consumers. Because Zenith could not show this, the Court strongly suggested the grant of summary judgment against Zenith. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

2. Pacific Stationery and Printing Co. was expelled from a cooperative buying group. The boycott injured Pacific, which lost access to discounts. The expulsion "was certainly a restraint of trade". *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985). Yet the Court found the expulsion lawful because it would not "characteristically be likely to result in predominantly anticompetitive effects" (*id.* at 2620–21)—by which it meant adverse effects on consumers, because the adverse effect on Pacific was conceded. See *Rothery Storage*, 792 F.2d at 215–29, for an analysis of refusals to deal.

3. Edwin G. Hyde was not allowed to provide anesthesia to his patients at East Jefferson General Hospital, because the Hospital had given an exclusive contract to competing anesthesiologists. The Court ignored the injury to Hyde and asked whether the arrangement could injure consumers, "whose interests the statute was especially designed to serve", by tying anesthesia to other medical services. *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 15, 104 S.Ct. 1551, 1560, 80 L.Ed.2d 2 (1984). After defining a market from the standpoint of consumers' alternatives (rather than Hyde's alternatives), 466 U.S. at 26–29, 104 S.Ct. at 1566–67, and concluding that the arrangement did not make consumers worse off (that is, did not add to or make it easier to exploit existing market power), the Court held the Hospital entitled to judgment as a matter of law. Hyde's inability to compete was thought irrelevant.

4. Pueblo Bowl-O-Mat, Inc., lost business because Brunswick Corp. acquired bowling emporia. The district court found that Pueblo suffered substantial injury in fact when business was diverted to Brunswick, apparently at lower prices. The Supreme Court assumed that this injury flowed directly from a violation of the Clayton Act—Brunswick should not have acquired the lanes, because the market was already concentrated, and Brunswick held a substantial market share. It held Pueblo's injury irrelevant, because if Pueblo suffered consumers gained. Unless Pueblo could show that it was injured by something that was *also* deleterious to consumers, it could not recover. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). See also *Local Beauty Supply, Inc. v. LaMaur Inc.*, 787 F.2d 1197 (7th Cir.1986).

5. The principle behind these cases is that to know whether a given restraint is an *antitrust* problem we must identify the potential effects of that restraint on consumers' welfare and allocative efficiency. So whether the NCAA may dominate the televising of college football depends on whether the exclusive contract potentially injures viewers of football, not on whether it injures colleges that want to telecast their games. *NCAA v. Board of Regents*, 468 U.S. at 106–07, 113–20, 104 S.Ct. at 2963–67, 2967–71. Whether performing rights societies may license copyrighted songs through a cooperative license depends on whether this tends to restrict output and raise price, not whether it injures TV stations that cannot obtain licenses in the way they prefer. *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 9–10,

19–20, 22 n. 40, 99 S.Ct. 1551, 1556–57, 60 L.Ed.2d 1 (1979); *Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917 (2d Cir. 1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985). Whether an exclusive selling territory or a nonprice restraint violates the law depends on the effect this may have on consumers, not on whether it "forecloses" competition by those who wish to sell the same product. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 762–64, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984); *GTE Sylvania*, 433 U.S. at 54–59, 97 S.Ct. at 2559–62.

The majority claims that no case requires "a plaintiff to isolate and demonstrate the consumer impact of a particular purported antitrust violation not directed at the consumer level." Maj. op. at 536, note omitted. The cases I have discussed so far fill the bill. The defendants in *Hyde* restricted the opportunities of anesthesiologists; the Court required the plaintiff to show how his exclusion injured consumers. The defendant in *GTE Sylvania* cut off plaintiff from an opportunity to compete; the Court required the plaintiff to show how his exclusion injured consumers. The other cases follow the same pattern. These many cases also show the error of the majority's proposition, maj. op. at 537, that "the Court has never given us to believe that anything save unfettered competition is the key to consumer well-being." What is *GTE Sylvania, BMI, Hyde*, or any merger case about? See also *Rothery Storage*, 792 F.2d at 214–30, which establishes my point with a comprehensive survey of the Court's decisions.

6. Liability in antitrust law almost always requires proof of market power. This is because market power is an essential ingredient of injury to consumers. Market power means the ability to injure consumers by curtailing output and raising price; no possible injury, no market power; no market power, no violation; injury to consumers is therefore an essential ingredient of liability. The Supreme Court, this court, and commentators all agree that market power must be identified from the perspective of consumers. This is what the

Court did in *NCAA*, 468 U.S. at 109–13, 104 S.Ct. at 2964–67; see also *United States v. General Dynamics Corp.*, 415 U.S. 486, 498–504, 94 S.Ct. 1186, 1194–97, 39 L.Ed.2d 530 (1974). In this court see, e.g., *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325, 1334–37 (7th Cir.1986) (a supplier with about 80% of the market's sales lacks market power because consumers cannot be injured by a reduction in its output). See also, e.g., Philip Areeda, *Market Definition and Horizontal Restraints*, 52 Antitrust L.J. 553 (1983); II Areeda & Turner at ¶¶ 501, 518; Robert G. Harris & Thomas M. Jorde, *Market Definition in the Merger Guidelines*, 71 Calif.L.Rev. 464 (1983); William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv.L.Rev. 937 (1981); Scherer at 56–64; George J. Stigler & Robert A. Sherwin, *The Extent of the Market*, 28 J.L. & Econ. 555 (1985); Sullivan at 41–44, 72–74.

The market definition in this case shows why you can't pick a market without knowing the purpose of the choice. The court has defined a market of professional basketball in Chicago. This is a plausible market, if the question is whether anything injured consumers. It looks at demand elasticity (can fans travel to Milwaukee? switch allegiance from basketball to hockey or opera?) and at supply elasticity (can new teams sell their product if the Bulls cut back output? can TV pipe other NBA games into Chicago?). Defining the market in this way shows that if the Stadium had contrived to prevent the startup of a second basketball team—as the stadium in *Hecht v. Pro-Football, Inc.*, 570 F.2d 982 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978), contrived to stop the advent of a second pro football team in Washington, D.C.—there would be a serious antitrust problem. This definition also shows that the sale of the Bulls to CPSC rather than IBI could not injure consumers; it did nothing to conditions of either demand or supply.

If, instead, we seek to learn whether CPSC harmed competition for a sports

franchise, we must define a market that looks at the demand and supply possibilities facing Rich and IBI. Rich could have been injured if IBI and CPSC, in cahoots, rigged their bids, or if CPSC had prevented IBI from bidding. But Rich has not complained. To tell whether IBI's opportunities as a would-be operator of professional teams were hampered, we must look at its options, not those of fans in Chicago. There is a national market in sports franchises, as the makeup of IBI and CPSC shows. Each syndicate includes owners of sports teams in other cities (and in other sports) around the country; Fishman himself had an interest in the Milwaukee Bucks basketball team. The Second Circuit has held that there is a national market in "sports capital". *North American Soccer League v. NFL*, 670 F.2d 1249 (2d Cir.), *cert. denied*, 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982). There is also a national market in which arenas compete for teams. See *Los Angeles Memorial Coliseum Commission v. NFL*, 726 F.2d 1381 (9th Cir.), *cert. denied*, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984), and consider the saga of the Indianapolis (nee Baltimore) Colts, *Indianapolis Colts v. Mayor and City Council of Baltimore*, 775 F.2d 177 (7th Cir.1985). We need not discuss the Brooklyn Dodgers, the Washington Senators, or the Washington Senators. Which market matters depends on the theory of competition involved. See Areeda, *Market Definition*, 52 Antitrust L.J. at 553, 583–84. The court today chooses a market (pro basketball in Chicago) the buyers in which were unaffected by the conduct in issue; a market looking at the opportunities of Fishman and IBI, such as a market in sports franchises, would reveal that the Stadium lacked market power; either way, the lack of injury to consumers reveals that there is no violation.

7. This court has held, in a case identical to ours in every material way, that when one entrepreneur wrests a monopoly from another by foul means, the antitrust laws do not supply a remedy. It held this, moreover, on the ground my brethren reject: that only injury to consumers violates the antitrust laws. In *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261 (7th Cir.1984), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985), Riegel stole Brunswick's trade secret and obtained a patent for it. This expelled Brunswick from the market and ended competition. We held that the antitrust laws are indifferent to which firm is the monopolist. The consumers' choices are unaffected. "If no consumer interest can be discerned even remotely in a suit brought by a competitor—if, as here, a victory for the competitor can confer no benefit, certain or probable, present or future, on consumers—a court is entitled to question whether a violation of the antitrust laws is being charged." 752 F.2d at 266–67. We threw the case out, remarking that "[w]e cannot find the consumer interest in this case." 752 F.2d at 267. We observed that *Brunswick v. Pueblo* had held that a firm may recover only for its injury that flows from acts that harm consumers too, and thought that it "follow[s] that if a form of wrongdoing (stealing a patentable process) cannot cause antitrust injury to anyone, because it has no tendency to raise prices or reduce output or do anything else that hurts consumer or other interests protected by the antitrust laws, it does not violate those laws at all." 752 F.2d at 268.

The majority distinguishes *Brunswick v. Riegel* on two grounds: that it involved patents and that Brunswick and Riegel were not "competing" for the patent monopoly. The former is irrelevant to the theory of decision in the case. The patent was the source of the market power, as here a natural monopoly is said to be the source of the market power. The source matters not to the question whether the antitrust laws govern the process by which market power passes from Firm A to Firm B.[1] The argument that Brunswick and Riegel were not "competing" also is irrelevant.

---

1. Although the majority is right to point out that a patent does not always create a monopoly, or even market power, the court in *Riegel* assumed that the patent in question created an absolute monopoly.

The majority means by this that CPSC won by stifling IBI's chances of buying the team, while Riegel won by theft and fraud. In every useful sense, however, both cases involve the same dispute—which of two firms shall hold a legal monopoly—and the same objection to the "unfair" means employed by one firm to win the day. That Riegel proceeded by a preemptive strike rather than waiting for a chance to prevent an auction cannot make any difference from the perspective of either the firm on the short end of the stick or the consumers in the market. *Brunswick v. Riegel* establishes both the appropriate theory of antitrust and the appropriate outcome of this case. It is consistent with other cases in our court, too. E.g., *Havoco*, 626 F.2d at 558 (rejecting a claim of unfair competition as an antitrust offense and stating that "only where a defendant with substantial market power uses the unfair means to increase its share of the market by eliminating a competitor" is there an antitrust problem).

8. Other cases in this circuit almost without exception say that the purpose of antitrust is to protect consumers' welfare and its close relative economic efficiency. E.g., *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1437 (7th Cir.1986) (collecting cases); *Olympia*, 797 F.2d at 375, 379–80; *Local Beauty Supply, Inc.*, 787 F.2d at 1202; *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 671–74 (7th Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986); *Brillhart v. Mutual Medical Insurance, Inc.*, 768 F.2d 196, 200–01 (7th Cir.1985); *In re Wheat Rail Freight*, 759 F.2d at 1315; *Sutliff Inc. v. Donovan Cos.*, 727 F.2d 648, 655 (7th Cir. 1984); *Products Liability Insurance Agency*, 682 F.2d at 663–64; *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advertising Ass'n*, 672 F.2d 1280, 1287 (7th Cir.1982). So, for example, when a firm substitutes one exclusive contractor for another, we hold that there is no claim because consumers cannot be injured. *Car Carriers; Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 539–40 (7th Cir.1986). This case, too, concerns the substitution of one firm for another; injury to consumers is impossible and benefit to consumers is likely.

9. The foremost scholars of antitrust agree that the laws are designed for the benefit of consumers and should not be used to advance any other interest. I Areeda & Turner at ¶¶ 103–13; Bork at 50–89; Richard A. Posner, *Antitrust Law: An Economic Perspective* 18–20 (1976). The appropriate goals of antitrust law have been subject to great debate. But the competing approach identifies political goals such as preventing a great increase in aggregate concentration. E.g., Robert Pitofsky, *The Political Content of Antitrust*, 127 U.Pa.L.Rev. 1051 (1979). These additional objectives do not require fetching humdrum business torts within the reach of antitrust, as my colleagues would do. And other circuits, following the Supreme Court, have embraced the economic approach to antitrust. See the cases cited at 566. Take, for example, the many cases holding that injury to a business competitor is irrelevant in the absence of injury to the market (which means market structure or consumers' welfare). E.g., *Ralph C. Wilson Industries, Inc. v. Chronicle Broadcasting Co.*, 794 F.2d 1359, 1363 (9th Cir.1986); *Hayden Publishing Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 68 (2d Cir.1984); *Stifel, Nicolaus & Co. v. Dain, Kalman & Quail, Inc.*, 578 F.2d 1256, 1261 (8th Cir.1978). One court recently put the principle to work by holding that "leveraging"—the use of the market position in one market to obtain an advantage in another, as CPSC did here—is unlawful only if the acquired monopoly injures consumers. There is no offense of "leveraging" in the raw. *Catlin v. Washington Energy Co.*, 791 F.2d 1343 (9th Cir.1986).

## III

These nine items are but a quick tour through the structure of antitrust. A constellation of doctrines shows that consumers' welfare is the point of antitrust, and that we ask whether a given arrangement is the "suppression of competition"—as op-

posed to the outcome of competition, which always includes some restraints—by inquiring whether the practices hurt or could hurt consumers. Against all of this my brethren set the essential facilities doctrine. Maj. op. 533–35, 539–42. The owner of an essential facility (the district court found that the Stadium is one) must make the facility available on equal terms, the majority says, and the Stadium was not made available. End of case. I agree with my colleagues that the essential facilities doctrine is pertinent, but it is part of the same picture: potential injury to consumers is relevant.

I confine my attention to five essential facility cases, which show the nature and limits of the doctrine: *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119 (7th Cir.1982); *City of Mishawaka v. American Electric Power Co.*, 616 F.2d 976 (7th Cir.1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981); *Hecht v. Pro-Football, Inc.*, 570 F.2d 982 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *Union Leader Corp. v. Newspapers of New England Inc.*, 284 F.2d 582 (1st Cir.1960), *cert. denied*, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961). These cases, like the other essential facility or "bottleneck boycott" cases, share the feature that the bottleneck was used to suppress horizontal competition that might be of benefit to consumers—competition that could survive if all firms had access to the essential facility. None involves a natural monopoly at each level, the problem we confront today.

In *Otter Tail* a firm with a monopoly of the nearby facilities for the long-distance transmission of electricity refused to wheel power over its lines. "Wheeling" is the receipt of power from Generator A, transmission over the lines of Firm B, for delivery to Consumer C. Otter Tail generated power and also sold power at retail in 465 towns. Four towns, including Elbow Lake, wanted to get into the retailing business. Elbow Lake tried to buy electricity from other firms, which were willing to sell if Otter Tail would wheel the power to Elbow Lake. Otter Tail refused to wheel; it also refused to sell its own power to Elbow Lake. The Court held this violated the Sherman Act, and it is easy to see why. There were three markets: the market in generation of power, the market in transmission, and the market in retail distribution (like manufacturing, wholesaling, and retailing). Otter Tail held a monopoly of transmission (wholesaling). But generation of power is highly competitive, and many generating firms put their power on the nationwide grid of transmission lines owned by the many electric utilities. Elbow Lake wanted to shop among the generating firms for the best price. Elbow Lake also may have been hoping that it could distribute power at retail for less than Otter Tail's costs. Otter Tail's refusal to wheel power prevented Elbow Lake from shopping, and thereby had the potential to raise the prices to Elbow Lake's consumers. *Otter Tail* is not a case in which a violation was found despite the absence of injury to consumers; injury was very likely. Otter Tail's transmission prices were regulated; to make a monopoly profit it needed to seize control of an unregulated market, which it did. Otter Tail used its bottleneck to prevent Elbow Lake from receiving the benefit of ongoing competition at the generating level. So in *Olympia*, 797 F.2d at 376–77, in summarizing the point of the essential facility cases, we said it would be a violation for Western Union to cut off telex service to customers that buy from rival vendors of equipment: the equipment market is competitive, unless a firm uses its bottleneck to stamp out that competition. In our case, however, neither the stadium business nor the pro basketball business in Chicago would be competitive but for the denial of access to the Stadium.

*Mishawaka* is almost the reverse of *Otter Tail*. Mishawaka was in the distribution business, buying power from American Electric, another regulated firm searching for an unregulated monopoly. As a retailer, Mishawaka was in a position to shop

around—after its existing exclusive contract with American Electric expired. Before Mishawaka could shop for power, American Electric put on a rate squeeze—that is, it charged Mishawaka more for wholesale power than it charged its retail customers for retail power. There was a direct injury to consumers. Everyone in Mishawaka paid more for power, while American Electric had the town over a barrel. And there was a potential longer-term injury. If Mishawaka had responded to the squeeze by selling its system to American Electric (so that consumers could take advantage of the lower retail rates), then consumers would have lost the long-term benefit of competition at the generation level. American Electric as retailer might use its own power and not shop for power from other generators; and if it decided to shop (to hold down its own costs) it would be under no competitive pressure to pass the savings on to the residents of Mishawaka. So again the stratagem was designed to deprive the consumers of Mishawaka of the benefit of competition in a market (generation) that was not monopolized, and to stifle potential competition from the town itself.

The effect on consumers in *Hecht* is even clearer. Washington, D.C., had one pro football team, playing at Kennedy Stadium. A new pro football league proposed to operate a second team in D.C. The existing team and the stadium authority froze the new team out. The result: a city that had an opportunity to have two teams ended up with one. This is a suppression of horizontal competition. Consumers lost out. So too if IBI had wanted to lease the Stadium for a team of the American Basketball Association or the World Hockey League, in either event doubling the number of competitors. Nothing remotely like this happened in Chicago. There was and will be only one professional basketball team, the district court found. Fishman and IBI didn't want to break up a monopoly (as the plaintiffs did in *Hecht*); they wanted to *be* the monopoly.

*Omega* is a different animal altogether. It involved cable TV, and the court assumed that the operation of a cable system is a natural monopoly in any area. The question was whether (the state action doctrine to one side) a city in cahoots with potential rivals could stifle any competition among operators of a cable system. The opinion, written by the author of *Brunswick v. Riegel*, contains a line on which the majority relies: "the antitrust laws protect competition not only in, but for, the market—that is, competition to be the firm to enjoy a natural monopoly". 694 F.2d at 127. My colleagues conclude that the antitrust laws are not concerned with consumers' welfare but with "fair competition" to be a monopolist. They miss why *Omega* was reasoned as it was. Assume that cable TV is a natural monopoly in any geographic area, which means that the average total cost of service is least if only one set of wires is hooked up to each home. There are at least three ways of getting to the single-producer outcome. One is for two or three firms to build competing grids and see who survives; that creates the inefficiency (multiple grids) we seek to avoid. A second is for the would-be rivals to sit down at a table and divide up the territory, each agreeing to provide all the service in a sector of the city and not to compete in any other sector. Then there will be only one grid per sector, but the consumer must pay a monopoly price. A third is for the firms to bid for the right to be the monopolist in a sector. Each firm may offer, say, a fixed monthly fee, and the firm bidding the lowest fee hooks up that sector. To get the business the firms will bid the price down to average total cost, both expanding output and giving the consumers (rather than themselves) the benefit of the savings from having only one grid per sector. It is a safe bet that when Judge Posner wrote in *Omega* that the antitrust laws protect competition *for* as well as in the market, he had this possibility in mind. See Richard A. Posner, *The Appropriate Scope of Regulation in the Cable Television Industry*, 3 Bell J.Econ. & Mgt.Sci. 98 (1972). Bidding for a natural monopoly may give consumers all the bene-

fit of competition; it is as if the bidding process could turn monopoly into competition.[2] If a city sets up an auction process, and the putative competitors subvert that process by rigging bids, consumers lose and the bid-rigging violates the antitrust laws. Again this does not help IBI, for no one was suggesting that IBI and CPSC make bids on ticket prices or TV contracts, with the low bidder to get the team. *That* would be franchise bidding. Nothing of the sort was proposed here or frustrated by the Stadium.

Finally there is *Union Leader.* Two newspapers were slugging it out for what the court assumed was the inevitable survival of one. It is not really an essential facilities case. Some language in the opinion suggests that in battling for survival firms may use only "honestly industrial" practices. This hoary notion, taken from Learned Hand's opinion in *United States v. Aluminum Co. of America,* 148 F.2d 416, 419 (2d Cir.1945), has not survived. See *Olympia,* 797 F.2d at 375 (collecting cases). If there will be but one survivor, the better to be quick about getting there. E.g., *Pacific Engineering & Production Co. v. Kerr-McGee Corp.,* 551 F.2d 790, 795–96 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977) (once it is clear that the market is a natural monopoly, a court should allow the use of pricing that would otherwise be condemned as "predatory"). See also, e.g., *Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 542–46 (9th Cir.1983), *cert. denied,* 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984) (a monopolist need not make essential technology available to a would-be competitor and need not articulate a good reason for withholding the technology).

There is, of course, another possibility: that a market with two firms is not a natural monopoly. The only way to tell whether a market is a natural monopoly is to see whether two firms can survive in it. Judges cannot readily compute cost functions. As a result, they ought not to abrogate antitrust rules just because one party cries "natural monopoly." In *Union Leader* the market had two newspapers, and it is a good idea to use antitrust to protect that market structure, which aids consumers. Maybe the market could sustain competition over the long haul. This was also a possibility in *Omega;* the excluded competitor wanted to use a technology that required less wiring, and two technologies may coexist (or the excluded technology may prove to be superior). Application of the antitrust laws will let the customers choose. Here, however, there was and is only one pro basketball team; there was no rivalry to preserve for consumers' benefit.

The cases I have examined, and the rest of the essential facility cases, fall into one of two categories: use of antitrust to preserve horizontal competition at a level other than the bottleneck (*Otter Tail* and *Hecht*) or the use of antitrust to preserve competition for the market (*Omega* and *Union Leader*). In each category, consumers' interests are at stake. Here they are not. It is as if Rich and CPSC had blocking patents. CPSC could buy from Rich without offering its patent to IBI, although that would "exclude" IBI and make CPSC's acquisition inevitable. So here; the essential facility doctrine is irrelevant.

My colleagues respond to this treatment of *Otter Tail* and the other essential facility cases that the opinions did not themselves draw the distinctions I have emphasized. True enough, but not important. A study of the majority opinion for four Justices in *Otter Tail* will not reveal the Court's reason; it gave only a result. As my brethren emphasize, the majority did not reply to the dissent.[3] It did not offer

---

2. Whether it would work is an open question. See Richard Schmalensee, *The Control of Natural Monopolies* 68–73 (1979); Oliver E. Williamson, *Franchise Bidding for Natural Monopolies— In General and with Respect to CATV,* 7 Bell J.Econ. 73 (1976).

3. The majority writes as if I were making the dissent's points in *Otter Tail,* so that the majority's failure to respond somehow refutes me. The dissenting Justices were arguing that Otter Tail should not be held liable. I am trying to find out why Otter Tail *was* held liable. My

any reason other than to say that Otter Tail had reduced competition. But, as subsequent cases—*BMI, NCAA, GTE Sylvania, Monsanto, Hyde,* and many others—demonstrate, a simple "reduction in competition" is not now enough to support liability. To rely on *Otter Tail* my colleagues must be able to tease a reason out of a silent opinion. To decide what that 4–3 decision means today, after 15 years of intervening cases have emphasized the importance of demonstrating injury to consumers, we must go behind the surface and find out what was really at stake. What was at stake was a reduction in horizontal competition among generators of power. Having discovered this, we ought not impute to the four Justices in *Otter Tail* an unarticulated rationale that requires us to disregard subsequent developments in antitrust law.

As for *Union Leader* and the other appellate cases, I am as guilty of trying to rationalize them as I am of rationalizing *Otter Tail.* But I had supposed that this is one of a judge's principal jobs. The *holdings* of decisions are more important than their language, especially for decisions such as *Union Leader.* When that case was decided in 1960, the premises being articulated by the Supreme Court were different from those in use today. "Opinion about the offense of monopolization has undergone an evolution." *Olympia,* 797 F.2d at 375. I have discussed (at 573) several of the cases that washed away the foundations of the rhetoric in *Union Leader.* The majority does not explain why it leans on an appellate decision from 1960 at the expense of developments in the Supreme Court and other courts, including ours, that affect the rationale (although not the holding) of *Union Leader.*

For what it is worth, I doubt that the Stadium was an essential facility in 1972. All of the essential facility cases involve natural monopolies. The least-cost way to serve all demand was with a single stadium (*Hecht*) or transmission grid (*Otter Tail, Mishawaka,* and *Omega*). If the antitrust approach supplies a coherent reason. That the majority in *Otter Tail* did not offer a reason for

laws allowed the owner of the facility to turn away users, there would be an incentive to wasteful duplication. Monopoly profits serve as a lure; the result would be inefficient. See *Hecht,* 570 F.2d at 992. Antitrust law does not relieve each would-be competitor of the need to build its own production facilities, if the market will support more than one. *MCI Communications Corp. v. AT & T,* 708 F.2d 1081, 1132–33 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). The high cost of a facility does not make it "essential". MCI built its own interstate phone lines at a cost of billions. We recently held that an entrant into the business of selling communications terminals had to hire its own sales force; it could not insist that an existing firm lend a hand. *Olympia,* 797 F.2d at 376–80, and the opinion denying rehearing, 802 F.2d 217 (1986). And if John DeLorean wants to get back into the business of building aluminum cars with gull-wing doors, he will have to build his own plant, even though that is time-consuming and expensive. See *Reisner v. General Motors Corp.,* 671 F.2d 91 (2d Cir.), *cert. denied,* 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982).

We know that the market for large indoor arenas in Chicago is not a natural monopoly. The Rosemont Horizon, built after 1972, is packed with basketball and hockey games (including college and high school), concerts, circuses, rodeos, ice shows, tennis tournaments, track meets, indoor soccer, and other events. Fishman could have built the Horizon or contracted to be its prime tenant. The majority's observation (maj. op. at 540) that $19 million is a lot of money, more than the initial cost of the Bulls (though certainly not more than the ongoing cost of running the Bulls) is irrelevant; a new arena would have had more tenants than the Bulls. The observation is like saying that if DeLorean wants to build only 1,000 cars a year, it is "uneconomic" to build a new plant, and therefore General Motors must build DeLorean's cars for him. Antitrust law requires nothing of the sort. A stadium is the place in

its own decision hardly shows that I am wrong.

which sporting contests are "manufactured." A would-be manufacturer cannot hire a crew of employees (the team) and demand that someone else supply the plant. The Chicago Symphony owns its auditorium, as new airlines buy or lease their own planes (for a lot more than $19 million). The building of new arenas and stadia to attract teams is common. Often the building is put up by a third party to lure a professional team as the anchor tenant; the owner makes money from other events as well. The New Jersey Giants and the Foxboro Patriots are testimony to the willingness to build; perhaps the Addison White Sox will join the list one day.

Too, in 1972 the Stadium was in competition with the International Amphitheatre. The Amphitheatre was IBI's first choice. That is where the Bulls played until forced (by the burning of McCormick Place) to move to the Stadium. Fishman testified that he thought the Amphitheatre "as good a place or better" than the Stadium. Fishman leased the Amphitheatre without asking the Stadium for terms. Had CPSC crawled into a hole as soon as IBI and Rich signed the contract, IBI would have acquired the Bulls and played the 1972–73 season at the Amphitheatre. The Stadium *became* "essential" only after CPSC convinced six or seven owners of NBA teams, a minority, that the Stadium was preferable. According to the district court, the Stadium became "essential" as soon as a blocking minority within the NBA insisted on it. CPSC's strategy backfired; their lobbying to get the team—lawful lobbying, my colleagues say—turned the Stadium into an essential facility. This is not an economic definition of "essential"; it does not even show that the Stadium was preferable (a majority of the NBA's owners voted to take IBI and the Amphitheatre). This is a political rather than an economic definition, which undermines the court's own holding that lobbying to a league is permissible.

## IV

The majority concludes that there is a per se violation of § 1 as well as a violation of § 2. If the conduct really is illegal per se, the court's discussion about market power and anticompetitive consequences becomes a sidelight, for a per se theory dispenses with such things. On a per se approach, a whole category of conduct—here, failure to help one's rival—becomes illegal. The § 1 claim in the district court was based on a conspiracy among NBA owners, as well as a conspiracy between CPSC and the NBA. The court today holds that the NBA's acts were lawful. That should doom the § 1 theory.

My colleagues say that the failure to lease the Stadium is a per se violation because "there was no arguable procompetitive justification" (maj. op. 541) for the failure to lease the Stadium. The defendants did not articulate a justification, but Part I of this opinion establishes one. This justification is more than "arguable"; it has the unanimous support of scholars. My colleagues' position amounts to saying that whenever a plaintiff brings an antitrust suit, defendants who cannot justify their conduct automatically lose. Quite the contrary, the plaintiff has the burden of showing that the conduct is harmful. In the event of equipoise the defendant wins. The per se rule, in contrast, is reserved for activities that "always or almost always tend to restrict competition *and decrease output*", *BMI v. CBS*, 441 U.S. at 19–20, 99 S.Ct. at 1562 (emphasis added). The defendant's neglect to establish efficiencies in a *given* case does not show that the *category* of conduct meets the standard for per se illegality. In two recent cases the Court has declined to apply the per se label to horizontal boycotts. *FTC v. Indiana Federation of Dentists*, —— U.S. ——, 106 S.Ct. 2009, 2017–18, 90 L.Ed.2d 445 (1986); *Northwest Wholesale Stationers, supra.* There is a much better argument that horizontal boycotts "restrict competition and decrease output" than that the acts in this case do so.

The per se holding in this case is a throwback to the *Pick-Barth* doctrine. See *Albert Pick-Barth Co. v. Mitchell Woodbury Co.*, 57 F.2d 96 (1st Cir.), *cert. denied*, 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932).

For many years business torts were treated as unlawful per se on the majority's rationale: they are "anticompetitive", and there is no "arguable procompetitive justification" for them. If a firm blew up its rival's plant, or rigged the bidding so that buyers stopped purchasing its rival's goods, or got a trade group to deem the rival's product "unsafe", a court would treat this as illegal per se. More than a decade ago the First Circuit, which decided *Pick-Barth*, abandoned the per se treatment. *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547 (1st Cir.1974). We have done likewise, holding in *Havoco*, 626 F.2d at 554–56, and in *Juneau Square Corp. v. First Wisconsin National Bank*, 624 F.2d 798, 812–13 (7th Cir.), *cert. denied*, 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980), that per se analysis is inappropriate when the nature of the claim is "unfair competition". The majority has restored *Pick-Barth* as the rule of this circuit without so much as a sidelong glance at the experience that has led *every* other court of appeals to abandon per se treatment of "unfair competition" and related business torts. E.g., *Northwest Power Products, Inc. v. Omark Industries, Inc.*, 576 F.2d 83 (5th Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979).

The majority's implicit answer is that ours is a "conspiracy" to commit a business tort. It is not clear why the "conspiracy" should change the analysis here any more than in *Indiana Federation of Dentists* and *Northwest Wholesale Stationers*, both of which involved horizontal agreements. My colleagues do not view the agreement among several actors as the reason why the withholding of the lease became anticompetitive; in the majority's view, the acts would be equally anticompetitive if CPSC were the only actor. So the majority's approach amounts to saying that whenever a plurality of actors do something that is evaluated under the Rule of Reason if done by one actor, then per se analysis applies. The court does not cite any case for this proposition, and in light of *Indiana Federation of Dentists, Northwest Wholesale Stationers*, and other re-

cent cases it is untenable. E.g., *Marrese v. American Academy of Orthopaedic Surgeons*, 726 F.2d 1150, 1155 (7th Cir.1984) (en banc), *rev'd on other grounds*, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985), holding that when particular conduct is not unlawful per se, a boycott entailing the same conduct is not unlawful per se either.

There is a further problem, independently dispositive. A § 1 conspiracy requires a plurality of actors. My colleagues conclude that CPSC and the Chicago Stadium Corp. (CSC) are the conspirators. Slip op. 35 n. 19. Yet the substantive theory of liability is that these two are "the same"— that they have a single interest, which is why CSC had to offer the Stadium to IBI. If CPSC and CSC were distinct, there could be no objection to CSC's choice of lessee. This case therefore comes within the principle of *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984), that two corporations in joint control cannot "conspire" for purposes of § 1.

*Copperweld* holds that a firm cannot conspire with its subsidiary. CPSC is not a subsidiary of CSC, but they have common investors and are under common control. *Copperweld* dealt with a wholly-owned subsidiary, but its rationale is that § 1 should be applied only to those agreements that bring formerly independent economic actors into a common plan. 467 U.S. at 768–69, 104 S.Ct. at 2740–41. CPSC and CSC never have been independent economic actors. Our case therefore is governed by *Century Oil Tool, Inc. v. Production Specialties, Inc.*, 737 F.2d 1316 (5th Cir.1984), which applies *Copperweld* to hold that two corporations under common control are not independent actors for purposes of § 1. CPSC and CSC are under common control. They cannot be guilty of "conspiring". See VII Areeda, *Antitrust Law* ¶¶ 1466a, 1467. That the overlap of investment is not complete is irrelevant; "control" is what matters for purposes of *Copperweld*, and my colleagues do not deny that CPSC and CSC have *never* been operated separately. The existence of some people who have invested in one corporation but not the other is

irrelevant, when these investors do not control (or even influence) either corporation. There is therefore no basis under *Copperweld* for a finding of conspiracy.

---

Ultimately this case is about the definition of competition. Does competition mean moment-to-moment rivalry, or is competition instead a process that produces benefits for consumers? See Bork at 58–61. My colleagues fix on competition as rivalry to buy the team, without asking whether this rivalry has anything to do with price and output in an appropriate market. The market the court defines is pro basketball in Chicago; price and output there are unaffected.

My brethren want rivalry to be "fair". CPSC should have taken no for an answer on June 14. Who says that competition is supposed to be fair, that we judge the behavior of the marketplace by the ethics of the courtroom? Real competition is bruising rivalry, in which people go out of business under intense pressure. See *Matsushita*, 106 S.Ct. at 1360, and *Ball*, 784 F.2d at 1338–39. In the words of Joseph Schumpeter, competition is a "gale of creative destruction." Antitrust law properly is suspicious of cooperation among rivals. Today the court holds that antitrust law *requires* cooperation among rivals—friendly, considerate cooperation at that.

Claims that competition should be "fair" are the staples of trade associations, which plead with their members not to harm (meaning, compete against) their fellow businessmen. Everyone has a family to support; let us be peaceful rivals. This is the siren song of the cartel. Real competition is dastardly. "Unfair" competition is still competition, too ruthless for someone's sensibilities. When economic pressure must give way to fair conduct, as the court today holds it must, rivals will trim their sails. Fair competition is tempered competition. To say that conduct is unlawful because it bruised a rival producer—even though it did not hurt and probably helped consumers—is to put the Blue Eagle of the National Recovery Administration on the banner of the Sherman Act. It is to turn antitrust law on its head.

V

The court reverses most of the awards based on state law, and it eliminates punitive damages. I concur with these decisions. What remain are awards of actual damages against the non-NBA defendants under the tort of interference with prospective economic advantage. My colleagues recognize that competition is privileged, which is why low prices are not tortious. But it concludes that a violation of the antitrust laws eliminates the competitive privilege. Thus the violation of the Sherman Act is the basis of the award of damages under state law.

Usually things work the other way 'round. Courts take business torts as the fount of antitrust liability. Here, in contrast, my colleagues conclude that but for the violation of the Sherman Act there would be no tort. I have not found a case in Illinois or any other state that used the Sherman Act as a basis of tort liability. Piggybacking in this fashion serves no purpose. Damages are trebled under the Sherman Act, and the tort award is not cumulative. From one perspective, who cares? From another, why would we expect Illinois law to provide duplicative awards of ⅓ of the federal award?

More, the antitrust violation here is a failure to lease the Stadium to IBI. In Illinois, as in other states, each firm is privileged to refuse to help its rivals. Liability on account of failure to assist a business rival is unheard of, yet that is the foundation of liability here, and it is a bad idea for the reasons explored in *Olympia*, 797 F.2d at 379–80, and the opinion denying rehearing. 802 F.2d 217. It is tortious to blow up a rival's ship on its way to pick up goods, but it is privileged to refuse to charter your boat to a rival in need, even if refusal to charter to your rival means that you can carry the goods yourself at a premium. See *Mogul S.S. Co. v. McGregor, Gow & Co.*, [1892] A.C. 25. Duties to assist would make assets less valuable (you could not use them when they had a special value), and so people would acquire fewer productive assets; duties to assist would lead firms to alter their conduct so as to be unable to assist their rivals (and thus free

578

themselves from a duty), even if the alteration should be inefficient. No Illinois case I have found creates a duty to assist one's rival by renting it an asset—essential or otherwise. See also *Restatement (Second) of Torts* § 766 comment 1; Brown, *The Right to Refuse to Sell*, 25 Yale L.J. 194 (1916); Prosser & Keeton, *The Law of Torts* 1012–13, 1024 (5th ed. 1984). It is problematic to interpret Illinois law as creating a duty of cooperation in the name of antitrust, which usually frowns on cooperation among rivals.

## VI

When an antitrust violation knocks a firm out of a market, its remedy is the profit it lost. E.g., *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124–25, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969). Suggestions that all damages awards be based on the overcharge to consumers, e.g., William M. Landes, *Optimal Sanctions for Antitrust Violations*, 50 U.Chi.L.Rev. 652 (1983), have not yet been adopted. But we must compute what is *lost*—that is, the economic profit IBI could have made but did not because of the violation. Just as a person wrongly fired must take a new job and loses only the difference between the old salary and the new, just as a person aggrieved by a broken contract loses only the amount of the price difference between the contract price and the cover price, so a person excluded from · a market by an antitrust violation loses only the difference in the profits of this opportunity and the next-best business opportunity.

When an antitrust violation forces a going concern out of the market, there are at least three kinds of loss. The entrepreneur loses the opportunity to make the best use of his skills. The firm loses the value of its sunk assets—the difference between the value of the assets to a going business and their value if put to some new employment. The firm also loses the full value of its assets for the time it takes to get into the new line of business. If the calculation is done right, these will sum up to the lost profit the firm experiences. There may be

other losses, such as the lost opportunity to earn monopoly profits, but these are not compensable. See *Brunswick v. Pueblo* and *Local Beauty v. LaMaur.*

A firm that is prevented from purchasing productive assets has none of the usual losses. The entrepreneur can go on to other things. If these are equally remunerative, he loses nothing. The district court found that Fishman made more money running a real estate business than he would have made as president of the Bulls. He therefore suffered no loss and did not appeal on this score. IBI had neither sunk assets nor a period in which assets stood idle.

The most one can say is that IBI lost an opportunity to buy an asset. That imposes loss only if the price of the asset was a bargain. It is a bargain if the discounted expected cash flows from owning the team, after paying all costs, exceed the capital value of $3.3 million in 1972. It should not make any difference whether we look directly for a bargain or compute (and discount) the cash flows; the result is the same, and the process is identical to the one used to generate awards in tort cases. See *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 533–52, 103 S.Ct. 2541, 2548–58, 76 L.Ed.2d 768 (1983); *Nemmers v. United States*, 795 F.2d 628, 633–34 (7th Cir.1986); *O'Shea v. Riverway Towing Co.*, 677 F.2d 1194, 1199–1201 (7th Cir.1982). The majority agrees with me (maj. op. 552) that capital loss and lost profits usually are the same. The capital value is the value of the profit stream. That equation is the basis of the majority's election to look at the profit stream, the better to compensate IBI for actual loss by reference to actual experience.

The problem is that IBI isn't an ordinary entrant. In most frustrated-entry cases, the putative entrant planned to buy some widely-sold items at their market price and go into business. A would-be maker of widgets rents a plant, buys the parts, hires labor, and sets to work. IBI, however, did not plan to make or build a basketball team. It wanted to buy an existing team. To buy, IBI had to compensate Rich for the expected profits Rich was giving up. Un-

less the Bulls were underpriced (the owner was not selling the team for the value of the profits), IBI suffered no loss *even if the Bulls were highly profitable.*

Rich put the Bulls up for bid. He attracted three bids around $3.3 million. The value of a thing is what people will pay for it. There is no hint that IBI viewed the Bulls as a bargain at $3.3 million. If IBI could have turned around and sold the Bulls in 1972 for $5 million, then its damages would have been $1.7 million, tripled, plus interest (see Part VII below). But there was no visible bargain element, no reason why Rich would have sold the team for less than it was worth. This was not an "unusually successful investment" (maj. op. at 553). The surprise is that the team fetched $3.3 million. If the Stadium was *really* an essential facility, then it had the power to extract all the profits in the market by charging a monopoly rent, leaving the owner of the Bulls with little or nothing. A legal monopolist may charge what the traffic will bear. *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 294 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); cf. *Los Angeles Memorial Coliseum Commission v. NFL,* 791 F.2d 1356, 1366–75 (9th Cir. 1986). This element of value therefore belonged to the Stadium all along. (Of course, the fact that the Bulls had a substantial capital value may indicate that the Stadium was not a bottleneck.) The best guess is that the Bulls were worth what the bidders were offering. Fishman and IBI therefore lost no bargain element, no unique opportunity, in 1972, and they have no damages.[4]

My brethren reply that recoveries ought to be based on actual rather than hypothetical calculations (maj. op. at 552). Now actual calculations are much better than hypothetical ones, but a calculation based on actual bids is an actual number. Bids on the table establish the value of a lost business opportunity. As in condemnation cases proof of

offers by willing buyers trumps calculations based on cash flows, cf. *In re Chicago, M. St.P. & P. R.R.,* 799 F.2d 317, 324 (7th Cir.1986), so here actual bids should trump cash flow computations. The cash flow computations are larded with estimates and hypothetical calculations, inevitably so. IBI's cost of capital, and the opportunity cost of IBI's and CPSC's capital, are unknowns. We cannot know them because, among other things, CPSC lent money to itself. Changing the estimates by even a few percentage points will double or wipe out the damages. Computations of value based on cash flows are notoriously malleable; we have mocked them because of their imprecision. E.g., *Metlyn Realty Corp. v. Esmark, Inc.,* 763 F.2d 826, 834–36 (7th Cir.1985); cf. *Olympia,* 797 F.2d at 382–83. The majority ultimately is "forced to hypothesize" (maj. op. at 558) IBI's cost of capital, on which most of its recovery depends. All the more reason to compute damages based on actual bids—they are the only real numbers, lost profits being judicial reconstructions.

The award of lost profits here is based on the proposition that CPSC's gain is IBI's loss. All the "profits" refer to CPSC's operating results. There would be an identity of gain and loss if CPSC's costs of doing business were computed accurately and subtracted from the cash flows, and if all elements of value attributable to CPSC's efforts were stripped from the computation. They have not been, however, and there lies the difference in the valuations produced by the two processes. There are several principal sources of differences.

1. Suppose the whole NBA did better than people expected in 1972. Then the owner of the Bulls would realize profits; the price of $3.3 million would turn out to be a bargain. There is some evidence of this in the prices of comparable franchises, which increased through the decade of the 1970s. This, however, is a gain to CPSC

---

**4.** Part of the value of a team is publicity for the owner and tax advantages for the investors. Part of the $3.3 million price compensated Rich for surrendering these benefits of ownership. The district court said that it was awarding Fishman and IBI nothing for the lost publicity and tax benefits. The implication is that the value of the *profit stream* expected from the Bulls was less than $3.3 million. The price was therefore not a bargain; it was a premium.

not matched by a loss to IBI, which could have purchased one of these franchises and participated in the upturn. This is related to cover in a contract case. One who is disappointed by a failure of his seller to deliver must cover if he wants to participate in the market. See UCC §§ 2–711(1)(a), 2–712, 2–713. He cannot sit on the sidelines, hoping that if the price rises he will get damages, and if the price falls he will avoid a loss.[5] To get the market reward for risk-taking, he must take risk. His damages are limited to the difference between the contract and market prices, whether he covers or not. IBI's proof that other comparable franchises were sold shows that it could have covered. It is not entitled to any element of value created by a general rise in the market for pro basketball teams. (Of course, if the other opportunities are not comparable, IBI could not have covered, but the sales of other teams should not have been used as benchmarks to compute IBI's damages, either.)

2. Suppose the Bulls did better than the rest of the league. In that event we must determine why. If the difference is random, or caused by factors peculiar to Chicago, then CPSC's gain does match IBI's loss. But if the abnormal team-specific gain came from entrepreneurial efforts of CPSC, then there is no match. IBI might not have produced these gains. CPSC, its owners and employees are entitled to compensation for their efforts; this includes compensation for extraordinary entrepreneurial gains, just as it includes hourly wages for floor sweepers. CPSC is entitled to keep any gains of this sort (although there do not appear to be any).

3. Suppose the Bulls appeared profitable because of bookkeeping transfers. Because CPSC and the Stadium were under common control, the Stadium had no incentive to drive hard bargains for rental. It made no difference whether the money appeared on CPSC's books or the Stadium's. (This is not quite right because the owner-ship of the two differed somewhat, but the principle holds nonetheless.) A lower rent means higher "profits" for the Bulls. But again CPSC's gain is not IBI's loss. If IBI had owned the team, the Stadium would have bargained with it at arms' length. CPSC or the Stadium is entitled to keep any "profit" that appeared on CPSC's books because of a rent lower than the maximum the Stadium could have negotiated.

4. Suppose the accounting profit on the Bulls' books includes items that are real costs of doing business—costs IBI also would have borne. This is what the "opportunity cost" and interest rate calculations are about. Capital must be hired, just like labor or any other input. It may be hired on the market (borrowed) or hired out of other uses the investors have (diverted). If CPSC had hired capital at 15% interest from a bank, the interest would have been an explicit cost of doing business. So if in 1975 CPSC had $10 million of a bank's money in use, it would have paid $1.5 million in return. This would have been subtracted from its income before a computation of profits.

What actually happened is that CPSC's investors supplied most of the money. They want to pay themselves for this money at the rate lenders charged for risky, arms' length investments. This is how "opportunity cost" has been used—the amount of the Bulls' income that is assigned as the "cost of capital" and subtracted from profits. If the investors had $10 million in the Bulls in 1975, they say, they are entitled to 15 or 20% return. The district court, on the other hand, allowed them only the rate of interest the United States was paying on Treasury Bills at the time. This risk-free rate was much lower than the rate paid to investors in high-risk businesses. So to keep the figures simple, in 1975 the district court allowed only $500,000 as the cost of capital, while CPSC says the allowance should have been $1.5 million. The differ-

---

5. There is a related problem of selection bias. Plaintiffs sue only when the price rises. If defendants must pay the full value when the price goes up, but swallow their losses when the price falls, then on average they expect to pay *more* than their gains: sometimes they pay plaintiffs, sometimes they pay through business losses. Then defendants as a group are penalized more than their expected profits from the violation; there is too much deterrence.

ence between the risky rate of interest and the safe, T–Bill rate accounts for more than the entire award of lost profits in this case.

The district court's choice of rate was mistaken. The rate allowed to CPSC's investors should be almost the same rate that a bank would have charged to CPSC. Any supplier of capital is entitled to compensation, and the Bulls' full cost of capital must appear in the damages calculations as a subtraction.

If CPSC had hired all of its capital from banks or outside investors, the rate would have been very high. CPSC suggests a rate of prime plus 3%, which seems favorable to the plaintiffs. Sports teams are risky ventures. Part of their value lies in publicity for the owners and tax advantages. These elements of value cannot be used to secure the loan, so the outside investors must charge a higher rate to compensate. Banks might accept lower rates if the investors guarantee the loan with their other assets (as investors in both groups did), but the guarantee has opportunity costs of its own because assets used to secure this loan cannot be used to finance some other venture. Because the use of personal assets creates an opportunity cost that offsets the reduction in the rate of interest, the correct rate is the one the bank will charge without personal guarantees.[6] This will turn out to be high, reflecting the risk of sports, the illiquidity of the assets, and the personal consumption value of ownership. The opportunity cost incurred by the owners in holding their own capital in the business is less than the rate a bank would have charged for a loan, because the owners get the recognition and tax benefits. But risk alone will make the opportunity cost high. The upshot of even a moderate opportunity cost for CPSC's capital, as the district court recognized, is no or low damages. The award of dam-

ages in this case is an artifact of the district court's assumption that the opportunity cost of CPSC's capital was the rate available on T–Bills, a riskless investment. It is a fantastic assumption. It has nothing to do with business reality or the economics of determining profits. The court properly reverses the use of the T–Bill rate, and although I think prime plus one-half percent is too low, it is a great improvement.

To put this somewhat differently, CPSC's owners supplied a service, much as labor is a service: risk-bearing. They are entitled to be paid for this service, which means that the value of the risk-bearing must be subtracted from CPSC's accounting profits. Gains resulting from defendants' efforts always are subtracted in computing lost profits. *Siebel v. Scott*, 725 F.2d 995, 1002 (5th Cir.), *cert. denied*, 467 U.S. 1242, 104 S.Ct. 3515, 82 L.Ed.2d 823 (1984); *Janigan v. Taylor*, 344 F.2d 781, 787 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). If CPSC had been a regulated utility under a profit constraint, it would have been allowed to subtract the market, risky rate of capital as an opportunity cost to determine whether it was making a profit. E.g., *Illinois Commerce Commission v. ICC*, 776 F.2d 355, 362–64 (D.C.Cir.1985) (Scalia, J.); *City of Charlottesville v. FERC*, 774 F.2d 1205, 1213–23 (D.C.Cir.1985) (Scalia, J.), *cert. denied*, —— U.S. ——, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986). This shows why opportunity cost here, too, goes into the computation of profit. It is not properly an item of "mitigation"—an analogy that has led my brethren to look at IBI's opportunities rather than CPSC's true costs.

Had IBI owned the Bulls, it would have supplied the risk-bearing service for itself. It did not, and it did not lose anything as a result. Payment for bearing risk is not a profit of any sort. It is simply a cost of

---

**6.** To put this a little differently, banks lent to CPSC, with guarantees, for prime plus one-half percent because if CPSC had gone belly up the guarantees would have made the banks whole. If CPSC had failed no one was going to make its

investors whole; their risk (and the appropriate rate of interest) was therefore the same as the banks would have demanded without the guarantees.

doing business. Players' salaries were subtracted from the Bulls' income to get its profits; the implicit expense of risk-bearing also must be subtracted. IBI was of course free to bear risk if it wanted. It could have bought another pro sports team, or gone into another (risky) line of business. Then it could have reaped any rewards from bearing risk, but it didn't.

My colleagues say that the district court on remand should "err on the side of conservatism" (maj. op. 559) because it is not appropriate to demand that IBI take substantial risks to mitigate its damages. This is where the choice between capital as a cost to CPSC and as an opportunity for IBI to reinvest has its bite. I agree with my colleagues that *if* this is a problem in "mitigation" the district court should be conservative. A disappointed bidder need not mitigate by taking risks greater than those it had planned to take if it purchased the assets. But it is not a problem in mitigation. We are simply trying to calculate CPSC's true "profits," net of its full costs of doing business. IBI gets the profits, trebled. The opportunity cost is a real cost. It is the largest difference between CPSC's gain and IBI's loss.

To sum up: The right way to compute damages is to determine the bargain element, if there was one, of which IBI was deprived in 1972. There was none, so there should be no damages. If damages are to be computed from discounting cash flows, however, the calculation of the flows should use as the cost the interest CPSC would have paid, without guarantees, for all of its capital.[7] Realistic cost computations also should allow CPSC to retain any elements of value that IBI could have duplicated (such as value attributable to a general increase in the popularity of NBA basketball).

## VII

The principle that we should compute damages to take account of the opportunity cost of money cuts both ways. It helps CPSC by requiring the use of a risky rate. It helps IBI by requiring the award of prejudgment interest. IBI was injured in 1972 (if we use a capitalization method) or throughout 1972–82 (if we use the district court's method of computing profits lost year by year). In either event, a dollar paid in 1986 does not make up for a dollar lost in 1972 or 1982. "In the typical case an award of prejudgment interest is necessary to ensure that the [victim] is placed in as good a position as he would have been in" had the defendant complied with the law. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983) (holding that there is a presumption in favor of prejudgment interest under the patent laws). Interest "merely serves to make the [victim] whole, since his damages consist not only of the value of the [profits lost] but also of the forgone use of the money". 461 U.S. at 656, 103 S.Ct. at 2062. See also *Waite v. United States*, 282 U.S. 508, 509, 51 S.Ct. 227, 227, 75 L.Ed. 494 (1931) (presumption in favor of prejudgment interest in patent law); *Jacobs v. United States*, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142 (1933) (prejudgment interest is an essential ingredient of "just compensation" under the fifth amendment because necessary to make the private party whole). Cases in this circuit after *Devex* regularly award prejudgment interest when the statute in question is silent. E.g., *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1425–27 (7th Cir. 1986) (employment discrimination under 42 U.S.C. § 1981); *City of Chicago v. Department of Labor*, 753 F.2d 606, 608 (7th Cir.1985) (violations of 29 U.S.C. § 801).

---

7. The majority observes that by 1975 CPSC's lenders released the guarantees. But by 1975 CPSC's investors had a great deal of equity in the venture. This equity was the debt investors' "cushion", enabling them to charge lower rates. (Releasing a guarantee is one way to lower the rate.) CPSC's cost of capital includes the cost of *all* of its capital, debt and equity alike, just as a utility's cost of capital looks at all sources of capital. "Opportunity cost" refers to the implicit cost of the *equity* investment in CPSC. That cost always exceeds the price the banks charged for their safer debt investments. (The interest actually paid to banks is subtracted as an actual expense of the corporation and plays no role in the opportunity cost adjustment.)

Prejudgment interest or some other method of compensating for the time value of money also is a staple ingredient in the computation of attorneys' fees, see *In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 588–89 (3d Cir.1984), unless the sovereign immunity of the government gets in the way, see *Library of Congress v. Shaw*, — U.S. —, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986).

Sixteen years ago we analyzed the problem as follows: "Interest is not enumerated as a recoverable item in the statute, 15 U.S.C. § 15. Recovery of it is therefore precluded." *Locklin v. Day-Glo Color Corp.*, 429 F.2d 873, 877 (7th Cir.1970), *cert. denied*, 400 U.S. 1020, 91 S.Ct. 584, 27 L.Ed.2d 632 (1971). That is the whole analysis. *Devex* changes things—particularly its reference to cases such as *Waite* and *Jacobs* that permit or require the award of interest. We should overrule *Locklin* and adopt a presumption in favor of interest as the standard in this circuit.

The majority's principal response relies on an amendment to the Clayton Act effective for cases filed after September 12, 1980. Section 4(a), 15 U.S.C. § 15(a), now provides that a district court should award interest on actual damages when the award is "just in the circumstances" and lists three things that the judge must consider to decide whether an award is "just". This case was filed in 1974, so the statute does not apply. I appreciate my colleagues' point that we could not sensibly award interest exceeding that allowed under § 4(a). Congress decided to withhold interest on amounts exceeding actual damages, interest that accrued before the complaint was filed, and interest that is not "just in the circumstances" (as defined by the criteria listed in the statute). A court construing a silent statute ought not read into the law a rule of decision that Congress has rejected. We therefore cannot accept IBI's argument that it is entitled to interest on the whole sum from the beginning.

Section 4(a) does not preclude an award on actual damages starting in 1974, however, or on treble damages starting in 1982, when the district court made its decision on the merits. My colleagues' reading of the 1980 amendment as *forbidding* an award of interest in cases filed before September 12, 1980, has no support. Certainly some members of Congress assumed that interest was unavailable; that assumption reflects an accurate reading of existing cases and is one reason why Congress passed a statute to provide for interest. Legislators' assumptions about the meaning of antitrust law do not govern, however. An assumption by one Congress about the work of an earlier Congress is not the same as law. So *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), construed § 4 of the Clayton Act as not authorizing recoveries by indirect purchasers, despite the concession (*id.* at 733 n. 14) that only the year before, when passing the parens patriae amendments to the Clayton Act, Congress had assumed that indirect purchasers may recover. Why is Congress' assumption in 1980 about the meaning of § 4 binding on us, when its assumption in 1976 about the meaning of the same statute is not?

We should bring the law for pre–1980 cases into line with the rule that applies to cases filed later. All but one of the cases denying interest in antitrust actions predate this legislation, *Devex*, or both. The exception is *Affiliated Capital Corp. v. City of Houston*, 793 F.2d 706 (5th Cir. 1986) (en banc), which did not cite *Devex* or the 1980 amendment. *Affiliated Capital* also adopted a rule that the district and appellate courts have discretion to grant or deny interest from the date a judgment should have been entered. See also *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1299–1300 (9th Cir.1984). *Locklin* does not even allow discretion.

Neither a count of judicial noses nor the observation that the Sherman Act was silent should obscure the fact that the time value of money works in defendants' favor. Antitrust cases can be long-lived affairs. This one has lasted 14 years, 2½ of which passed between the finding of liability and the award of damages. During all of the time, the defendants held the stakes and earned interest. If IBI had owned the

Bulls, it would have possessed (and invested) the profits.[8] To deny prejudgment interest is to allow the defendants to profit from their wrong, and because 14 years is a long time the profit may be substantial.

Is this small beer, to be made up by the trebling of the damages? Hardly. Any erosion of the trebling on account of a denial of interest undermines the deterrent force of the antitrust law. Trebling makes up for the fact that antitrust violations are hard to detect and prove. The acts of the defendants were easy to detect, but the court's rule presumably applies in a cartel case as well. These may be detected only belatedly, and the denial of interest will make trebling much less useful in increasing the damages defendants expect to pay. The expected damages are the deterrent. Today's decision reduces that deterrent. Suppose IBI was denied a "bargain" in 1972 worth, say, $1 million in the discounted present value of the flow of profits. The damages should be $1 million (or on the majority's view, the profit flow worth $1 million when discounted to 1972 dollars, which is the same thing). One million dollars invested at 10% rate of return in 1972 would be worth $3.8 million in 1986—more than $1 million trebled. If the cost of capital in the stock market is 15%, a plausible figure meaning that money invested (with dividends reinvested) grows at this rate, than $1 million in hand in 1972 would grow to $7.08 million in 1986. The trebling keeps pace with interest only when the rate is 8.16% per annum or less. (For example, at a rate of 5% the million grows to $1.98 million in 1986 and is exceeded by the $3 million trebled damages.) To turn this around, if the rate of return on investment is 10%, an award of a dollar today gives the plaintiffs only 26.3% of the damages they actually suffered; a trebled award gives them only 79% of their actual damages.

Of course, the way the district court computed damages, some were suffered as late as 1982. The effects of compound interest are less spectacular when the injury is so recent. But 10% compound interest for four years is substantial nonetheless. A million lost in 1982 would be worth $1.46 million in 1986, and if the rate is 15% (more realistic for available investments, considering that regulated utilities are allowed more than 10%) it would be worth $1.75 million. The denial of prejudgment interest systematically undercompensates victims and underdeters putative offenders. We should allow, indeed require, such awards.

## VIII

I concur in the following portions of the opinion and the judgment: Part I.B (defining the, or at least a, market as professional basketball in Chicago); Part I.E (holding that the NBA's rejection of IBI, and the lobbying that produced the rejection, did not violate the antitrust laws); Part I.F (to the extent it holds that the defendants did not commit the tort of interference with contractual relations and that the NBA defendants did not commit the tort of interference with prospective economic advantage); Part II.C.2 (to the extent it holds that the district court must recompute damages using a more appropriate measure of opportunity cost, although I do not entirely agree with the majority's preferred measure); Part II.D (reversing the award of punitive damages under state law); Part II.E (holding the Estate of Arthur Wirtz liable for any treble damages appropriately awarded); and Part II.F.2 (affirming the district court's denial of equitable relief). I remain dubitante about the finding of tort liability based on interference with prospective economic advantage. I dissent from the remainder of the decision. I would hold that the defendants did not violate the Sherman Act; that if they did, IBI has not established that it lost any profits; and that if IBI has shown lost profits, it is entitled to interest on its actual damages from the filing of the complaint to 1982, and to interest on the whole award from 1982 to date.

---

**8.** A plaintiff is effectively investing his antitrust damages with the defendant, so the right rate of interest is the one defendant pays to banks for its own capital. This rate compensates for the possibility of nonpayment plus the value of de-

lay. The risk may be less than the risk of a single venture, because the defendants are diversified, so the rate appropriately would be somewhat less than the opportunity cost of CPSC's money.

The court has produced two long opinions, but for all that it is a simple case. Antitrust law is designed to enhance the welfare of consumers and the efficiency of the economy as a whole. It requires rigorous competition. Today the court uses antitrust to protect the welfare of a competit-*or* at the potential expense of consumers. Instead of requiring rigorous competition, the court wants "fair" (meaning tempered) competition. This case should have been resolved with the simple principle at the beginning of this opinion: unless the plaintiff can make out a plausible case of consumers' injury, actual or potential, now or tomorrow, there is no antitrust problem. Ours is a business tort in antitrust clothing. *Copperweld* told us to kick out of federal court "private state tort suits masquerading as antitrust actions." 467 U.S. at 777, 104 S.Ct. at 2745. The majority holds that there is not even a business tort, at least not one independent of the antitrust violation. The lack of any claim of injury to consumers enabled us to dispose of this case in a jiffy. I regret that we took a long road to the wrong destination.

### ORDER

The parties have advised us that they have settled this case and they jointly move for an order "vacating the appeal and cross-appeal" and remanding for the entry of orders effectuating their settlement. To the extent that the parties might be asking us to vacate our opinion of November 21, 1987, *supra* p. 520, we decline to do so. Vacation of prior orders is appropriate when mootness bars the opportunity for complete review, *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950), but a case does not become moot because parties voluntarily abandon their rights to further review.

In all other respects, the joint motion is granted. The petition for rehearing is DISMISSED, and this case is REMANDED to the district court for implementation of the settlement including dismissal of these lawsuits if appropriate. Each side shall bear its own costs in this court. The mandate shall issue seven days from the date hereof.